**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

———————————————————————x

In re                          :

CALIFORNIA RESOURCES CORPORATION,  :
*et al.*,[1]                       :

                  Debtors.   :

———————————————————————x

:  Chapter 11

:  Case No. 20-33568 (DRJ)

:  Joint Administration Pending

**DECLARATION OF MARK RAJCEVICH IN SUPPORT OF DEBTORS'
CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Mark Rajcevich, hereby declare under penalty of perjury:

1.      I am a Managing Director at Alvarez & Marsal North America, LLC ("A&M").  A&M was engaged in March 2020 to be the restructuring advisor for California Resources Corporation ("CRC") and certain of its affiliated debtors and debtors-in-possession (collectively, the "Debtors").

2.      I have approximately 20 years of experience in advising companies in distressed and bankruptcy-related situations.  I have advised both public and private companies across various industries, including E&P (oil and gas), manufacturing, automotive, homebuilding, real estate development, retail and print and financial services.  I have advised

---

[1]    The Debtors in these chapter 11 cases and the last four digits of their U.S. taxpayer identification numbers are:  California Resources Corporation (0947); California Heavy Oil, Inc. (4630); California Resources Coles Levee, L.P. (2995); California Resources Coles Levee, LLC (2087); California Resources Elk Hills, LLC (7310); California Resources Long Beach, Inc. (6046); California Resources Mineral Holdings LLC (4443); California Resources Petroleum Corporation (9218); California Resources Production Corporation (5342); California Resources Production Mineral Holdings, LLC (9071); California Resources Real Estate Ventures, LLC (6931); California Resources Royalty Holdings, LLC (6393); California Resources Tidelands, Inc. (0192); California Resources Wilmington, LLC (0263); CRC Construction Services, LLC (7030); CRC Marketing, Inc. (0941); CRC Services, LLC (6989); Monument Production, Inc. (0782); Oso Verde Farms, LLC (7436); Socal Holding, LLC (3524); Southern San Joaquin Production, Inc. (4423); Thums Long Beach Company (1774); Tidelands Oil Production Company LLC (5764).  The Debtors' corporate headquarters is located at 27200 Tourney Road, Suite 200, Santa Clarita, CA 91355.

companies with regard to the assessment and preparation of financial and operational restructuring strategies, cash flow forecasts, business plans and related financial projections, and assisted companies in preparing for and operating throughout the chapter 11 process.  Prior to joining A&M in 2006, I worked for four years in FTI Consulting's restructuring practice and for two years in PricewaterhouseCoopers' Business Recovery Services practice.  I hold a bachelor's degree (with high honors) in Finance from the University of Illinois.

3.     I am generally familiar with the Debtors' day-to-day operations, business and financial affairs and books and records.  I submit this declaration (the "Declaration") to assist the Court and parties-in-interest in understanding the circumstances that resulted in the commencement of these chapter 11 cases and in support of:  (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") filed on the date hereof (the "Petition Date") and (b) the emergency relief that the Debtors have requested from the Court pursuant to the motions and applications described herein (collectively, the "First Day Pleadings").

4.     In March 2020, the Debtors retained A&M as restructuring advisor to assist in the process of preparing for a potential chapter 11 filing.  Since A&M's retention, I have overseen the team of A&M professionals that has been helping the Debtors complete cash forecasting and related analyses, compile the diligence necessary to draft the First Day Pleadings and otherwise prepare for these chapter 11 cases.  A description of the relief requested in and the facts supporting each of the First Day Pleadings is set forth below.

5.     Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information obtained from the Debtors' management team and advisors, including the A&M team working under my supervision, my review of relevant

-2-

documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives or my opinions based upon my experience and knowledge.  If called as a witness, I would testify competently to the statements set forth in this Declaration.

## I.      Relief Sought in the Debtors' First Day Pleadings

A.      <u>Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Debtors' Chapter 11 Cases and (II) Granting Related Relief (the "Joint Administration Motion").</u>

6.      Pursuant to the Joint Administration Motion, the Debtors request entry of an order authorizing joint administration of the Debtors' chapter 11 cases.  Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest, because it will remove the need to prepare, file, and serve duplicative notices, motions, applications and orders.

7.      I understand that many of the motions, hearings and orders in these chapter 11 cases will affect each and every Debtor entity.  For example, virtually all of the relief sought by the Debtors in the First Day Motions is sought on behalf of all of the Debtors.  The entry of an order directing joint administration of these chapter 11 cases will thus reduce fees and costs by avoiding duplicative filings and objections.  Joint administration of these chapter 11 cases for procedural purposes only under a single docket will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding instead of numerous independent chapter 11 cases.  Joint administration would also simplify the supervision and administrative duties of the Office of the United States Trustee for the Southern District of Texas (the "<u>U.S. Trustee</u>"), as well as spare other parties-in-interest from having to spend unnecessary time and effort to review duplicative proceedings.

SC1:5217056.18

8.      For these reasons, the relief requested in the Joint Administration Motion is in the best interests of the Debtors, their creditors and all other parties-in-interest.

B.      <u>Debtors' Emergency Motion for an Order (I) Extending the Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Current Income and Expenditures, (C) Schedules of Executory Contracts and Unexpired Leases, (D) Statements of Financial Affairs, and (E) Rule 2015.3 Financial Reports; (II) Waiving the Requirement to File a List of Equity Security Holders; and (III) Granting Related Relief (the "Schedules Extension Motion").</u>

9.      By the Schedules Extension Motion, the Debtors seek entry of an order (a) extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases and statements of financial affairs (collectively, the "<u>Schedules and Statements</u>") for an additional 45 days, (b) extending the deadline by which the Debtors must file financial information reports under Bankruptcy Rule 2015.3(a) (the "<u>2015.3 Reports</u>") to the later of: (i) 45 days after the Petition Date or (ii) 15 days after the date of the meeting of creditors pursuant to section 341 of the Bankruptcy Code; and (c) waiving the requirement to file a list of, and provide notice directly to, Debtor CRC's equity security holders.

10.      The Debtors have a substantial number of creditors and parties-in-interest; to prepare the Schedules and Statements, the Debtors will have to compile information from books, records and documents relating to hundreds of claims, assets and contracts from each Debtor entity, representing a significant expenditure of time and effort.  Thus, requiring the Debtors to file the Schedules and Statements during the first 14 days of these chapter 11 cases would distract the Debtors' management and advisors from focusing on ensuring a smooth transition into these chapter 11 cases.  Additionally, because numerous invoices related to prepetition goods and services have not yet been received and entered into the Debtors' accounting system, it may be some time before the Debtors have access to all of the information

-4-

required to prepare the Schedules and Statements.  I understand that the Schedules and Statements will be filed well in advance of the proof of claim bar date, and thus I believe any prejudice to creditors and other parties-in-interest to be minimal.

11.     Further, I am advised that several of the Debtors hold interests in certain non-Debtor subsidiaries that fall under the requirements of Bankruptcy Rule 2015.3, and thus are required to file 2015.3 Reports.  Based on the size and complexity of the Debtors' businesses and the substantial burdens imposed by complying with Bankruptcy Rule 2015.3 in the early days of these chapter 11 cases, it is my belief that cause exists to extend the deadline to file the initial 2015.3 Reports.

12.     Additionally, I am advised that the Debtors must file a list of their equity security holders pursuant to Bankruptcy Rule 1007(a)(3).  I believe this requirement should be waived as to Debtor CRC in these chapter 11 cases.  Debtor CRC is a publicly traded company and its common stock was historically listed on the New York Stock Exchange under the ticker symbol "CRC," with over 49.453 million shares outstanding and an average trading volume over the past three months of approximately 3.67 million shares per day.  I understand that while CRC generally maintains a list of registered holders of its common stock, it does not maintain a list of purchasers of beneficial ownership of common stock in market transactions.  Therefore, preparing a complete list of all current equity security holders with accurate names and addresses would not be possible without engaging in an expensive and time-consuming endeavor, with little benefit to the Debtors' estates and creditors.

13.     I understand that the Debtors will file a list of significant holders of their outstanding common stock, and that the Debtors intend to cause notices to be served on registered holders of CRC's common stock.  Additionally, I understand that the Debtors will

-5-

notify CRC's equity security holders of the filing of these chapter 11 cases through the filing of a current report on Form 8-K with the Securities and Exchange Commission.  This Form 8-K will also provide information to equity security holders regarding how they can obtain free copies of pleadings and other information.  I believe these alternative measures are adequate to inform CRC's equity security holders of the commencement of these chapter 11 cases.

14.     For these reasons, I believe that the relief requested in the Schedules Extension Motion should be approved.

C.     <u>Debtors' Emergency Motion for an Order (I) Authorizing the Debtors to File Consolidated Creditor Lists, (II) Authorizing the Debtors to Redact Personal Identification Information for Individual Creditors, (III) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and (IV) Granting Related Relief (the "Creditor Matrix Motion")</u>.

15.     Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order (a) authorizing, but not directing, the Debtors to file (i) a consolidated list of creditors (the "<u>Creditor Matrix</u>") in lieu of submitting a separate matrix for each Debtor and (ii) a consolidated list of the Debtors' top 30 creditors (the "<u>Top 30 List</u>"), (b) authorizing, but not directing, the Debtors to redact the portions of (i) the Creditor Matrix containing the home addresses of individual parties-in-interest and (ii) the Top 30 List containing the names and employee compensation related claim amounts of individual employees (the "<u>Employee Compensation Information</u>"); and (c) approving the form and manner of notifying creditors of commencement of these chapter 11 cases.

16.     The preparation of separate creditor lists for each Debtor would be expensive, time consuming and administratively burdensome.  Because a large number of creditors may be shared by the various Debtors, the Debtors believe that a single, consolidated list of the Debtors' 30 largest unsecured, non-insider creditors will aid communication with these creditors, while avoiding administrative burdens, costs and the possibility of duplicative service.

17.     Additionally, public disclosure of personal information of individual parties-in-interest would put such parties, including the Debtors' employees, directors, officers, royalty owners, vendors and equity security holders, at risk of identity theft or other injury.  I also understand that, because certain of the Debtors' creditors are located in countries in the European Union, the Debtors must comply with the European Union General Data Protection Regulation, which I am advised applies to all European Union member countries and imposes significant restraints on the disclosure of "personally identifiable information."

18.     Further, the Employee Compensation Information is of a sensitive, confidential and proprietary nature to the Debtors and, thus, is confidential commercial information.  The Debtors do not make this information generally available to the public, and the Debtors believe disclosure of such information could materially injure their ability to maintain a stable workforce.  I am advised that the protection of such information is necessary to prevent competitors from using the information to recruit away the Debtors' employees or otherwise compete against the Debtors.  Such protection is also needed to preserve morale for members of the Debtors' workforce who may see such information and compare it to their own compensation.  Moreover, the Debtors' employees have some expectation of privacy with respect to such information.

19.     The Debtors also propose to cause to be served the notice of commencement, substantially in the form attached as Exhibit B to the Creditor Matrix Motion, to all parties entitled to notice of commencement of these chapter 11 cases to advise them of the section 341 meeting of creditors.  I believe that service of the notice of commencement on the Creditor Matrix will not only prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous Creditor

Matrix, but also preserve judicial resources and prevent creditor confusion through the efficient service of critical information.

20.     For these reasons, I believe that the relief requested in the Creditor Matrix Motion should be granted.

D.     Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, Debtors to (A) Continue Their Existing Cash Management System, (B) Honor Certain Related Obligations, (C) Maintain Existing Bank Accounts and (D) Continue to Perform Intercompany Transactions and (II) Granting Related Relief (the "Cash Management Motion").

21.     By the Cash Management Motion, the Debtors request authority, but not direction, to (a) continue their existing cash management system, (b) honor certain related obligations, (c) maintain existing bank accounts and utilize existing check stock and (d) continue to perform intercompany transactions.

22.     I understand that the Debtors use a cash management system in the ordinary course of their business to collect, transfer and disburse funds generated from their operations. The Debtors' cash management system is overseen by the Debtors' treasury department and is broadly comparable to the centralized cash management systems used by other companies similar to the Debtors. The Debtors' cash management system comprises 13 bank accounts at JPMorgan Chase Bank, N.A. ("JPM") and a lockbox account at Bank of America, N.A. As of the Petition Date, the Debtors have approximately $20 million of cash on hand.

23.     As more fully described in the Cash Management Motion, I understand that borrowings from the Debtors' prepetition revolving credit facility and capital raises are deposited into Debtor CRC's account at JPM (account number x9673) (the "General Account"). Funds from the General Account are used to pay debt servicing costs and interest rate hedging. Funds from the General Account are also transferred to the Debtors' main consolidation and distribution account at JPM (account number x0099) (the "Consolidation Account"), managed by

-8-

Debtor CRC Services, LLC ("CRC Services").  In addition to financing proceeds, sales receipts

are deposited, either directly or through the Debtors' operating account at JPM (account number

x1115), to the Consolidation Account.  Funds from the Consolidation Account are then

distributed to the Debtors' other accounts.  These accounts include the Debtors' services

accounts, marketing accounts, payroll account and certain other accounts.

24.     In connection with the maintenance of the Debtors' bank accounts and in

the ordinary course of business, the banks charge certain service charges and other fees, costs

and expenses (the "Bank Fees").  The Bank Fees for the Debtors collectively average

approximately $9,500 per month.

25.     In the ordinary course of business, the Debtors also make monthly

payments on their corporate cards, purchasing cards and fuel cards.  The Debtors monitor the

expenses charged to the credit cards to ensure compliance with company policies.  As of the

Petition Date, I understand that there are no amounts incurred under the corporate cards or under

the purchasing cards, and approximately $150,000 incurred under the fuel cards (collectively, the

"Credit Card Obligations").

26.     Additionally, I understand that the Debtors maintain routine business

relationships with each other and with their non-Debtor affiliates that result in intercompany

receivables and payables owing between one Debtor entity and another Debtor entity or non-

Debtor affiliate (the "Intercompany Claims").  These intercompany transactions occur as part of

the daily operation of the Debtors' cash management system, and, at any given time, there are

intercompany claims owing between Debtors or between a Debtor and a non-Debtor affiliate

arising in connection with the receipt and disbursement of funds.  The Debtors monitor and

record fund transfers in their accounting system and can determine, trace and account for

intercompany transactions.  Additionally, I understand that the intercompany transactions with non-Debtor affiliates are *de minimis*, representing no more than $2,000 per annum per Debtor and limited to state and local taxes.  I have been informed that the Debtors believe that all such amounts for 2020 have been paid, and the Debtors do not anticipate making these payments on behalf of the non-Debtor affiliates until March 2021.

27.     The Debtors' cash management system allows the Debtors to centrally manage all of their cash flow needs and includes necessary accounting controls that enable the Debtors to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable.  I believe that continued use of the cash management system will facilitate the Debtors' transition into chapter 11 by, among other things, avoiding administrative inefficiencies and expenses associated with disrupting this system and minimizing delays in the payment of postpetition obligations.  Further, payment of the prepetition Bank Fees and Credit Card Obligations is essential to the Debtors' uninterrupted operation and any disruption of such payments as they become due would impair the Debtors' ability to smoothly transition in these chapter 11 cases.  It is also my belief that the intercompany claims are critical to the Debtors' operations and cash management system.  The Debtors rely on the intercompany transactions to fund business operations, provide administrative, management and support services and fund essential capital expenditures.  Given the scale of the Debtors' operations, the Debtors would be unduly burdened both financially and logistically if they were required to halt intercompany transactions or otherwise make material changes.

28.     For these reasons, I believe that the relief requested in the Cash Management Motion is in the best interest of the Debtors, their creditors and all other parties-in-interest.

E.     <u>Debtors' Emergency Motion for an Order (I) Authorizing, But Not Directing, the Debtors to Continue Their Insurance Program and Pay Prepetition Obligations Relating Thereto, (II) Modifying the Automatic Stay to Permit Debtors' Employees to Proceed with Workers' Compensation Claims, (III) Authorizing Financial Institutions to Honor Related Payment Requests and (IV) Granting Related Relief (the "Insurance Motion")</u>.

29.     By the Insurance Motion, the Debtors seek (a) authority, but not direction, to continue their Insurance Program and pay prepetition obligations relating thereto, including brokerage fees arising thereunder or in connection therewith, and to revise, extend, supplement or change insurance coverage as needed and (b) a modification of the automatic stay to permit the Debtors' employees to proceed with Workers' Compensation Claims.

30.     I understand that in the ordinary course of their businesses, the Debtors maintain an insurance program (the "Insurance Program") that provides coverage for the Debtors' operations.  The Insurance Program includes coverage for, among other things, physical damage, pollution and environmental spill risk, officers or directors (including group excess liability coverage for the Debtors' executives), the Debtors' development and production facilities and various other property-related and general liabilities (collectively, the "Insurance Policies").  As part of the Insurance Program, the Debtors also maintain a workers' compensation insurance program (the "Workers' Compensation Insurance" and claims under such policy, the "Workers' Compensation Claims").

31.     Premiums with respect to the insurance policies (the "Insurance Premiums") are determined annually and are paid either annually or bi-annually.  The Debtors pay all Insurance Premiums to the insurance carriers through the brokers.  The Debtors' aggregate annual Insurance Premiums total approximately $15.7 million.  As of the Petition Date, I understand that the Debtors do not believe that they owe any prepetition amounts on account of the Insurance Premiums.  I understand that the insurance premiums may be adjusted

-11-

as a result of audits, loss assessments and operating cost adjustments (the "Insurance Policy Audits"). I have been informed that the Insurance Policy Audits for certain prepetition Insurance Premiums may not conclude until after the Petition Date, and thus the aggregate amount of the Debtors' obligations arising from the Insurance Policy Audits is unknown at this time.

32. I understand that as part of the Insurance Program, the Debtors may be required to pay various deductibles or retention amounts, depending upon the type of claim and insurance policy involved. Under certain insurance policies, the Debtors' third party claims administrator, Gallagher Basset Services, Inc., may pay claimants and then invoice the Debtors or draw funds directly from the Debtors' bank accounts for reimbursement for claims paid. I have been informed that as of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of such reimbursements of claims. I also understand that the Debtors' Insurance Program is managed through their brokers, Aon PLC and Willis Towers Watson PLC, who assist the Debtors in determining the appropriate types and amounts of insurance coverage for their businesses and assets and then negotiate with insurance companies on the Debtors' behalf to procure the policies. Insurance premiums are also paid to the brokers who then remit such payment to the insurance carriers. As of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of any brokerage fees.

33. I believe that the Insurance Program is essential to the preservation of the value of the Debtors' businesses, properties and assets, and their ability to successfully reorganize in these chapter 11 cases. Failure to pay Insurance Premiums or any other amounts related to the Insurance Program may significantly harm the Debtors' estates. Given the number of regulatory and contractual requirements imposed on the Debtors to maintain specific amounts and types of insurance, the termination of existing insurance policies could create uncertainty as

-12-

to the Debtors' ability to continue operating their business.  Additionally, any disruption to the

Debtors' Insurance Program or any material change in the terms thereof would place additional

risk on the Debtors and other parties who benefit from the Insurance Program.  The untimely

termination of existing insurance policies would also require the Debtors to commit significant

resources to obtain replacement policies, which could result in less favorable coverage or terms

from insurers.  Further, in the event any of the insurance policies lapse or new coverage is

required or necessary, it is imperative that the Debtors be able to renew, supplement, purchase or

enter into new insurance coverage on a postpetition basis in the ordinary course of business.

34.     Additionally, I believe that the allowance of Workers' Compensation

Claims is necessary for the Debtors to preserve the value of their estate.  I believe that staying

the Workers' Compensation Claims could cause employees to depart or otherwise harm

employee morale, which could severely disrupt the Debtors' business and prevent a successful

reorganization.

35.     For these reasons, I believe that the relief requested in the Insurance

Motion should be granted.

F.     Debtors' Emergency Motion for Entry of an Order (I) Authorizing, But Not
       Directing, the Debtors to Continue Their Surety Bond Program and Pay Prepetition
       Obligations Relating Thereto, (II) Authorizing Financial Institutions to Honor
       Related Payment Requests and (III) Granting Related Relief (the "Surety Motion").

36.     Through the Surety Motion, the Debtors request authority, but not

direction, to continue their Surety Bond Program, to pay prepetition obligations relating thereto

and to renew, acquire additional bonding capacity and execute other agreements in connection

therewith.

37.     In the ordinary course of business, the Debtors are required to provide

surety bonds to local, state and federal governmental or other public agencies and third parties, to

secure the Debtors' payment or performance of certain obligations (the "Surety Bond Program"). I have been informed that, as of the Petition Date, the Debtors' Surety Bond Program includes approximately 100 surety bonds in the aggregate amount of approximately $87.4 million.

38.     The Debtors' surety bonds were issued by Arch Insurance Company and Sompo International Insurance (together, the "Surety Bond Carriers"). The Debtors pay approximately $485,000 annually in premiums on account of the Surety Bond Program. The Debtors believe that all material premiums in connection with the Surety Bond Program that were due and payable on or prior to the Petition Date have been fully paid. Additionally, the Debtors' Surety Bond Program is managed through their surety bond broker, who assists the Debtors in obtaining comprehensive surety bond coverage for their operations in the most cost-effective manner, negotiating the terms, provisions and premiums, and providing ongoing support throughout the applicable bonding periods. This broker collects fees for services rendered in addition to or as part of the premiums paid on the relevant surety bonds (the "Brokerage Fees"). As of the Petition Date, the Debtors do not believe that they owe any prepetition amounts on account of the Brokerage Fees.

39.     In addition to paying premiums to the Surety Bond Carriers, as part of the Surety Bond Program, the Debtors have also issued letters of credit (the "LCs") and entered into indemnity agreements (the "Indemnity Agreements") in favor of the Surety Bond Carriers. If the Surety Bond Carriers sustain a loss on a surety bond, they are entitled to recover the full amount from the Debtors. The Surety Bond Carriers can draw on the LCs in accordance with the terms thereof or seek a recovery from the Debtors pursuant to the terms of the applicable Indemnity Agreement.

40.     I believe that the continuation of the Surety Bond Program is necessary for

-14-

the Debtors to preserve the resources and going-concern values of their estates.  In order to continue business operations during the reorganization process, the Debtors must be able to continue to provide financial assurance and, therefore, must maintain their existing Surety Bond Program, including satisfying any obligations thereunder, renewing or acquiring additional bonding capacity in the ordinary course of their businesses and executing other agreements, as needed, in connection with the Surety Bond Program.  It is my belief that failure to provide, maintain or timely replace their surety bonds will prevent the Debtors from undertaking essential functions related to their operations.

41.    I also believe that the Surety Bond Program is essential to the preservation of the value of the Debtors' businesses, properties and assets, and their ability to successfully reorganize in these chapter 11 cases.  Payment of expenses in connection with the Surety Bond Program is similarly critical to the Debtors' uninterrupted operations.  It is my belief that the Debtors' failure to provide, maintain or timely replace the surety bonds may jeopardize the Debtors' ability to conduct their operations.

42.    For these reasons, I believe that the relief requested in the Surety Motion should be granted.

G.    <u>Debtors' Emergency Motion for an Order (I) Authorizing, But Not Directing, the Debtors to Pay Certain Prepetition Taxes and Assessments, (II) Authorizing Financial Institutions to Honor Related Payment Requests and (III) Granting Related Relief ("Taxes Motion")</u>.

43.    Pursuant to the Taxes Motion, the Debtors seek authority, but not direction, to pay prepetition taxes that the Debtors anticipate will become due and owing during the chapter 11 cases.  In the ordinary course of business, the Debtors incur certain taxes and fees relating to their operations.  These include, but are not limited to, ad valorem taxes, excise taxes, income and franchise taxes, withholding taxes, production taxes, sales and use taxes, greenhouse

-15-

gas taxes, and other business licenses and permitting fees that are payable directly to federal, state and local authorities (the "Taxing Authorities").

44.     It is my understanding that the Debtors believe they are current on all of their taxes that have become due as of the Petition Date, other than with respect to certain ad valorem property taxes.  With respect to these ad valorem taxes, the Debtors are required to pay real property taxes semi-annually on April 10 and December 10 each year.  It is my understanding that, in light of the market conditions and in an effort to preserve liquidity, on April 10, 2020, the Debtors paid approximately $7.0 million of the due and owing $39.9 million real property taxes.  The Debtors intend to request a waiver of penalties and interest from certain of the Taxing Authorities along with payment of the outstanding $32.9 million real property taxes.  If authorized, the Debtors intend to pay these outstanding amounts, which may include interest and penalties, in the coming months.

45.     The Debtors estimate that approximately $81,985,000 in taxes were due and payable as of the Petition Date or will become due and payable in the ordinary course after the Petition Date:

| Category | Description | Estimated Prepetition Amount |
|---|---|---|
| Ad Valorem | The Debtors are required to pay ad valorem taxes on real and personal property.  Secured real property taxes are paid semi-annually on April 10 and December 10 each year.  The Debtors are also periodically invoiced for supplemental assessments related to real property which are paid in two installments with payment dates determined based on the assessor's invoice date.  Personal property taxes are paid annually on August 1. | $42,000,000 |
| Excise | The Debtors are required to pay excise taxes for various items, including but not limited to a utility user taxes and taxes on foreign insurance premiums and sales of gasoline blendstocks.  These taxes are remitted within 30 days | $35,000 |

SC1:5217056.18

| | following the end of each quarter, except for utility user taxes, which are paid monthly. | |
|---|---|---|
| Sales and Use | The Debtors are subject to tax on the purchase or use of tangible personal property, which may include rentals of such property, unless exempt by statute.  The tax is based on the purchase price and varies by city or, in the case of an unincorporated area, by county.  The Debtors generally make monthly prepayments for these taxes. | $1,300,000 |
| Income and Franchise Taxes and Fees | The Debtors are required to pay various income and franchise taxes and business license fees in order to continue conducting their businesses within particular jurisdictions.  The Debtors generally pay these amounts on an annual basis. | $75,000 |
| Withholding | In the ordinary course, the Debtors withhold federal and state income taxes on behalf of service providers and royalty interest holders.  Back-up withholding is required if a service provider or owner has not provided the Debtors with a verifiable tax identification number.  These withheld taxes are remitted directly to either the federal or state taxing authority on either a monthly or quarterly basis. | $175,000 |
| Production | The Debtors incur taxes on extracting natural resources, such as oil and natural gas in place.  The tax is based on production multiplied by a flat rate.  The Debtors pay these taxes on either a quarterly or semi-annual basis. | $14,400,000 |
| Greenhouse Gas | Certain Debtors incur greenhouse gas taxes and fees under California's cap and trade program.  The tax is based on greenhouse gas emissions largely from combustion of fossil fuels.  The Debtors are required to surrender one allowance for each metric ton of carbon dioxide equivalent greenhouse gas emitted.  Taxes are due over a triennial compliance period where allowances equivalent to the total greenhouse gas emissions throughout the compliance period are surrendered.  In the ordinary course of business, certain Debtors purchase and sell the allowances at various times depending on the price of the allowances at auction or in transactions with third parties. | $24,000,000 |

46.     I believe that payment of the prepetition taxes is critical to the Debtors'

uninterrupted operations.  If the Debtors do not pay prepetition taxes, they risk liens and other

penalties from the Taxing Authorities which could reduce the overall value of the Debtors'

estates.  Further, I understand that certain of the Taxing Authorities may attempt to revoke the

Debtors' licenses and permits, assert statutory liens, subject the Debtors to audits or impose

-17-

financial penalties if the Debtors are unable to pay prepetition taxes.  I have also been informed that failure to pay prepetition taxes may subject the Debtors' directors, officers and certain other employees personally liable for such taxes.  I believe that payment of prepetition taxes would thus avoid the loss of focus and morale that would result from the risk of personal liability, and would aid the Debtors' continued, uninterrupted operations through these chapter 11 cases.

47.     For the reasons stated above, I believe that the relief requested in the Taxes Motion should be granted.

H.     <u>Debtors' Emergency Motion for an Order (I) Authorizing, But Not Directing, the Debtors to Pay or Honor Royalty Obligations and Joint-Interest Billings Payments, (II) Authorizing Financial Institutions to Honor Related Payment Requests and (III) Granting Related Relief (the "Royalty Motion")</u>.

48.     By the Royalty Motion, the Debtors seek authority, but not direction, to pay or honor Royalty Obligations and Joint-Interest Billings Payments (each as defined below).

49.     The Debtors are party to a number of oil and gas leases (the "<u>Oil and Gas Leases</u>") pursuant to which they are granted real property interests in the oil, natural gas and certain other minerals under a parcel of property and the exclusive right to explore, drill and produce such minerals from the property, subject to applicable law.  In exchange, the Debtors remit to the lessors of such Oil and Gas Leases and holders of certain other interests, claims or rights to payment, the amounts to which such parties may be entitled under the applicable Oil and Gas Lease or other operative documents, either a share of the production or royalty payments in lieu of a share of production (the "<u>Oil and Gas Lease Royalty Payments</u>").  Oil and Gas Lease Royalty Payments include, among others, advance royalty payments, minimum royalty payments and shut-in royalty payments.

50.     In addition to the Oil and Gas Lease Royalty Payments, the Debtors also (a) are party to agreements pursuant to which the Debtors are obligated to pay counterparties net

profit interests, (b) pay non-participating royalty interests to third parties and (c) pay overriding royalty interests (collectively with Oil and Gas Lease Royalty Payments, the "Royalty Interests") to third parties.

51.      The amount of Royalty Payments the Debtors owe to holders of Royalty Interests in a month is subject to variation due to many factors, including the specific terms of the Royalty Interests, changes in ownership and changes in the amount or type of minerals captured.  The average amount of Royalty Payments the Debtors pay to the holders of Royalty Interests per month is approximately $17.6 million.  The Debtors estimate that, as of the Petition Date, the Debtors have approximately $24 million in accrued but unpaid Royalty Payments owed to holders of Royalty Interests.  Additionally, certain Royalty Payments are held in suspense by the Debtors, either because they have not yet reached the threshold minimum for payment or because they are subject to various disputes or other open commercial issues (the "Suspense Obligations").  As of the Petition Date, the Debtors estimate that they hold approximately $30.3 million in accrued but unpaid Suspense Obligations.

52.      Further, in the case of certain properties (each, a "Joint Operated Property"), the Debtors are co-tenants with other interest owners with respect to the oil and gas to be produced.  Each interest owner in the Joint Operated Property owns a pro rata share of the Joint Operated Property based on the proportion of leased acres such owner contributes to the Joint Operated Property.  The Debtors either explore, drill and produce oil directly as an operator of a Joint Operated Property or participate in a Joint Operated Property as a non-operating working interest owner with a third-party operator (each, an "Operator").  The Operator, whether the Debtors or a third party, explores, drills and extracts oil and gas on behalf of itself and any other interest owners in the underlying oil and gas in the applicable Joint Operated Property.

-19-

53.     The Debtors are party to joint operating agreements, pooling agreements, unitization agreements or similar agreements or administrative orders (collectively, the "JOAs"). Pursuant to the JOAs, (a) when the Debtors participate as a non-operating working interest owner, in certain instances, the Debtors receive their share of revenue, or receive payment in kind, from the Operators and reimburse the Operators for the Debtors' share of the costs attributable to the JOA (such costs, the "Joint-Interest Billings Payments") and (b) when the Debtors are the Operator, the Debtors distribute to the owners of working and certain other interests in the JOA (collectively, the "Non-Op Working Interests") their share of revenue and net of all applicable deductions for such Non-Op Working Interests' share of costs attributable to the JOA (the "Non-Op Working Interest Payments" and together with the Royalty Payments and the Suspense Obligations, the "Royalty Obligations").

54.     The amount of Joint-Interest Billings Payments and Non-Op Working Interest Payments that the Debtors owe in a given month is not predictable on a month-to-month basis, due to factors similar to those which affect the monthly amount of Royalty Payments.  As of the Petition Date, the Debtors estimate that they hold approximately $8.1 million which has been accrued on account of Non-Op Working Interests prepetition and that they owe approximately $9.7 million on account of Joint-Interest Billings Payments accrued prepetition.

55.     It is my view that payment of the Royalty Obligations and Joint-Interest Billings Payments is critical to the Debtors' uninterrupted operations.  I have been informed that failure to pay the Royalty Obligations or Joint-Interest Billings Payments when due could result in contractual or statutory liens being asserted against the Debtors' Oil and Gas Leases, notwithstanding the automatic stay.  The time and cost attendant to multiple liens being perfected

-20-

on the Debtors' assets could significantly disrupt the Debtors' businesses and chapter 11 process, which could cost the Debtors' estates a substantial amount in lost revenue.

56.     Additionally, I have been informed that, to the extent the Debtors hold proceeds belonging to holders of Royalty Interests and Non-Op Working Interests, the Debtors likely do not hold legal title to such proceeds.  Thus, payments owed to holders of Royalty Interests and Non-Op Working Interests likely are not property of the estate and it is unclear whether the automatic stay would prevent any action to obtain possession or control of such payments.  Therefore, failure to grant the relief requested in the Royalty Motion could subject the Debtors to unnecessary litigation by holders of Royalty Interests and Non-Op Working Interests.  Additionally, because the Royalty Obligations are not funds that are property of the estates, it is my understanding that the Debtors believe no creditors are prejudiced by the relief sought in the Royalty Motion.

57.     For these reasons, I believe the relief requested in the Royalty Motion should be granted.

I.     <u>Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, the Debtors to Pay Certain Prepetition Claims of Certain Vendors, (II) Authorizing Financial Institutions to Honor Related Payment Requests and (III) Granting Related Relief (the "Lienholder Motion").</u>

58.     By the Lienholder Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to pay certain prepetition claims of certain vendors, service providers, shippers, contractors, specialty suppliers, mechanics, laborers and technical engineers that supply goods and repair, maintain, equip, transport or otherwise service necessary equipment and machinery (the "<u>Vendors</u>"), in an interim amount not to exceed $75.6 million.

59.     The Debtors operate the majority of their fee interests and oil and gas leases, and are, as operators, responsible for paying all of the operating expenses required for the

production of the wells (the "Operating Expenses") on account of their working interests in the oil and gas wells and on behalf of the non-operating working interest owners.  The Debtors then, pursuant to the terms of joint operating agreements, seek reimbursement from non-operating working interest owners for their pro rata share of the Operating Expenses.  Regardless of when an operator is reimbursed by non-operating working interest owners, however, the Debtors, in their capacity as operator, must continue to pay the Operating Expenses in a timely fashion.

60.     The Operating Expenses are largely comprised of goods and services which the Debtors purchase, in the ordinary course of business, from Vendors (the "Operating Vendors"), including Vendors that are sole source or limited source suppliers.  The Operating Vendors provide unique materials or services, services needed for compliance with certain laws and regulations, or provide a material economic or operational advantage when compared to other available vendors.  Without the Operating Vendors, the Debtors' business operations would be significantly impaired.

61.     As is typical in the industry, the Operating Expenses are not uniform and are not entirely predictable on a month-to-month basis.  In the six months preceding the Petition Date, the Debtors paid an approximately $491.8 million in Operating Expenses.  As of the Petition Date, the Debtors estimate that they have approximately $104 million of Operating Expenses outstanding, of which approximately $61 million will become due within the first 30 days of these chapter 11 cases.

62.     To effectively market or sell production from oil and gas properties operated by the Debtors, the Debtors, as operator, enter into contractual arrangements (the "Marketing Arrangements") pursuant to which third parties (the "Marketing Counterparties") charge the Debtors for gathering, transportation, treating, dehydration, compression, processing,

fractionation and other similar services necessary or desirable to ensure that such properties'

production is in a condition ready for sale (such charges, collectively, the "Marketing

Expenses").  In addition, in instances where the Debtors are not the operator, the Debtors incur

Marketing Expenses where they elect to take their production "in-kind" rather than requesting

the third-party operator to market the Debtors' non-operating working interests' production on

the Debtors' behalf.  In the six months preceding the Petition Date, the Debtors paid

approximately $45.1 million in Marketing Expenses.  As of the Petition Date, the Debtors

estimate that they have approximately $13.4 million of prepetition Marketing Expenses

outstanding, all of which will become due within the first 30 days of these chapter 11 cases.

63.     In the ordinary course of business, the Debtors also acquire new oil and

gas leases to maintain and develop their asset base, either by purchasing new oil and gas leases

or by engaging in land swaps, whereby the Debtors exchange oil and gas leases with neighboring

lessees (each such acquisition a "Land Acquisition").  The Debtors rely on a number of

contractors (the "Land Acquisition Vendors") to effectuate these Land Acquisitions and to

ensure the Debtors' compliance with certain obligations thereunder.  The Land Acquisition

Vendors assist with the acquisition of mineral rights, conduct lease availability checks and

undertake title research to facilitate the continued development of the Debtors' business.  In the

ordinary course, the Land Acquisition Vendors are usually compensated directly by the Debtors

at a per diem rate for their time and efforts.

64.     After the Land Acquisitions are complete, the Debtors also must satisfy

certain obligations to maintain their property rights, including, among others, payments related to

abandonment and remediation operations, lease renewal and lease amendments, easement and

right of way agreements, license agreements, surface leases, agricultural leases and lot line

adjustments.  The Debtors estimate that, as of the Petition Date, they owe approximately $2.3

million, of which approximately $1.2 million will become due within the first 30 days of these

chapter 11 cases, on account of expenses related to Land Acquisitions and related maintenance

obligations (the "Land Expenses" and together with the Operating Expenses and the Marketing

Expenses, the "Vendor Claims").

65.      It is my view that payment of the Vendor Claims is critical to the Debtors'

uninterrupted operations.  I have been informed that failure to make the Vendor Claims when

due could result in the Debtors' removal as operator under certain joint operating agreements and

the assertion of  liens against the Debtors' property under applicable lien statutes.  These liens

may be perfected notwithstanding the automatic stay, which could significantly disrupt the

Debtors' businesses and chapter 11 process and cost the Debtors' estates a substantial amount in

lost revenue.  Failure to pay the Vendor Claims may also lead to certain vendors refusing to

provide future goods and services.  Replacement vendors, even where available, would, in

certain circumstances, likely result in substantially higher costs for the Debtors and severe

disruption of the Debtors' operations.  Moreover, replacement vendors may lack knowledge of

the Debtors' operations or fail to match the Debtors' high performance standards, thereby

placing the safety of the Debtors' employees, contractors and the reputation of the Debtors'

businesses at risk.

66.      Additionally, I understand that the Debtors' compliance with the

Marketing Arrangements and timely payment of the Marketing Expenses are critical to the

Debtors' ability to receive revenue from production that they market both on behalf of

themselves and third parties (the "Marketed Production").  The Marketing Counterparties

typically have possession and, at times, title to the Marketed Production.  If the Debtors do not

-24-

pay Marketing Expenses when due, the Marketing Counterparties may refuse to release Marketed Production or revenues associated with the Marketed Production in their possession or refuse to accept delivery of additional Marketed Production.

67.     Furthermore, I have been informed that in instances where delivery of Marketed Production is refused, the Debtors may be forced to shut-in a well or entire fields. Shutting in a well or entire fields may have economic consequences to the Debtors beyond temporary cessation of production and lost revenue, including the impossibility of re-establishing production or the triggering of obligations to other interest owners, including potential forfeiture of the Debtors' interest under the terms of the oil and gas lease.  Failure to comply with the Marketing Arrangements thus has the potential to severely impair the Debtors' revenue stream, their ability to make timely payments to third parties holding interests in production and their ability to operate their business.

68.     For these reasons, I believe the relief requested in the Lienholder Motion should be granted.

J.      <u>Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, the Debtors to Pay Certain Prepetition Compensation Obligations, (II) Authorizing, But Not Directing, the Debtors to Pay Postpetition Compensation Obligations in the Ordinary Course of Business and (III) Granting Related Relief (the "Wages Motion").</u>

69.     Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to (i) pay certain prepetition Compensation Obligations (as defined below) and (ii) continue to honor the Compensation Obligations on a postpetition basis as and to the extent set forth in the Wages Motion, (b) authorizing applicable banks and other financial institutions to honor and process related checks and transfers and (c) granting related relief.

70.     The Debtors employ a total of 1,224 employees, who perform services from California and Texas; 678 of the Debtors' employees are salaried and 546 are paid on an hourly basis.  Each of the Debtors' employees receives his or her compensation, including wages and benefits from the Debtors.  The Debtors also from time to time rely on the services of independent contractors, consultants and temporary employees whose services are procured from staffing agencies (collectively, "Third Party Staffing Employees").  The Debtors currently retain approximately 100 Third Party Staffing Employees in the aggregate, although the number fluctuates based on the Debtors' specific needs at any given time.

71.     The Debtors pay and incur a number of obligations in compensating their workforce.  These obligations include wages, deductions and payroll taxes, employee health and welfare benefits, retirement plans, incentive compensation, severance, non-insider retention and other benefits in the ordinary course of business (collectively, the "Employee Compensation"). The Debtors are party to a collective bargaining agreement with the United Steel, Paper and Forestry, Rubber Manufacturing, Energy, Allied Industrial and Service Workers International Union (the "Tidelands CBA") that represents approximately 65 of the Debtors' employees and provides certain benefits, including overtime pay and severance benefits.  The Debtors also compensate their Third Party Staffing Employees and non-employee directors for service to the Debtors in the ordinary course of business (such compensation obligations, collectively with the Employee Compensation, the "Compensation Obligations").  The Debtors estimate that they owe an aggregate of approximately $20.3 million on account of accrued and unpaid Compensation Obligations as of the Petition Date.

72.     In the ordinary course of business, the Debtors provide severance benefits to eligible employees not covered by a collective bargaining agreement that experience a

qualifying termination of employment through the Notice and Severance Pay Plan.   Employees

that are covered by the Tidelands CBA are eligible for severance benefits under the Tidelands

CBA.

        73.     The Compensation Obligations and interim and final relief requested by

the Wages Motion are summarized in the following table, as described in more detail in the

Wages Motion:

| Compensation Obligations | Interim Relief Requested | Final Relief Requested |
|---|---|---|
| Wages | $3,300,000 | $— |
| Withholding Obligations | $1,104,000 | $— |
| Health and Welfare Benefits | $3,512,550 | $— |
| Retirement Plans | | |
|     Qualified Retirement Plans | $335,000 | $5,835,000 |
|     Non-Qualified Compensation Plans | $15,000 | $— |
| Incentive Compensation | $17,250 | $107,426 |
| Severance Obligations | | |
|     Insider Severance | $— | $— |
|     Non-Insider Severance | $— | $4,500,000 |
| Non-Insider Retention Awards | $— | $643,800 |
| Supplemental Benefits | $187,955 | $— |
| Third Party Staffing Employees Compensation | $670,000 | $— |
| Director Compensation | $— | $42,000 |

The Compensation Obligations are the primary source of income for many of the Debtors'

employees, who rely on timely and uninterrupted payment of their wages and other benefits from

the Debtors to sustain the health and well-being of themselves and their families.   Some of the

health and welfare benefits made available to employees include medical, dental and vision

insurance, prescription drug benefits, life insurance, accidental death and dismemberment

insurance, and short-term and long-term disability insurance.   Many of the employees are highly

trained personnel who are not easily replaced, particularly in the California marketplace, and the

Debtors' failure to timely pay and provide compensation and benefits in the ordinary course may

SC1:5217056.18

result in such employees seeking alternative employment. The Debtors have already experienced attrition in critical positions, even during this time of economic uncertainty, and accordingly, continuing to pay compensation and benefits to the Debtors' workforce in the ordinary course is particularly critical. Additionally, the Debtors' employees, Third Party Staffing Employees and non-employee directors have skills and a knowledge of the Debtors' infrastructure that are critical to the Debtors' daily operations.

74.     For these reasons, I believe the authority to continue paying severance benefits and to honor existing and outstanding retention awards to non-insider employees is important to employee morale. Failing to honor employee obligations would result in a loss of confidence by employees in their financial security. A loss of employees in critical positions would require the Debtors to undergo the difficult and expensive process of quickly replacing its highly trained employees. Accordingly, as noted in the table above and discussed below, the Debtors are requesting the authority to pay prepetition accrued and unpaid amounts in respect of severance obligations and to continue to pay severance obligations in the ordinary course of business on a postpetition basis, and to pay outstanding non-insider retention awards granted prior to May 2020 in accordance with their existing terms, in each case as part of final relief only. The Debtors reserve the right to seek authority to pay retention compensation by separate motion.

75.     In the proposed interim order, the Debtors request the authority to (a) pay unpaid prepetition wages and to continue to pay wages in the ordinary course of business, (b) forward or continue to contribute prepetition withholding obligations to the extent that such amounts have not yet been forwarded or contributed, and continue forwarding and contributing postpetition withholding obligations to the appropriate third parties in the ordinary course of

-28-

business, (c) pay all prepetition amounts pursuant to employee benefits obligations and continue

to provide employee benefits in the ordinary course of business, with the exception of non-

qualified compensation plans, incentive compensation, non-insider retention awards and

severance obligations, (d) pay any prepetition amounts owed to third parties in respect of

administrative or processing costs incidental to the payment or provision of the Compensation

Obligations in the ordinary course of business, including in respect of the non-qualified

compensation plans and incentive compensation, and (e) pay any prepetition unpaid

compensation to Third Party Staffing Employees and to continue to pay compensation to Third

Party Staffing Employees in the ordinary course of business; *provided* that, pending entry of the

Final Order, the Debtors shall not honor any prepetition Compensation Obligations that exceed

the priority amounts set forth in section 507(a)(4) and (a)(5) of the Bankruptcy Code for any

individual employee or Third Party Staffing Employee, unless otherwise required by applicable

law.  For the avoidance of doubt, in the proposed interim order, the Debtors do not seek authority

to pay any amounts pursuant to the non-qualified compensation plans, incentive compensation,

non-insider retention awards or any severance, including the severance obligations.  However,

the Debtors reserve their rights to seek approval of such relief at a later time.  In the proposed

interim order, the Debtors also seek the authority, out of the abundance of caution, to remit to

employees any amounts held by the Debtors relating to prepetition deductions from employees'

paychecks under the 2014 Employee Stock Purchase Plan, which was terminated on May 26,

2020.

   76.  In the proposed final order, the Debtors request the authority to (a) pay

and honor any unpaid prepetition amounts related to the Compensation Obligations, with the

exception of severance obligations or any other severance benefits, non-insider retention awards,

incentive compensation and non-qualified compensation plans, including amounts that exceed

the priority amounts set forth in sections 507(a)(4) and (a)(5) of the Bankruptcy Code for any

individual employee, Third Party Staffing Employee or non-employee director and continue in

the ordinary course and/or modify such programs in the Debtors' discretion, (b) pay any unpaid

prepetition amounts pursuant to the severance obligations and continue and honor the severance

obligations and any other severance benefits in the ordinary course of the business; *provided* that

nothing in the Final Order shall be deemed to authorize the payment of any amounts which

violate section 503(c) of the Bankruptcy Code, (c) pay and honor the non-insider retention

awards in accordance with their terms, (d) continue to honor outstanding awards to non-insiders

under the long-term incentive plan consistent with past practice and in accordance with their

terms, (e) pay any unpaid prepetition director compensation and to continue to pay the director

compensation in the ordinary course of business and (f) continue to administer the non-qualified

compensation plans in the ordinary course of business; *provided* that only postpetition deferrals

and credits or contributions, as applicable, will be earned as administrative expenses under the

non-qualified compensation plans; and *provided further* that nothing in the Final Order shall be

deemed to authorize the payment of amounts owed to participants on account of the non-

qualified compensation plans.

77.     For these reasons, I believe that the relief requested in the Wages Motion

should be granted.

K.    Debtors' Emergency Motion for an Order (I) Authorizing, but not Directing, the
        Debtors to (A) Enter into, and Perform Under, Postpetition Hedging Arrangements,
        (B) Assume and Amend, as Necessary, International Swap and Derivatives
        Association, Inc. Master Agreements and the Prepetition Swap Contracts
        Thereunder, (C) Continue Performing Under Prepetition Exchange Agreements and
        (D) Grant Liens and Superpriority Administrative Expense Claims, and (II) Granting
        Related Relief (the "Hedging Motion")

78.     Pursuant to the Hedging Motion, the Debtors seek entry of an order

-30-

authorizing, but not directing, the Debtors, in their sole discretion, to (a) enter into, and perform under, postpetition hedging arrangements, (b) assume, and amend as necessary, certain prepetition International Swap and Derivatives Association, Inc. master agreements ("ISDA") and the prepetition swap contracts thereunder, including entry into the amendment to the ISDA Master Agreement substantially in the form attached to the Hedging Motion as Exhibit B, (c) continue performing under exchange agreements and (d) grant liens and superpriority administrative expense claims.

79.     The Debtors, as an oil and natural gas exploration and production company, are highly dependent on the price of oil and natural gas.  I understand that to protect against fluctuations in the price of oil and natural gas, the Debtors have historically entered into physical and financial derivative contracts ("Hedging Arrangements").  I have been informed that in March 2020, in order to provide for increased liquidity for their operations, the Debtors monetized their prepetition Hedging Arrangements, with the exception of two interest rate swap contracts dated as of May 8, 2018, by and between (a) Debtor California Resources Corporation and Citibank, N.A., MUFG Bank, Ltd., HSBC and DNB, and (b) Debtor CRC Marketing Inc. and Societe Generale (together, the "Prepetition Swap Contracts").

80.     I understand that in order to document the Hedging Arrangements, the Debtors enter into ISDAs with the applicable counterparties.  The ISDAs are standard contracts that govern all derivative contracts entered into between the Debtors and the applicable counterparty, and allow for offsetting of amounts payable or receivable between the Debtors and the counterparties.  As of the Petition Date, the Debtors have nine ISDAs outstanding and wish to assume, and amend as necessary, including entry into the ISDA Amendment, three of these ISDAs (the "First Day ISDAs") with the following counterparties: BP Energy Company, J. Aron

& Company LLC, and Merrill Lynch Commodities, Inc.  These three counterparties are lenders under the Debtors' RBL Facility and the DIP Credit Agreement.

81.     Additionally, in order to clear transactions relating to the procurement of natural gas, CRC Marketing is party to a contracting party agreement and other ancillary agreements related thereto (the "Exchange Agreements") with ICE NGX Canada Inc. (collectively with certain of its affiliates and subsidiaries, "ICE NGX").  ICE NGX is a centralized exchange and clearinghouse that provides electronic trading, central counterparty clearing and data services to natural gas, crude oil and electricity markets in North America. Pursuant to the Exchange Agreements, CRC Marketing purchases and sells natural gas through the NGX Exchange and is obligated to post collateral and other credit support, including letters of credit, to secure payment for transactions effected through the NGX Exchange, and, in some instances, to prepay such obligations.  In addition, under the Exchange Agreements, ICE NGX is authorized to setoff, settle or otherwise recoup amounts owed by CRC Marketing to ICE NGX against amounts owed by ICE NGX to CRC Marketing.

82.     I understand that as of the Petition Date, there are no amounts owed on account of prepetition Exchange Obligations.  Out of an abundance of caution, the Debtors request authority to pay any prepetition amounts due and owing on account of prepetition Exchange Obligations. Additionally, to maintain continued access to the gas and power markets, the Debtors request authority to continue performing under the Exchange Agreements, and that all claims of ICE NGX relating to postpetition Exchange Obligations be granted superpriority administrative expense status and that the Debtors be authorized to pledge additional collateral, including cash collateral and letters of credit issued under the DIP Facility, to ICE NGX in the ordinary course of business.

83.     It is my belief that the relief requested in the Hedging Motion is necessary for the Debtors' continued operations and successful transition into these chapter 11 cases.  By the terms of the DIP Facility, the Debtors are obligated to use commercially reasonable best efforts to enter into Hedging Arrangements.  Additionally, entry into the Hedging Arrangements and continued performance under the Prepetition Swap Contracts will allow the Debtors to protect their cash flows, margins, and capital program from the cyclical nature of commodity prices and interest rates.  Such hedging arrangements and swap contracts are common to the Debtors' industry and adhere to the Debtors' prepetition practice, should be thus be allowed in the Debtors' ordinary course of business.

84.     The ability to assume and amend as necessary the First Day ISDAs, including entry into the ISDA Amendment, will similarly benefit the estate, as the Debtors' ISDAs are a prerequisite for the Debtors to enter into Hedging Arrangements.  If the Debtors are unable to assume the First Day ISDAs and enter into the ISDA Amendment, as well as make further amendments to the First Day ISDAs in the ordinary course of business, additional time and estate resources will be needed for the Debtors to negotiate and enter into new ISDAs on a postpetition basis.  Such expenditures of time and money in the early days of these chapter 11 cases will harm the Debtors and decrease the value of the Debtors' estate for all interested parties.

85.     Finally, I understand that performance under the Exchange Agreements and the ability to grant postpetition collateral is necessary for the Debtors' continued ability to transact with ICE NGX in the gas and power markets.  The inability to continue their prepetition trading and exchange practices with ICE NGX will harm the Debtors' estates by causing

disruption to the Debtors' operations and compromising their ability to procure and sell natural gas and power in amounts needed to satisfy customer demand and maintain system reliability.

86.     For these reasons, it is my view that the relief requested in the Hedging Motion should be granted.

L.     Debtors' Emergency Motion for an Order (I) Approving Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service and (IV) Granting Related Relief (the "Utilities Motion").

87.     Pursuant to the Utilities Motion, the Debtors seek entry of an order (a) approving the Debtors' proposed form of adequate assurance of payment for postpetition utility services, (b) establishing procedures for resolving objections by utility companies relating to the adequacy of the proposed adequate assurance and (c) prohibiting the utility companies from altering, refusing or discontinuing service to, or discriminating against, the Debtors on the basis of the commencement of these chapter 11 cases or that a debt owed by the Debtors for utility services rendered before the Petition Date was not paid when due.

88.     To operate their businesses and manage their properties, the Debtors obtain gas, electricity, waste and other disposal, water, telecommunications and other utility services from a number of utility companies.  The Debtors' businesses involve, among other things, the acquisition, development, exploration and production of oil, natural gas and natural gas liquids.  To successfully locate, develop and extract oil, natural gas and NGLs, the Debtors require electricity and gas to operate their exploration and production equipment at their numerous oil and natural gas well sites, and the Debtors must maintain these operations in a near-constant state.  In addition, the Debtors maintain offices responsible for managing the Debtors' businesses.  These offices require electricity, telecommunications and other similar services in order to operate.  Uninterrupted utility services are essential to the Debtors' ongoing

-34-

operations.  Should any utility company refuse or discontinue service, even for a brief period, the

Debtors' business operations could be severely disrupted, and such disruption would jeopardize

the Debtors' ability to manage their reorganization efforts.

89.      To the best of my knowledge, there are no defaults or arrearages of any

significance for the Debtors' undisputed invoices for prepetition utility services, other than

payment interruptions that may be caused by the commencement of these chapter 11 cases.  The

Debtors intend to pay all postpetition obligations owed to the utility companies in a timely

manner and anticipate having sufficient funds to do so.  Nevertheless, to provide the utility

companies with adequate assurance pursuant to sections 366(b) and 366(c) of the Bankruptcy

Code, the Debtors propose to deposit cash into a segregated account for the benefit of the utility

companies in an amount equal to two weeks' payment for utility services, calculated using the

historical average for such payments.  Based on the foregoing, the Debtors estimate that the total

amount of such deposit will be approximately $435,775.[2]

90.      The relief requested in the Utilities Motion will ensure the continuation of

the Debtors' businesses as the Debtors transition into chapter 11.  The relief requested also

provides the utility companies with a fair and orderly procedure for determining requests for

additional adequate assurance.

91.      For these reasons, it is my view that the relief requested in the Utilities

Motion should be granted.

---

[2]      As discussed in greater detail in the Utilities Motion, the Debtors' proposed adequate deposit does not include
any amounts for utility companies who currently have active surety bonds or letters of credit that exceed the
Debtors' historical average of two weeks' payment owed to such utility companies.

SC1:5217056.18

M.    Debtors' Emergency Motion for Interim and Final Orders (I) Establishing Notice and Objection Procedures for Transfers of Equity Securities and Claims of Worthless Stock Deductions and (II) Granting Related Relief (the "NOL Motion").

92.    Pursuant to the NOL Motion, the Debtors seek entry of interim and final orders (a) establishing notice and objection procedures (the "Equity Procedures") related to certain transfers of and declarations of worthlessness for federal or state tax purposes with respect to CRC's existing common stock or any beneficial ownership thereof (such record or beneficial ownership of existing common stock, the "Common Stock") and (b) directing that any purchase, sale or other transfer of Common Stock in violation of the Equity Procedures be null and void *ab initio*.

93.    As of December 31, 2019, the Debtors believe they had federal net operating losses ("NOL") carryovers of approximately $1.3 billion, state NOL carryforwards of approximately $2.5 billion, disallowed business interest carryforwards of approximately $467, an indeterminate amount of net unrealized built-in loss and tax credit carryforwards of approximately $76 million (collectively, the "Tax Attributes").[3]  Further, the Debtors have continued to incur or accrue relevant federal and state Tax Attributes, including NOLs, since December 31, 2019 and will continue to incur and accrue Tax Attributes for the remainder of the year.

94.    I understand that the Tax Attributes provide the potential for material future tax savings or other tax structuring possibilities in these chapter 11 cases because the Debtors can generally carry forward their Tax Attributes to offset future taxable income or tax, thereby reducing their future aggregate tax obligations.  Additionally, such Tax Attributes may

---

[3]    The approximately $76 million of tax credit carryforwards includes approximately $19 million of state enhanced oil recovery credit carryforwards.

generally be utilized by the Debtors to offset any taxable income or tax generated by transactions consummated during these chapter 11 cases.  Thus, the value of the Tax Attributes will inure to the benefit of all of the Debtors' stakeholders.

95.      I am advised that the Internal Revenue Code limits the amount of taxable income that can be offset by a corporation's Tax Attributes in taxable years following an "ownership change."  I am also advised that this limitation could severely restrict the use of the Tax Attributes, causing substantial damage to the Debtors' estates.  The Equity Procedures, therefore, are the mechanism by which the Debtors propose that they will monitor and, if necessary, object to, certain transfers of Common Stock and declarations of worthlessness with respect to Common Stock to ensure preservation of the Tax Attributes.

96.      I believe that implementation of the Equity Procedures is necessary and appropriate to preserve the value of the Tax Attributes for the benefits of the Debtors' estates. The Equity Procedures will assist the Debtors to preserve their flexibility in operating their businesses during the pendency of these chapter 11 cases and to implement a chapter 11 plan that makes full and efficient use of the Tax Attributes and maximizes the value of these estates. Additionally, I believe that the Equity Procedures do not create additional restrictions on transfers of, or declarations of worthlessness with respect to, Common Stock.  The Debtors seek to establish procedures only to monitor those types of transactions that would pose a serious risk under the Internal Revenue Code of limiting the Debtors' use of the Tax Attributes, in order to preserve the Debtors' ability to seek substantive relief if it appears that a proposed transfer or declaration of worthlessness could jeopardize the Debtors' utilization of the Tax Attributes.

97.      For these reasons, it is my view that the NOL Motion should be approved.

N.    Debtors' Motion for an Order (I) Establishing a Record Date for Notice and Sell-Down Procedures for Trading in Certain Claims and (II) Granting Related Relief (the "Claims Trading Motion").

98.    By the Claims Trading Motion, the Debtors seek entry of an order (the "Record Date Order") (a) establishing a record date (the "Record Date") for notice and potential sell-down procedures for trading in certain claims (as defined in section 1015(c) of the Bankruptcy Code) against one or more of the Debtors ("Claims") in order to preserve the Debtors' ability to formulate a plan of reorganization that maximizes the use of their Tax Attributes (as defined below) and (b) approving the notice of the Record Date (the "Record Date Notice").

99.    As discussed above, as of December 31, 2019, the Debtors believe they had federal net operating losses ("NOL") carryovers of approximately $1.3 billion, state NOL carryforwards of approximately $2.5 billion, disallowed business interest carryforwards of approximately $467, an indeterminate amount of net unrealized built-in loss and tax credit carryforwards of approximately $76 million (collectively, the "Tax Attributes").[4]  Further, the Debtors have continued to incur or accrue relevant federal and state Tax Attributes, including NOLs, since December 31, 2019 and will continue to incur and accrue Tax Attributes for the remainder of the year.

100.    While I understand that sections 382 and 383 of the Internal Revenue Code generally impose annual limitations on a taxpayer's use of its Tax Attributes following an ownership change, I am advised that a special provision of section 382 also provides significant relief to a debtor if an ownership change occurs in the context of a confirmed chapter 11 plan and

---

[4]    The approximately $76 million of tax credit carryforwards includes approximately $19 million of state enhanced oil recovery credit carryforwards.

-38-

certain requirements are satisfied.  Under section 382(l)(5) of the Internal Revenue Code, a

debtor corporation is not subject to the general limitation imposed by sections 382 and 383 with

respect to an ownership change if, as a result of the transactions contemplated by a bankruptcy

plan, historic stockholders and/or the corporation's "qualified creditors" own at least 50% of the

total value and voting power of the reorganized debtor's stock (the "Section 382(l)(5)

Exception").

      101.     To qualify for the Section 382(l)(5) Exception, "qualified creditors"

(together with historic stockholders) must hold at least 50% of the reorganized debtor's stock

immediately after emergence.  A key aspect of the "qualified creditor" analysis is the length of

time that creditors have held their claims, together with a favorable presumption regarding that

holding period that applies to certain creditors who own less than 5% of the stock of the

reorganized company immediately after the ownership change.  The Debtors do not yet know

whether they could qualify for the Section 382(l)(5) Exception.  The establishment of the Record

Date is designed to ensure that the Debtors preserve their ability to request sell-down procedures

if doing so is necessary and sufficient to satisfy this "qualified creditor" rule to preserve the Tax

Attributes.

      102.     The Debtors anticipate that they may need to seek entry of a sell-down

order that will enable them, in the event Debtors elect to reorganize under a plan that

contemplates the use of the 382(l)(5) Exception, to (a) determine whether the Debtors will

qualify for the Section 382(l)(5) Exception and, if necessary, (b) require certain substantial

claimholders to "sell-down" claims to the extent necessary to allow the Debtors to qualify for the

Section 382(l)(5) Exception (the "Sell-Down Procedures") and institute certain claims transfer

restrictions.  I understand that entry of the Record Date Order will not affect the rights of any

SC1:5217056.18

party-in-interest; instead, it will set and preserve the Record Date should Sell-Down Procedures eventually become necessary to avoid the imposition of an irrevocable limitation on the Debtors' utilization of the Tax Attributes.  Whether or not the Debtors request—and the Court ultimately implements—the Sell-Down Procedures, entry of the Record Date Order protects the Debtors' option to choose to preserve the Tax Attributes without prejudicing any party-in-interest.  To preserve their ability to request and implement the Sell-Down Procedures, the Debtors seek to notify claims traders prospectively that claims acquired after the Record Date may be subject to sell-down.  Without an established Record Date on or around the commencement of these chapter 11 cases, it is possible that the Debtors would not be able to effectively implement the Sell-Down Procedures that would avoid limitations on Tax Attributes.

103.     For these reasons, it is my view that the Claims Trading Motion should be approved.

O.     <u>Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay and (VI) Granting Related Relief (the "DIP Motion").</u>

104.     Pursuant to the DIP Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to (i) obtain senior secured superpriority postpetition financing in the amount of $1,133,010,655.62 consisting of (x) a Senior DIP Facility in the aggregate principal amount of up to $483,010,655.62, provided by JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (in such capacities, the "<u>Senior DIP Agent</u>"); JPMorgan Chase Bank, N.A., Bank of America, N.A. and Citibank, N.A., in their capacity as the issuing banks for DIP Letters of Credit (the "<u>Senior Issuing Banks</u>") and the financial institutions party thereto from time to time as lenders (the "<u>Senior DIP Lenders</u>"), and (y) a junior secured

-40-

superpriority debtor-in-possession term loan facility (the "Junior DIP Facility", together with the

Senior DIP Facility, the "DIP Facilities") in the aggregate principal amount of $650,000,000,

provided by Alter Domus (US) LLC, as administrative agent (in such capacity, the "Junior DIP

Agent", and together with the Senior DIP Agent, the "DIP Agents"), and the financial

institutions party thereto from time to time as lenders (the "Junior DIP Lenders", and together

with the Senior DIP Lenders, the "DIP Lenders"). and (ii) grant liens and superpriority

administrative expense claims, (b) authorizing the use of cash collateral, (c) granting adequate

protection, and (d) modifying the automatic stay.

       105.     The Debtors require immediate access to the DIP Facilities in addition to

continued use of cash collateral.  First, immediate access to the DIP Facilities is necessary to

reassure employees, trade creditors, and other stakeholders that the Debtors have the financial

ability to continue operating in the ordinary course during the pendency of these chapter 11

cases.  Second, the Debtors' preexisting cash balances and cash generated from operations are

not sufficient to fund business operations and the administration of these cases.  As of the

Petition Date, the Debtors' total unrestricted cash balance is approximately $20 million, which I

believe is insufficient to operate their enterprise and continue paying their debts as they come

due.  The Debtors' business is cash intensive, with significant daily costs required to satisfy

obligations to vendors and employees.  Due to their current limited liquidity, the Debtors require

immediate access to the DIP Facility and the use of cash collateral to operate their business,

preserve value and avoid irreparable harm pending the Final Hearing.  In particular, during the

prepetition period, in order to conserve liquidity, the Debtors carefully managed their working

capital, including accounts payable, by delaying payments of certain obligations.  The efforts,

though successful from a working capital perspective, had a negative impact on the Debtors'

vendor base.  As such, the ability of the Debtors to access cash collateral and the DIP Facilities is important to restore and preserve their many counterparty relationships and build confidence in the Debtors' ability to reorganize.

106.    I believe that the relief requested in the DIP Motion is necessary and appropriate to preserve the value of the Debtors' estate.  Absent the ability to access the DIP Facilities, there is a risk of substantial disruption to the Debtors' business.  The DIP Facilities will provide the Debtors with immediate access to the liquidity necessary to stabilize the Debtors' businesses during the pendency of these chapter 11 cases.  Moreover, the liquidity provided under the DIP Facilities is necessary to facilitate the administration of these chapter 11 cases, fund all payments contemplated by the Debtors' "first day motions" and ensure that the Debtors are able to conduct and consummate a strategy to maximize value for their creditors.

107.    For these reasons, it is my view that the DIP Motion should be approved.

SC1:5217056.18

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Date:  July 15, 2020

_/s/ Mark Rajcevich_____
Mark Rajcevich
Alvarez & Marsal North America, LLC
Managing Director

SC1:5217056.18