IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

―――――――――――――――――――――――――― x
                                          :
In re                                     :   Chapter 11
                                          :
                                          :   Case No. 20-33568 (DRJ)
CALIFORNIA RESOURCES CORPORATION,         :
*et al.*,[1]                              :   Joint Administration Pending
                                          :
                           Debtors.       :
―――――――――――――――――――――――――― x

**DECLARATION OF BRUCE MENDELSOHN IN SUPPORT OF DEBTORS'
EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING,
(II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE
CLAIMS, (III) AUTHORIZING THE USE OF CASH COLLATERAL,
(IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE
<u>AUTOMATIC STAY AND (VI) GRANTING RELATED RELIEF</u>**

Bruce Mendelsohn hereby declares and says:

1.  I am a Partner and the Head of Global Restructuring of Perella Weinberg Partners L.P. ("<u>PWP</u>"), a financial advisory firm that maintains an office at 767 5th Avenue, New York, New York 10153. I submit this declaration (this "<u>Declaration</u>") in support of *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying*

―――――――

[1] The Debtors in these chapter 11 cases and the last four digits of their U.S. taxpayer identification numbers are: California Resources Corporation (0947); California Heavy Oil, Inc. (4630); California Resources Coles Levee, L.P. (2995); California Resources Coles Levee, LLC (2087); California Resources Elk Hills, LLC (7310); California Resources Long Beach, Inc. (6046); California Resources Mineral Holdings LLC (4443); California Resources Petroleum Corporation (9218); California Resources Production Corporation (5342); California Resources Production Mineral Holdings, LLC (9071); California Resources Real Estate Ventures, LLC (6931); California Resources Royalty Holdings, LLC (6393); California Resources Tidelands, Inc. (0192); California Resources Wilmington, LLC (0263); CRC Construction Services, LLC (7030); CRC Marketing, Inc. (0941); CRC Services, LLC (6989); Monument Production, Inc. (0782); Oso Verde Farms, LLC (7436); Socal Holding, LLC (3524); Southern San Joaquin Production, Inc. (4423); Thums Long Beach Company (1774); Tidelands Oil Production Company LLC (5764). The Debtors' corporate headquarters is located at 27200 Tourney Road, Suite 200, Santa Clarita, CA 91355.

SC1:5248780.7

*the Automatic Stay, (VI) Scheduling A Final Hearing and (VII) Granting Related Relief* (the "DIP Motion")[2] filed by California Resources Corporation and certain of its affiliated debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases.

### Qualifications

2. I am a Partner and the Head of Global Restructuring of PWP, which I joined in 2016. PWP is a full-service investment banking firm providing strategic and financial advisory services, including with respect to mergers and acquisitions, capital raising, and restructuring transactions, across a broad range of industries. PWP and its senior professionals have extensive experience with respect to the reorganization and restructuring of distressed companies, both out of court and in chapter 11 proceedings.

3. I have approximately 30 years of investment banking and capital structure advisory experience assisting companies on a wide range of strategic matters. I have advised companies, creditors, shareholders and other stakeholders with respect to issues relating to chapter 11 plan negotiations, debtor-in-possession ("DIP") financings, cash collateral usage, 363 sale processes and new money recapitalizations, in each case analyzing and evaluating business plans, cash flow forecasts and liquidity needs, as well as evaluating, negotiating and structuring DIP financings. Prior to joining PWP, I was a partner at Goldman Sachs and most recently served as Head of the Americas Restructuring Group as part of their U.S. Leveraged Finance team. Prior to working at Goldman Sachs, I worked for UBS and MJ Whitman in restructuring and distressed securities. Prior to that time, I worked at Lehman Brothers. I received a Bachelor

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion.

2

of Arts degree from Emory University and an MBA from the Wharton School at the University of Pennsylvania.

4. In addition to working with the Debtors in the above-captioned chapter 11 cases, my experience includes representing companies, boards, creditors, and other stakeholders in a variety of situations across a broad range of industries, including the chapter 11 cases of: American Tire Distributors, Bonanza Creek, Breitburn Energy, Bristow Group, Crossmark Holdings, Eco-Bat Technologies, Fieldwood Energy, iHeart Communications, Memorial Production Partners, Pacific Drilling, Sanchez Energy Corporation, Seadrill, Sears, Video Equipment Rental Corporation, Windstream and 21st Century Oncology. In addition, while at Goldman Sachs, I was involved in the following bankruptcy cases: Bridge Information Systems, Brothers Gourmet Coffees, Calpine, CRC Communications, Focal Communications, General Growth Properties, Lehman Brothers, Network Plus, Nextel International, Orchard Supply, Qwest Communications and 360 Networks.

5. I am not being compensated separately for this testimony other than through payments received by PWP as the investment banker proposed to be retained by the Debtors. Except as otherwise indicated herein, all of the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by PWP professionals involved in advising the Debtors in these chapter 11 cases, or information provided to me by the Debtors. If called upon to testify, I could and would testify to the facts set forth herein on that basis. I am authorized to submit this Declaration on behalf of the Debtors.

## Background

6. As described in the *Declaration of Todd A. Stevens in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (the "Stevens First Day Declaration"), the Debtors

3

are an independent oil and natural gas exploration and production company operating properties exclusively within the state of California.  The Debtors also own or control natural gas processing plants, power plants, oil and natural gas gathering systems and other related assets.  More specifically, through oil and gas leases and other contracts entered into with mineral rights owners throughout California, the Debtors hold working interests in oil and gas properties that provide for the right to explore, drill and maintain wells.  After receipt of proceeds, the Debtors distribute funds to various working interest holders, royalty interest holders, governmental entities, and other parties, as applicable, in addition to retaining the Debtors' proportionate share of the proceeds.

7. Further information regarding the Debtors, their assets, liabilities and operations, and the commencement of these chapter 11 cases is set forth in detail in the Stevens First Day Declaration and the *Declaration of Mark Rajcevich, Managing Director at Alvarez & Marsal North America, LLC in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (the "Rajcevich First Day Declaration" and together with the Stevens First Day Declaration, the "First Day Declarations").

**Facts Specific to the Relief Requested**

**I.      The Debtors' Prepetition Indebtedness**

8. As of the Petition Date, the Debtors have approximately $5,235,010,656 in total funded debt, excluding accrued interest.  The following table summarizes the Debtors' prepetition indebtedness:

| Debt | Maturity | Approximate Principal Amount |
|---|---|---|
| RBL Facility | June 30, 2021 | $883,010,655.62 |
| 2017 Term Loan | December 31, 2022 | $1,300,000,000 |
| 2016 Term Loan | December 31, 2021 | $1,000,000,000 |
| Second Lien Notes | December 15, 2022 | $1,808,000,000 |
| Senior Unsecured Notes | September 15, 2021 | $100,000,000 |
| Senior Unsecured Notes | November 15, 2024 | $144,000,000 |
| **Total:** | | $5,235,010,656 |

A.  The RBL Facility

9.  As set forth in the Stevens First Day Declaration, CRC is a party to that certain credit agreement, dated as of September 24, 2014 (as may be amended, modified or supplemented from time to time, the "RBL Agreement"), which provides for a first lien revolving credit facility (the "RBL Facility"), among CRC as borrower, several lenders that from time to time are parties thereto (the "RBL Lenders") and JPMorgan Chase Bank, N.A., as administrative agent (the "RBL Agent").  The RBL Facility allows for cash borrowings as well as the issuance of letters of credit ("LCs") to backstop certain of the Debtors' obligations.  Each of the other Debtors, other than Debtors California Resources Mineral Holdings LLC, California Resources Production Mineral Holdings, LLC, Monument Production, Inc. and Oso Verde Farms, LLC (the "Debtor Non-Guarantors"), guarantees CRC's obligations under the RBL Agreement.  The RBL Facility is secured by a first-priority lien on a substantial majority of the Debtors' assets.  Interest under the RBL Facility accrues at either LIBOR (London Inter-Bank Offered Rate) or an alternate base rate ("ABR"), in each case plus a margin that varies based on the utilization of the RBL Facility.  The unused portion of the RBL Facility is subject to a commitment fee of 0.50% per annum.  The RBL Facility matures on June 30, 2021.

10.  The RBL Facility is structured as a "reserve backed loan," where funding availability is a function of an assessment of the relative value of CRC's oil and gas reserves,

which contribute to a borrowing base against which CRC is able to borrow. As of December 31, 2019, the borrowing base under the RBL Facility was $2.3 billion and was subject to scheduled semi-annual redeterminations on May 1 and November 1 of each year and is based upon a number of factors, including commodity prices and the Debtors' reserves, and RBL Lenders' aggregate commitment under the RBL Facility was $1 billion. In addition, the $1.3 billion outstanding under the 2017 Term Loan is taken into account in limiting the amount of the commitment available under the RBL Facility. Thus, a reduction to the borrowing base as of December 31, 2019 would have had the effect of reducing capacity under the RBL Facility. On April 30, 2020, the Debtors entered into an amendment to the RBL Agreement with the RBL Agent and the RBL Lenders, which amendment deferred the scheduled redetermination of the borrowing base to May 15, 2020 and reduced the revolving loan limit of the RBL Facility from $1 billion to $900 million. On May 15, 2020, the borrowing base was reduced from $2.3 billion to $1.2 billion.

11.　　As of the Petition Date, there is approximately $732,871,057 in principal amount outstanding under the RBL Facility plus $150,139,598.62 in face amount of outstanding LCs.

    B.　　The 2017 Term Loan

12.　　As set forth in the Stevens First Day Declaration, on November 17, 2017, CRC as borrower entered into a credit agreement (as may be amended, modified or supplemented from time to time, the "2017 Term Loan") with the lenders from time to time parties thereto (the "2017 Term Loan Lenders") and The Bank of New York Mellon Trust Company, N.A., as administrative agent (the "2017 Term Loan Agent"), which provides for a $1.3 billion term loan facility. Each of the other Debtors, other than the Debtor Non-Guarantors, guarantees CRC's obligations under the 2017 Term Loan. The net proceeds of the 2017 Term

6

Loan were used to pay the remaining balance on a term loan outstanding under the RBL Agreement. Interest under the 2017 Term Loan accrues at either LIBOR plus 4.75% or an ABR plus 3.75%. The 2017 Term Loan is secured by the same first-priority lien that secures the RBL Facility but is entitled to collateral recovery after the RBL Facility in accordance with the Collateral Agency Agreement (defined below). The 2017 Term Loan matures on December 31, 2022. As of the Petition Date, there is $1.3 billion outstanding under the 2017 Term Loan.

13. To govern the relationship between the 2017 Term Loan and the RBL Facility and the shared collateral relating to both, the RBL Agent, the 2017 Term Loan Agent and the Debtors entered into that certain Collateral Agency Agreement, dated as of November 17, 2017 (the "Collateral Agency Agreement").

C. The 2016 Term Loan

14. As set forth in the Stevens First Day Declaration, on August 12, 2016, CRC as borrower entered into a credit agreement (as may be amended, modified or supplemented from time to time, the "2016 Term Loan") with the lenders from time to time parties thereto (the "2016 Term Loan Lenders") and The Bank of New York Mellon Trust Company, N.A., as administrative agent (the "2016 Term Loan Agent"), which provides for a $1.0 billion term loan facility. Each of the other Debtors, other than the Debtor Non-Guarantors, guarantees CRC's obligations under the 2016 Term Loan. The net proceeds of the 2016 Term Loan were used to (a) prepay $250 million of a term loan outstanding under the RBL Agreement and (b) repay then outstanding loans under the RBL Facility. Interest under the 2016 Term Loan accrues at either LIBOR plus 10.375% or an ABR plus 9.375%. The 2016 Term Loan is secured by a first-priority lien on a substantial majority of the Debtors' assets but is entitled to collateral recovery after the RBL Facility and the 2017 Term Loan in accordance with the Pari Passu

Intercreditor Agreement (defined below). The 2016 Term Loan matures on December 31, 2021. As of the Petition Date, there is $1 billion outstanding under the 2016 Term Loan.

15. To govern the relationship between the 2016 Term Loan on the one hand and the 2017 Term Loan and the RBL Facility on the other hand, the RBL Agent, the 2017 Term Loan Agent, the 2016 Term Loan Agent and the Debtors entered into that certain Pari Passu Intercreditor Agreement, dated as of August 15, 2016 (the "Pari Passu Intercreditor Agreement").

D. The Second Lien Notes

16. As set forth in the Stevens First Day Declaration, on December 15 2015, CRC entered into an indenture (as may be amended, modified or supplemented from time to time, the "Second Lien Indenture") with the guarantors party thereto and The Bank of New York Mellon Trust Company, N.A. ("BNYM"), as trustee and collateral trustee, pursuant to which CRC issued $2.25 billion in aggregate principal amount of 8% senior secured second-lien notes due December 15, 2022 (the "Second Lien Notes"). Each of the other Debtors, other than the Debtor Non-Guarantors, guarantees CRC's obligations under the 2017 Term Loan. Pursuant to the Agreement of Resignation, Appointment and Acceptance, dated as of June 18, 2020, by and among CRC, BNYM and Delaware Trust Company, BNYM resigned as trustee and collateral trustee and Delaware Trust Company was appointed the successor trustee and collateral trustee (in such capacities, the "Second Lien Notes Trustee"). The Second Lien Notes were issued in exchange for $2.8 billion aggregate principal amount of the Debtors' then-outstanding Senior Unsecured Notes (as defined and described below). Interest on the Second Lien Notes accrues at 8% per annum and is paid semiannually in arrears on June 15 and December 15. The Second Lien Notes are secured on a junior-priority basis to the first-priority liens that secure the loans under the RBL Facility, 2017 Term Loan and 2016 Term Loan in accordance with the 1L-2L

Intercreditor Agreement (defined below).  The Second Lien Notes require principal repayments of approximately $287 million in June 2021, $57 million in December 2021, $59 million in June 2022 and $1.41 billion in December 2022.  As of the Petition Date, the Debtors had approximately $1.808 billion in aggregate principal amount of the Second Lien Notes outstanding.

17.     To govern the relationship between the 2016 Term Loan, the 2017 Term Loan and the RBL Facility on the one hand and the Second Lien Notes on the other hand, the RBL Agent, the 2017 Term Loan Agent, the 2016 Term Loan Agent, the Second Lien Notes Trustee and the Debtors entered into that certain Intercreditor Agreement, dated as of December 15, 2015 (the "1L-2L Intercreditor Agreement" and together with the Collateral Agency Agreement and the Pari Passu Intercreditor Agreement, the "Intercreditor Agreements").

## II.  The Debtors' Immediate Need for DIP Financing and Access to Cash Collateral

18.     As set forth in the Rajcevich First Day Declaration, the Debtors state that they do not have sufficient available sources of working capital and financing to operate their businesses or to maintain their properties in the ordinary course of business—let alone pursue the various options available to create value for stakeholders—without DIP financing and the authorized use of "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code ("Cash Collateral").  The Debtors' access to the proposed DIP Facilities (as defined below) will provide the Debtors with immediate access to the liquidity necessary to fund critical payments in the ordinary course of business that are essential to the Debtors' operational viability.

19.     Additionally, as set forth in the DIP Motion, I understand the DIP Lenders are willing to provide liquidity on the terms provided in the DIP Credit Agreements, the Interim Order and the Final Order, and that the Debtors, moreover, believe that the liquidity to be

provided by the DIP Facilities, together with the use of Cash Collateral, will enable the Debtors to fund their operations during the course of these chapter 11 cases.

20. As stated in the DIP Motion, the Debtors believe (a) that their ability to finance their operations, maintain business relationships, pay their employees, protect the value of their assets and pursue a strategy to maximize value for their creditors requires the availability of working capital from the DIP Facilities and the ability to use Cash Collateral, and (b) that the absence of such sources of financing would immediately and irreparably harm the Debtors, their estates, and their creditors and the possibility for successful administration of these chapter 11 cases.

### III. The Debtors' Prepetition DIP Financing Marketing Efforts

21. Following the Debtors' determination that chapter 11 proceedings would be required for an effective restructuring of the Debtors' balance sheet, the Debtors, with the assistance of PWP as well as the Debtors' restructuring advisor, Alvarez & Marsal North America, LLC ("A&M") and the Debtors' restructuring counsel, Sullivan & Cromwell LLP ("S&C" and, collectively with PWP and A&M, the "Advisors"), immediately began to size a DIP financing facility and identify potential sources of DIP financing.

22. Beginning in April 2020, the Debtors, with the assistance of PWP, made extensive inquiries into alternatives for financing and solicited proposals for DIP financing from various lending institutions with experience in providing such financing and other potential sources of capital. The Debtors, with the assistance of PWP, contacted nine potential lenders that it believed would be interested in providing to the Debtors DIP financing in an amount sufficient to fund the Debtors' operations through, and emergence from, its chapter 11 csaes. Six of these potential lenders conducted extensive diligence related to a potential DIP Facility, and five submitted a proposal. Ultimately, many of the parties contacted by PWP reported that they

were unwilling to extend financing to the Debtors due to a number of factors, including their unwillingness to provide unsecured financing or financing secured by junior liens, the prospect of a priming fight with the Debtors' prepetition RBL Secured Parties, and the volatile state of the oil and gas industry.

23. As part of these marketing efforts, the Debtors, with the assistance of their Advisors, including me and other individuals at PWP who report to me, engaged in discussions with the RBL Agent and the RBL Lenders' advisors, certain lenders under the Debtors' 2017 and 2016 Term Loans, certain lenders under the Debtors' Second Lien Notes (as defined below) (the "1L Lenders"), and Ares Management LLC ("Ares") regarding their interest in providing DIP financing as well as their willingness to consent to third-party DIP financing. I supervised these efforts on behalf of PWP and, along with individuals at PWP who report to me, interacted with these potential lenders. I believe that the marketing process used to determine the most viable DIP financing facility for the Debtors was appropriate under the circumstances, including, without limitation, in light of the Debtors' condition, timing concerns, and the Debtors' existing capital structure.

24. After extensive negotiations with the 1L Lenders, Ares, and the RBL Agent in which I was involved, the Debtors received term sheets from the 1L Lenders providing for DIP financing in the form of (a) a Senior DIP Facility to be provided by the RBL Agent and certain of the RBL Lenders, and (b) a Junior DIP Facility to be provided by the 1L Lenders, (the "Combined Proposal"). I believe that the marketing process used to determine the most viable DIP financing facility for the Debtors was appropriate under the circumstances, including, without limitation, in light of the Debtors' condition, timing concerns and existing capital structure.

25. After considering all possible financing options, the Debtors, in consultation with their Advisors, including me and other individuals at PWP who report to me, determined that the Combined Proposal was the best financing alternative available to the Debtors. First, the Combined Proposal enjoys the support of the 1L Lenders, Ares, and the RBL Agent. Second, the Combined Proposal would provide the liquidity needed for the Debtors to continue operating in the ordinary course. Third, the Combined Proposal avoids the otherwise strong possibility of litigation with the Debtors' secured creditors.

26. The Debtors have been unable to otherwise obtain sufficient credit (a) having priority over administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien, or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. The negotiations among the Debtors and the DIP Lenders with respect to the DIP Facilities, in which I was closely involved, were, in my view, conducted at arm's length. Negotiations over the economic terms, milestones and structure of the DIP Facilities continued into the days immediately leading up to the Petition Date.

27. The terms of the DIP Facilities are detailed in the DIP Motion, as well as in (a) that certain Senior Secured Superpriority Debtor-In-Possession Credit Agreement (as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof, the "Senior DIP Credit Agreement"), by and among California Resources Corporation, as borrower ("CRC" or the "Senior DIP Borrower"), each of the other Debtors, as guarantors (the "Senior DIP Guarantors"), JPMorgan Chase Bank, N.A. (or any successor or assign), as administrative agent and collateral agent (in such capacities, the "Senior DIP Agent"), JPMorgan Chase Bank, N.A., Bank of America, N.A. and Citibank, N.A., in their capacity as the

issuing banks for DIP Letters of Credit (the "Senior Issuing Banks") and the financial institutions party thereto from time to time as lenders (the "Senior DIP Lenders"), a form of which is attached as Exhibit 1 to the Interim Order attached to the DIP Motion, and (b) that certain Junior Secured Superpriority Debtor-In-Possession Credit Agreement substantially in the form attached as Exhibit 2 to the Interim Order attached to the DIP Motion (as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof, the "Junior DIP Credit Agreement"), by and among CRC, as borrower (the "Junior DIP Borrower", and together with the Senior DIP Borrower, the "DIP Borrower"), each of the other Debtors, as guarantors (the "Junior DIP Guarantors", and together with the Senior DIP Guarantors, the "DIP Guarantors"), Alter Domus (US) LLC (or any successor or assign), as administrative agent (in such capacity, the "Junior DIP Agent", and together with the Senior DIP Agent, the "DIP Agents"), and the financial institutions party thereto from time to time as lenders (the "Junior DIP Lenders" and, together with the Senior DIP Lenders, the "DIP Lenders").

28. As noted in the DIP Motion, the DIP Facilities contemplate DIP financing in the form of (a) the $483,010,655.62 senior Senior DIP Facility, consisting of (i) a $400,139,598.62 Senior New Money Subfacility, including $150,139,598.62 to deem the RBL Letters of Credit as being issued under the Senior New Money Subfacility and a sublimit of not more than $35,000,000 for additional letters of credit (together, the "DIP Letters of Credit"), and (ii) the a $82,871,057.00 Senior Roll-Up Subfacility, and (b) the $650,000,000 Junior DIP Facility. As further noted in the DIP Motion, in exchange for access to the DIP Facilities, the Debtors have agreed, among other things and subject to the Carve-Out (as defined in the Interim Order) to grant the DIP Lenders allowed superpriority administrative expense claims status in these chapter 11 cases, as well as automatically perfected first priority liens on substantially all

of the Debtors' Collateral (as defined in the DIP Credit Agreement) that is not subject to valid, perfected and non-avoidable liens as of the Petition Date and all collateral that secures obligations under the RBL Credit Agreement. Based on the current market prices for the 2017 Term Loans and the willingness of the DIP Lenders to provide the Junior DIP Facility to refinance the Prepetition RBL Facility in full, the Debtors believe that the Prepetition RBL Facility is oversecured.

29. The Debtors negotiated several key concessions from the DIP Lenders over the course of the weeks preceding the filing. Although the RBL Lenders were unwilling to provide the Senior DIP Facility unless the RBL Facility was partially refinanced by the Junior DIP Facility, the Debtors were able to negotiate the following concessions, the terms of which are described in further detail in the DIP Motion: (a) additional financing flexibility under the facility's financial covenants, including the elminiation of asset coverage covenants, more lenient minimum liquidity requirements and more accommodative variance testing, (b) additional time under the proposed milestones, and (c) an increase in the funding commitment relative to initial indications. I was closely involved in such negotiations and understand that all of the aforementioned concessions contributed to the Debtors selecting the DIP Lenders' proposal.

30. Based on my experience with DIP financing transactions as well as my involvement in the marketing and negotiation of the various DIP financing alternatives available to the Debtors, I believe that the financial terms proposed under the DIP Facilities are customary and usual for DIP financings of this type. Specifically, the contemplated pricing, fees, interest rate, default rate, and other economic terms of the DIP Facilities were, in my view, negotiated among the Debtors, with my involvement, and the DIP Lenders at arm's length and are in

aggregate generally consistent with the cost of DIP financings in comparable circumstances, particularly for a distressed borrower with a stated urgent need for liquidity. Also, the terms of the DIP Facilities are the result of a marketing process. As set forth above, the Debtors, with the assistance of their Advisors, including me and individuals at PWP who report to me, solicited and considered other sources of DIP financing to determine whether the Debtors could obtain DIP financing on better terms and engaged in discussions with multiple third parties. Notably, none of the other lenders referenced above that provided indicative term proposals were willing to provide the Debtors with DIP financing on an unsecured or non-superpriority basis. Accordingly, I believe that, in light of the marketing process and other facts described above, the DIP Facilities are the best financing option presently available to the Debtors under the circumstances.

31. As noted in the DIP Motion, the Debtors have agreed to provide to the Prepetition Secured Parties several forms of adequate protection to the extent of any diminution in value of their collateral.

32. Based on my experience as a restructuring professional, this proposed package is not inconsistent with adequate protection provided to lenders in connection with DIP financings of this type.

## Conclusion

33. Based on my experience with DIP financing transactions as well as my involvement in the marketing and negotiation of the DIP financing process described above, I believe that the DIP Facilities are the best financing option presently available to the Debtors under the circumstances and contains terms that are customary and usual for DIP financings of this type. Further, the negotiations among the Debtors and the DIP Lenders with respect to the DIP Facilities were, in my view, conducted at arm's length.

I, the undersigned Partner of Perella Weinberg Partners, declare under penalty of perjury that the foregoing is true and correct.

Dated: July 15, 2020

*/s/ Bruce Mendelsohn*
Bruce Mendelsohn
Partner
Perella Weinberg Partners
*Proposed Investment Banker to the Debtors and Debtors-in-Possession*