IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

———————————————————————x
:
In re                                                    :     Chapter 11
:
:     Case No. 20-33568 (DRJ)
CALIFORNIA RESOURCES CORPORATION,    :
*et al.*,[1]                                             :
:      Jointly Administered
:
Debtors.                   :
———————————————————————x

## DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

| | |
|---|---|
| VINSON & ELKINS LLP | SULLIVAN & CROMWELL LLP |
| Harry A. Perrin (TX 15796800) | Andrew G. Dietderich  (admitted *pro hac vice*) |
| Paul E. Heath (TX 09355050) | James L. Bromley  (admitted *pro hac vice*) |
| Matthew W. Moran (TX 24092856) | Alexa J. Kranzley (admitted *pro hac vice*) |
| 1001 Fannin Street, Suite 2500 | 125 Broad Street |
| Houston, TX 77002-6760 | New York, NY 10004 |
| | |
| *Proposed Co-Counsel to the Debtors and Debtors-in-Possession* | *Proposed Co-Counsel to the Debtors and Debtors-in-Possession* |

Dated:  July 31, 2020

---

[1]   The Debtors in these chapter 11 cases and the last four digits of their U.S. taxpayer identification numbers are:  California Resources Corporation (0947); California Heavy Oil, Inc. (4630); California Resources Coles Levee, L.P. (2995); California Resources Coles Levee, LLC (2087); California Resources Elk Hills, LLC (7310); California Resources Long Beach, Inc. (6046); California Resources Mineral Holdings LLC (4443); California Resources Petroleum Corporation (9218); California Resources Production Corporation (5342); California Resources Production Mineral Holdings, LLC (9071); California Resources Real Estate Ventures, LLC (6931); California Resources Royalty Holdings, LLC (6393); California Resources Tidelands, Inc. (0192); California Resources Wilmington, LLC (0263); CRC Construction Services, LLC (7030); CRC Marketing, Inc. (0941); CRC Services, LLC (6989); Monument Production, Inc. (0782); Oso Verde Farms, LLC (7436); Socal Holding, LLC (3524); Southern San Joaquin Production, Inc. (4423); Thums Long Beach Company (1774); Tidelands Oil Production Company LLC (5764).  The Debtors' corporate headquarters is located at 27200 Tourney Road, Suite 200, Santa Clarita, CA 91355.

PRELIMINARY STATEMENT

*The Plan*

On July 15, 2020, California Resources Corporation and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") filed with the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") (the "Chapter 11 Cases").

Also on July 15, 2020, the Debtors entered into the Restructuring Support Agreement (the "Original Restructuring Support Agreement") with certain supporting creditor parties holding 84.4% of the 2017 Term Loans, 50.8% of the 2016 Term Loans, 8.2% of the Second Lien Notes and Ares.  On July 22, 2020, the Debtors entered into an Amended and Restated Restructuring Support Agreement (the "Restructuring Support Agreement") with certain supporting creditor parties holding approximately 85% of the 2017 Term Loans and approximately 68% of the 2016 Term Loans, the Second Lien Notes and the Unsecured Notes, as well as Ares (the "Supporting Creditors"), thereby amending the Original Restructuring Support Agreement.  The Restructuring Support Agreement provides for the restructuring of the Debtors as a going concern through the Confirmation of the Plan attached hereto as Appendix A.

The Plan and Disclosure Statement are the outcome of extensive, good faith and arm's length negotiations among the Debtors and the Supporting Creditors.  The Plan contemplates a restructuring that provides for, among other things, the elimination of over $5 billion of debt and mezzanine equity interest, the consolidation of CRC's ownership in the Elk Hills power plant and cryogenic gas plant, a substantial capital infusion into the Debtors through a new money backstopped Rights Offering that will raise $450 million and the payment of all General Unsecured Claims in full.  The restructuring contemplated by the Restructuring Support Agreement and the Plan will deleverage the Debtors' balance sheet and leave them positioned to succeed in the highly competitive natural gas and oil industry in the years to come, and is in the best interests of the Debtors' stakeholders.

*Reorganized CRC*

The Debtors' decisions to enter into the Original Restructuring Support Agreement and the Restructuring Support Agreement, commence the Chapter 11 Cases and solicit votes for the Plan were precipitated by the historic decline in prices for oil, natural gas and natural gas liquids ("NGLs") which have remained depressed since late 2018.  Prior to entering into the Original Restructuring Support Agreement, the Debtors took numerous actions and pursued many strategic avenues aimed at adapting to these evolving market conditions and to position themselves for future success.  However, as market headwinds persisted over a sustained period of time, it became clear that material changes to the Debtors' balance sheet were necessary.  The Plan that the Debtors are proposing, which is consistent with the Restructuring Support Agreement and supported by the Supporting Creditors, provides the best available path

ii

forward for the Debtors and will significantly reduce their debt and further advance their efforts to position themselves for long-term success.

The same challenges that have affected the Debtors have caused the distress and the commencement of Chapter 11 Cases of many other natural gas and oil companies.

SC1:5210217.8

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN AND CERTAIN OTHER DOCUMENTS AND INFORMATION.  THE FINANCIAL INFORMATION INCLUDED HEREIN IS FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW AND WHETHER TO VOTE ON THE PLAN.  THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS THAT ARE ATTACHED HERETO ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR SUCH OTHER PLAN-RELATED DOCUMENTS AND INFORMATION, THE PLAN OR SUCH OTHER PLAN-RELATED DOCUMENTS AND INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

THE STATEMENTS AND INFORMATION CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN SINCE THE DATE HEREOF.  EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE CASTING A BALLOT.  THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  ANY PERSONS DESIRING ANY SUCH ADVICE OR OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

ALTHOUGH THE DEBTORS HAVE ATTEMPTED TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT, EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED.

THE FINANCIAL PROJECTIONS PROVIDED IN THIS DISCLOSURE STATEMENT HAVE BEEN PREPARED BY THE MANAGEMENT OF THE DEBTORS AND THEIR FINANCIAL ADVISORS.  THESE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, ALTHOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL.  THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR THE ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT

iv

FROM THOSE ASSUMED AND/OR MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE FINANCIAL PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING, THREATENED OR POTENTIAL LITIGATION OR ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AND MAY NOT BE CONSTRUED BY ANY PARTY AS AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR WILL IT BE CONSTRUED TO CONSTITUTE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS IT RELATES TO THE HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS.

UPON CONFIRMATION OF THE PLAN, CERTAIN OF THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, IN RELIANCE ON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE.  OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS.  TO THE EXTENT EXEMPTIONS UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT.  IN ACCORDANCE WITH SECTION 1125(E) OF THE BANKRUPTCY CODE, A DEBTOR OR ANY OF ITS AGENTS THAT PARTICIPATES, IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, IN THE OFFER, ISSUANCE, SALE, OR PURCHASE OF A SECURITY, OFFERED OR SOLD UNDER THE PLAN, OF THE DEBTOR, OF AN AFFILIATE PARTICIPATING IN A JOINT PLAN WITH THE DEBTOR, OR OF A NEWLY ORGANIZED SUCCESSOR TO THE DEBTOR UNDER THE PLAN, IS NOT LIABLE, ON ACCOUNT OF SUCH PARTICIPATION, FOR VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE OFFER, ISSUANCE, SALE, OR PURCHASE OF

SECURITIES.  NEITHER THE SOLICITATION OF VOTES ON THE PLAN NOR THIS DISCLOSURE STATEMENT CONSTITUTES AN OFFER TO SELL SECURITIES (OR A SOLICITATION OF AN OFFER TO ACQUIRE SECURITIES) IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS. NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN HAS BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY COMPARABLE AUTHORITY.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SEC OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN OR THE MERITS OF THE PLAN.  THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(2) OF THE SECURITIES ACT, OR ANY OTHER APPLICABLE EXEMPTION FROM SECURITIES LAWS WILL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS.  THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS.

SEE ARTICLE IX OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE PLAN.

SC1:5210217.8

TABLE OF CONTENTS

INTRODUCTION ............................................................................................................................. 1
A.   Purpose of the Disclosure Statement ................................................................................. 1
B.   Disclosure Statement Enclosures ...................................................................................... 2
C.   Confirmation of the Plan ................................................................................................... 2
     1.   Requirements ......................................................................................................... 2
     2.   Approval of the Plan and Confirmation Hearing .................................................. 2
     3.   Only Impaired Classes Vote .................................................................................. 2
D.   Treatment and Classification of Claims and Interests; Impairment ................................... 3
     1.   Class 1 – Other Priority Claims ............................................................................ 3
     2.   Class 2 – Other Secured Claims ........................................................................... 3
     3.   Class 3 – RBL Claims ........................................................................................... 4
     4.   Class 4 – 2017 Term Loan Secured Claims .......................................................... 4
     5.   Class 5 – Unsecured Debt Claims ......................................................................... 5
     6.   Class 6 – General Unsecured Claims ..................................................................... 6
     7.   Class 7 – Interests in CRC .................................................................................... 6
E.   Treatment of Intercompany Claims ................................................................................... 7
F.   Voting Procedures and Voting Deadline ......................................................................... 12
G.   Confirmation of the Plan ................................................................................................. 12
     1.   Plan Objection Deadline ...................................................................................... 12
     2.   Confirmation Hearing .......................................................................................... 13

ARTICLE II GENERAL INFORMATION REGARDING THE DEBTORS ............................. 13
A.   The Debtors' Corporate History ...................................................................................... 13
B.   The Debtors' Assets and Operations ............................................................................... 14
     1.   Mineral Acreage .................................................................................................. 14
     2.   Reserves .............................................................................................................. 16
     3.   Drilling Locations ............................................................................................... 16
     4.   Productive Wells ................................................................................................. 16
     5.   Production Sharing Contracts .............................................................................. 16
     6.   Marketing Arrangements ..................................................................................... 17
     7.   The Debtors' Infrastructure ................................................................................. 18
     8.   The Debtors' Employees ...................................................................................... 18
     9.   Surface Assets ..................................................................................................... 18
C.   Financial Performance and Cash Position ....................................................................... 18
D.   The Debtors' Prepetition Indebtedness ........................................................................... 19
     1.   The RBL Facility ................................................................................................. 19
     2.   The 2017 Term Loan ........................................................................................... 20
     3.   The 2016 Term Loan ........................................................................................... 20
     4.   The Second Lien Notes ........................................................................................ 21
     5.   The Senior Unsecured Notes ................................................................................ 21
E.   Elk Hills .......................................................................................................................... 22
     1.   The Elk Hills Facilities ........................................................................................ 22

SC1:5210217.8

2. The Elk Hills Transaction ...................................................................................23
3. The "Recharacterization Claim" and "Bypass" Option...........................................24
F. Events Leading to the Commencement of the Debtors' Chapter 11 Cases ........................... 25
G. The Restructuring Support Agreements.................................................................................. 26
1. The Original Restructuring Support Agreement ..................................................26
2. The Restructuring Support Agreement.................................................................26
3. The Backstop Commitment Agreement.................................................................28
4. The Settlement Agreement ...................................................................................28
H. The Debtors' Prepetition DIP Financing Marketing Efforts.................................................. 29

THE CHAPTER 11 CASES ............................................................................................................ 30
A. Commencement of the Chapter 11 Cases .............................................................................. 30
B. Automatic Stay....................................................................................................................... 30
C. "First Day" Motions and Related Applications ..................................................................... 30
D. Debtor-In-Possession Financing ............................................................................................ 32
E. Other Procedural Motions and Retention of Professionals.................................................... 33
F. The Compensation Motion ..................................................................................................... 33
G. The Official Committee of Unsecured Creditors ................................................................... 33
H. Confirmation of the Plan........................................................................................................ 33

SUMMARY OF THE PLAN............................................................................................................ 34
A. Considerations Regarding the Plan ........................................................................................ 35
B. Classification and Treatment of Claims and Interests ........................................................... 37
1. Deemed Substantive Consolidation .....................................................................38
2. Summary of Classes and Treatment of Claims Against and Interests in the Debtors ........38
3. Treatment of Claims Against and Interests in the Debtors...................................39
4. Treatment of Intercompany Claims.......................................................................43
5. Treatment of Executory Contracts and Unexpired Leases ..................................43
C. Implementation of the Plan .................................................................................................... 43
1. Operations Between the Confirmation Date and Effective Date ..........................43
2. Organizational Existence......................................................................................43
3. Cancellation of Existing Interests, Existing Indebtedness and Related Agreements...........44
4. Sources of Cash for Plan Distributions ................................................................44
5. Implementation of Effective Date Agreements ...................................................45
6. Restructuring Support Agreement ........................................................................45
7. Backstop Commitment Agreement .......................................................................45
8. New Common Stock..............................................................................................45
9. Ares Settlement ....................................................................................................45
10. Rights Offering......................................................................................................46
11. Exemption from Registration................................................................................46
12. Registration Rights Agreement .............................................................................46
13. Exit Facilities........................................................................................................46
14. Section 1146 Exemption from Certain Transfer Taxes and Recording Fees ........48
15. Preservation of Causes of Action..........................................................................48

SC1:5210217.8

VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION OF THE PLAN ....... 49
A. General ........................................................................................................................ 49
B. Parties in Interest Entitled to Vote ............................................................................. 49
C. Classes Impaired and Entitled to Vote Under the Plan .............................................. 50
D. Voting Procedures and Requirements ......................................................................... 50
   1. Ballots ................................................................................................................... 51
   2. Submitting Ballots ................................................................................................ 51
   3. Voting ................................................................................................................... 52
   4. Releases Under the Plan ....................................................................................... 52
E. Acceptance of Plan ..................................................................................................... 52
F. Confirmation Without Necessary Acceptances; Cramdown ...................................... 53
G. Classification .............................................................................................................. 54

FEASIBILITY AND BEST INTERESTS OF CREDITORS ....................................................... 54
A. Best Interests Test ...................................................................................................... 54
B. Liquidation Analysis .................................................................................................. 55
C. Application of the Best Interests Test ........................................................................ 56
D. Feasibility ................................................................................................................... 56

EFFECT OF CONFIRMATION ................................................................................................ 57
A. Binding Effect of Confirmation ................................................................................. 57
B. Good Faith .................................................................................................................. 57

SECURITIES LAW MATTERS ............................................................................................... 57
A. Bankruptcy Code Exemptions from Registration Requirements ............................... 57
   1. Issuance. ................................................................................................................ 57
   2. Subsequent Transfers. .......................................................................................... 58
B. Private Placement Exemptions ................................................................................... 59
   1. Issuance. ................................................................................................................ 59
   2. Subsequent Transfers. .......................................................................................... 60
C. Registration Rights Agreement .................................................................................. 62

CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING .............................. 62
A. Certain Bankruptcy Law Considerations ................................................................... 62
B. Risk Factors Relating to Securities to Be Issued Under the Plan ............................... 66
C. Risks Related to Debtors' Ongoing Operations during the Chapter 11 Case ............. 68
D. Operational Risks for the Reorganized Debtors ......................................................... 70
E. Financing Risks for the Reorganized Debtors ............................................................ 76
F. Exploration and Production Risks for the Reorganized Debtors ................................. 76
G. Environmental and Other Regulatory Risks for the Reorganized Debtors ................. 79
H. Additional Risks for the Reorganized Debtors ........................................................... 83

CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ..................... 85
A. Consequences to the Debtors ...................................................................................... 86
   1. Cancellation of Debt ............................................................................................. 87

ix

SC1:5210217.8

2.      Limitation of NOL Carryforwards and Other Tax Attributes...................................................87

B.    Consequences to U.S. Holders.......................................................................................... 89

1.      Recapitalization Treatment...........................................................................................90

2.      Taxable Exchange Treatment........................................................................................90

3.      Treatment of Subscription Rights.................................................................................91

4.      Character of Gain or Loss.............................................................................................92

5.      Consideration Received in Satisfaction of Accrued Interest or OID.......................................92

6.      Distributions on and Dispositions of New Common Stock .......................................................93

7.      Information Reporting and Backup Withholding...........................................................94

RECOMMENDATION ......................................................................................................... 94

SC1:5210217.8

### Appendices and Exhibits

Appendix A          Debtors' Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code
Appendix B          Liquidation Analysis
Appendix C          Financial Projections
Appendix D          Valuation Analysis

Exhibit 1           Restructuring Support Agreement

SC1:5210217.8

## ARTICLE I

## INTRODUCTION

A.      Purpose of the Disclosure Statement

Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan; *provided*, that any capitalized term used herein that is not defined herein or in the Plan, but is defined in the Bankruptcy Code or the Bankruptcy Rules, will have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

The Debtors are commencing this solicitation after extensive, good faith, arm's length discussions over the past year among the Debtors and the Supporting Creditors. As a result of these negotiations, the Debtors have entered into the Restructuring Support Agreement with the Supporting Creditors. The Restructuring Support Agreement provides, among other things, that additional Holders of 2017 Term Loans, 2016 Term Loans, Second Lien Notes and Unsecured Notes may execute joinders and become party to the Restructuring Support Agreement. As of the date hereof, the Supporting Creditors that own or manage with the authority to act on behalf of the beneficial owners of approximately 85% in principal amount of the 2017 Term Loans and approximately 68% in principal amount of the 2016 Term Loans, the Second Lien Notes and the Unsecured Notes, as well as Ares, are party to the Restructuring Support Agreement.

The Debtors and the Supporting Creditors have agreed to support a value-maximizing, deleveraging transaction to restructure the Debtors' existing debt obligations through the Plan. The Plan contemplates the reorganization of the Debtors and the resolution of all outstanding Claims against, and Interests in, the Debtors, and it leaves the Debtors' trade and other general unsecured creditors unaffected. The Plan is the product of extensive, hard-fought, arm's length negotiations among the Debtors and the Supporting Creditors. The Debtors believe the Plan is reflective of these good faith negotiations and will treat Holders of Claims and Interests in an economic and fair manner. The Debtors believe that the Plan strikes a fair and equitable balance between these competing factors and appropriately distributes value among their stakeholders in accordance with the Bankruptcy Code's priority scheme.

The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against the Debtors in connection with (i) the solicitation of acceptances of the Plan and (ii) a hearing to consider Confirmation of the Plan.

The purpose of this Disclosure Statement is to describe the Plan and its provisions and to provide certain information, as required under section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors who will have the right to vote on the Plan so they can make informed decisions in doing so. Holders entitled to vote to accept or reject the Plan will receive a Ballot (as defined below) together with this Disclosure Statement to enable them to vote on the Plan.

SC1:5210217.8

This Disclosure Statement includes, among other things, information pertaining to the Debtors' prepetition business operations and financial history and the events leading up to the Chapter 11 Cases.  In addition, an overview of the Plan is included, which overview sets forth certain terms and provisions of the Plan, the effects of Confirmation of the Plan, certain risk factors associated with the Plan and the manner in which distributions will be made under the Plan.  This Disclosure Statement also discusses the Confirmation process and the procedures for voting, which procedures must be followed by the Holders of Claims entitled to vote under the Plan for their votes to be counted.

B.      Disclosure Statement Enclosures

Accompanying this Disclosure Statement is a ballot (the "Ballot") for voting to accept or reject the Plan, if you are the record Holder of a Claim in a Class entitled to vote on the Plan (each, a "Voting Class").

C.      Confirmation of the Plan

1.      Requirements.  The requirements for Confirmation of the Plan are set forth in section 1129 of the Bankruptcy Code.  The requirements for approval of the Disclosure Statement are set forth in section 1125 of the Bankruptcy Code.

2.      Approval of the Plan and Confirmation Hearing.  To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code.

3.      Only Impaired Classes Vote.  Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan.  Generally, a claim or interest is impaired under a plan if the Holder's legal, equitable or contractual rights are changed under such plan.  In addition, if the Holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such Holders are not entitled to vote on such plan.

Under the Plan, only Holders of Claims in Classes 4 and 5 are impaired and are entitled to vote on the Plan.  Under the Plan, Holders of Claims in Classes 1, 2, 3 and 6 are unimpaired and, therefore, deemed to accept the Plan; and Holders of Interests in Class 7 will not receive any distributions and are, therefore, deemed to reject the Plan.

ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 4 AND 5.

2

D.      Treatment and Classification of Claims and Interests; Impairment

1.      <u>Class 1 – Other Priority Claims</u>

(a)     *Classification*:  Class 1 consists of all Other Priority Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment with the applicable Debtor(s), in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes Allowed and (iii) such other date as may be ordered by the Bankruptcy Court which does not result in an impairment of such Allowed Other Priority Claim.

(c)     *Voting*:  Class 1 is Unimpaired.  Each Holder of an Other Priority Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of Other Priority Claims is entitled to vote to accept or reject the Plan.

2.      <u>Class 2 – Other Secured Claims</u>

(a)     *Classification*:  Class 2 consists of all Other Secured Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment with the applicable Debtor(s), in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive one of the following treatments, in the sole discretion of the applicable Debtor:  (i) payment in full in Cash, including the payment of any interest payable under section 506(b) of the Bankruptcy Code on the later of (1) the Effective Date and (2) on the date that such Allowed Other Secured Claim becomes Allowed, or as soon thereafter as is reasonably practicable; (ii) delivery of the collateral securing such Allowed Other Secured Claim or (iii) treatment of such Allowed Other Secured Claim in any other manner that renders the Claim Unimpaired.

(c)     *Voting*:  Class 2 is Unimpaired.  Each Holder of an Other Secured Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f)

3

of the Bankruptcy Code.  No Holder of an Other Secured Claim is entitled to vote to accept or reject the Plan.

3.    Class 3 – RBL Claims

(a)    *Classification*:  Class 3 consists of all RBL Claims.

(b)    *Allowance*:  The RBL Claims shall be Allowed in the full amount due and owing, if any, under the RBL Documents and the DIP Orders as of the Effective Date, including any post-petition interest and fees that have accrued as of the Petition Date but remain unpaid.

(c)    *Treatment*:  On the Effective Date, each Holder of RBL Claims, on account of and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed RBL Claims shall be paid in full in Cash in an amount equal to such Allowed RBL Claims, to the extent not previously paid from the proceeds of the DIP Facilities.

(d)    *Voting*:  Class 3 is Unimpaired.  Each Holder of a RBL Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of RBL Claim is entitled to vote to accept or reject the Plan.

4.    Class 4 – 2017 Term Loan Secured Claims

(a)    *Classification*:  Class 4 consists of all 2017 Term Loan Secured Claims.

(b)    *Allowance*:  The 2017 Term Loan Secured Claims shall be Allowed at an aggregate amount equal to $537,000,000, representing a stipulated secured claim as of the Confirmation Date pursuant to section 506(a) of the Bankruptcy Code.

(c)    *Treatment*:  On the Effective Date, each Holder of 2017 Term Loan Secured Claims shall receive, on account of and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed 2017 Term Loan Secured Claims, its Pro Rata share of (i) 83.6% of the total New Common Stock subject to dilution by the Rights Offering, the Backstop Commitment Premium, the Eligible Stock, the Exit Premium

4

SC1:5210217.8

and the MIP; and (ii) 100% of the Tranche A Remaining Subscription Rights.

(d) *Voting*:  Class 4 is Impaired and each Holder of a 2017 Term Loan Secured Claim is entitled to vote to accept or reject the Plan.

5. <u>Class 5 – Unsecured Debt Claims</u>

(a) *Classification*:  Class 5 consists of all Unsecured Debt Claims.

(b) *Allowance*:  The 2017 Term Loan Deficiency Claims shall be Allowed at an aggregate amount equal to $794,000,000, representing the excess of the principal and accrued and unpaid interest at the contractual rate, including the Default Rate (as defined in the 2017 Term Loan Agreement) to the extent applicable, up to and including the Petition Date plus all other fees, costs, charges and other expenses provided for under the 2017 Term Loan Agreement, above the amount of the stipulated secured claim as of the Confirmation Date.  The 2016 Term Loan Claims shall be Allowed in an aggregate amount equal to $1,045,453,264, representing the principal and accrued and unpaid interest at the contractual rate, including the Default Rate (as defined in the 2016 Term Loan Agreement) to the extent applicable, up to and including the Petition Date plus all other fees, costs, charges and other expenses provided for under the 2016 Term Loan Agreement.  The Second Lien Notes Claims shall be Allowed in an aggregate amount equal to $1,893,358,228, representing the principal and accrued and unpaid interest at the contractual rate, up to and including the Petition Date plus all other fees, costs, charges and other expenses provided for under the Second Lien Notes Indenture.  The Unsecured Notes Claims shall be Allowed in an aggregate amount equal to $247,590,679, representing the principal and accrued and unpaid interest at the contractual rate, up to and including the Petition Date plus all other fees, costs, charges and other expenses provided for under the Unsecured Notes Indenture.

(c) *Treatment*:  On the Effective Date, each Holder of Unsecured Debt Claims shall receive, on account of and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Unsecured Debt Claims, its Pro Rata share of (i) 16.4% of the total New Common Stock subject to dilution by the Rights Offering, the Backstop Commitment Premium, the Eligible Stock, the Exit Premium and the MIP; and (ii) 100% of the Tranche B Remaining Subscription Rights; *provided* that the receipt and retention of all New Common Stock and Tranche B Remaining Subscription Rights by Holders of Unsecured Debt Claims shall not be subject to any turnover or similar provisions in any of the Intercreditor

5

Agreements or similar agreement requiring turnover of such New Common Stock or Tranche B Remaining Subscription Rights.

(d)   *Voting*:  Class 5 is Impaired and each Holder of an Unsecured Debt Claim is entitled to vote to accept or reject the Plan.

6.   Class 6 – General Unsecured Claims

(a)   *Classification*:  Class 6 consists of all General Unsecured Claims.

(b)   *Treatment*:  The legal, equitable and contractual rights of the Holders of Allowed General Unsecured Claims are unaltered by the Plan (subject to the Allowed amount of such Claims being "statutorily capped" under section 502 of the Bankruptcy Code, as applicable).  Each Holder of an Allowed General Unsecured Claim shall receive one of the following treatments:  (i) on account of and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed General Unsecured Claim (A) Cash in the amount of its Allowed General Unsecured Claim (1) on the Effective Date or as soon thereafter as is reasonably practicable (to the extent not previously paid as authorized by the Bankruptcy Court during the Chapter 11 Cases), (2) on the date that such Allowed General Unsecured Claim becomes due and owing in the ordinary course of the Debtors' business, if after the Effective Date or (3) on the date that such Allowed General Unsecured Claim becomes an Allowed Claim, or as soon thereafter as reasonably practicable, or (B) such other less favorable treatment as may be agreed upon by the Holder thereof and the applicable Debtor(s), (ii) such other treatment as may be required to allow such Allowed General Unsecured Claim to be paid in the ordinary course of business after the Effective Date of the Chapter 11 Cases or (iii) treatment of such Allowed General Unsecured Claim in any other manner that renders the Claim Unimpaired.

(c)   *Voting*:  Class 6 is Unimpaired.  Each Holder of a General Unsecured Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of General Unsecured Claims is entitled to vote to accept or reject the Plan.

7.   Class 7 – Interests in CRC

(a)   *Classification*:  Class 7 consists of all Interests in CRC.

(b)   *Treatment*:  No Holder of an Interest in CRC shall receive any distributions on account of its Interest.  On and after the Effective Date, all Interests in CRC shall be cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

(c)   *Voting*:  Class 7 is Impaired.  Each Holder of an Interest in CRC is conclusively deemed to have rejected the Plan pursuant to section 1126(g)

6

of the Bankruptcy Code.  No Holder of an Interest in CRC is entitled to vote to accept or reject the Plan.

E.      Treatment of Intercompany Claims

Notwithstanding anything herein to the contrary, on the Effective Date or as soon thereafter as is reasonably practicable, at the option of the Reorganized Debtors with the consent of the Required Consenting Parties as set forth in the Restructuring Support Agreement, all Intercompany Claims will be:  (i) preserved and reinstated, in full or in part; (ii) canceled and discharged, in full or in part, in which case such discharged and satisfied portion shall be eliminated and the Holders thereof shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such portion under the Plan; (iii) eliminated or waived based on accounting entries in the Debtors' or the Reorganized Debtors' books and records and other corporate activities by the Debtors or the Reorganized Debtors; (iv) contributed to the capital of the obligor entity; or (v) otherwise compromised.  In no event shall Intercompany Claims be Allowed as General Unsecured Claims or entitled to any distribution under the Plan.

Summary of Classification and Treatment of
Claims and Interests in the Debtors

THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.

The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order deeming the substantive consolidation of the Debtors' Estates into a single Estate for certain limited purposes related to the Plan, including voting, Confirmation and distribution.  As a result of the deemed substantive consolidation of the Estates, each Class of Claims and Interests will be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors.  The Plan will not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to voting and distribution rights under the Plan.

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including related to the claims reconciliation process.  Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual distribution received by Creditors.  The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only.  In addition to the cautionary notes contained elsewhere in the Disclosure Statement, it is underscored that the Debtors make no representation as to the accuracy of these recovery estimates.  The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

For a summary of the treatment of each Class of Claims and Interests, see Article IV, "Summary of the Plan," below.

7

SC1:5210217.8

Summary of Classes and Treatment of Claims and Interests in the Debtors

| Claims | Plan Treatment of Allowed Claims and Interests | Status | Projected Recovery Under the Plan at Set- Up Equity Value[2] | Projected Recovery under the Plan if ICE Brent strip price < $40/Bbl[3] | Estimated Allowed Claims |
|---|---|---|---|---|---|
| Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment with the applicable Debtor(s), in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes Allowed and (iii) such other date as may be ordered by the Bankruptcy Court which does not result in an impairment of such Allowed Other Priority Claim. | Unimpaired | 100% | 100% | [•] |
| Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment with the applicable Debtor(s), in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive one of the following treatments, in the sole discretion of the applicable Debtor: (i) payment in full in Cash, including the payment of any interest payable under section | Unimpaired | 100% | 100% | [•] |

---

[2]   Subject to footnote 3 below, the Set-Up Equity Value is $1.65 billion.

[3]   If, during the five business days prior to the conditional approval of the Disclosure Statement by the Court, the average closing price of the ICE Brent strip price for the period of December 2020 to November 2021 (to be determined by taking the arithmetic average of the 12 monthly contracts available for Brent Crude (ICE) as provided by Bloomberg, L.P. utilizing the ticker symbol COA COMDTY during the period from December 2020 to November 2021) is less than $40.00/Bbl, the Set-Up Equity Value will be $1.3 billion.

8

| Claims | Plan Treatment of Allowed Claims and Interests | Status | Projected Recovery Under the Plan at Set- Up Equity Value[2] | Projected Recovery under the Plan if ICE Brent strip price < $40/Bbl[3] | Estimated Allowed Claims |
|---|---|---|---|---|---|
| | 506(b) of the Bankruptcy Code on the later of (1) the Effective Date and (2) on the date that such Allowed Other Secured Claim becomes Allowed, or as soon thereafter as is reasonably practicable; (ii) delivery of the collateral securing such Allowed Other Secured Claim or (iii) treatment of such Allowed Other Secured Claim in any other manner that renders the Claim Unimpaired. | | | | |
| RBL Claims | On the Effective Date, each Holder of RBL Claims shall receive, on account of and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed RBL Claims shall be paid in full in Cash in an amount equal to such Allowed RBL Claims, to the extent not previously paid from the proceeds of the DIP Facilities. | Unimpaired | 100% | 100% | $0 |
| 2017 Term Loan Claims[4] | On the Effective Date, each Holder of 2017 Term Loan Claims shall receive, (A) on account of and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed 2017 Term Loan Secured Claims, its Pro Rata share of (i) 83.6% of the total New Common Stock subject to dilution by the Rights Offering, the Backstop Commitment Premium, the Eligible Stock, the Exit Premium and the MIP and (ii) 100% of the Tranche A Remaining Subscription Rights; and (B) on account of and in full and final | Impaired | 35.0% | 17.1% | $1,330,854,868 |

---

[4]   The estimated 2017 Term Loan Claims recovery does not include receipt of the Remaining Tranche A Subscription Rights pursuant to the terms of the Plan and the Rights Offering Procedures.  The value of the Remaining Tranche A Subscription Rights cannot be estimated due to uncertainty regarding the level of subscription.

9

| Claims | Plan Treatment of Allowed Claims and Interests | Status | Projected Recovery Under the Plan at Set-Up Equity Value[2] | Projected Recovery under the Plan if ICE Brent strip price < $40/Bbl[3] | Estimated Allowed Claims |
|---|---|---|---|---|---|
| | satisfaction, settlement, release and discharge of and in exchange for its Allowed 2017 Term Loan Deficiency Claim, its Pro Rata share of (i) 16.4% of the total New Common Stock subject to dilution by the Rights Offering, the Backstop Commitment Premium, the Eligible Stock, the Exit Premium and the MIP and (ii) 100% of the Tranche B Remaining Subscription Rights. | | | | |
| Unsecured Debt Claims Other Than 2017 Term Loan Deficiency Claim[5] | On the Effective Date, each Holder of Unsecured Debt Claims shall receive, on account of and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Unsecured Debt Claims, its Pro Rata share of (i) 16.4% of the total New Common Stock subject to dilution by the Rights Offering, the Backstop Commitment Premium, the Eligible Stock, the Exit Premium and the MIP and (ii) 100% of the Tranche B Remaining Subscription Rights. | Impaired | 2.2% | 1.1% | $3,186,402,171 |
| General Unsecured Claims | The legal, equitable and contractual rights of the Holders of Allowed General Unsecured Claims are unaltered by the Plan (subject to the Allowed amount of such Claims being "statutorily capped" under section 502 of the Bankruptcy Code, as applicable). Each Holder of an Allowed General Unsecured Claim shall receive one of the following treatments: (i) on | Unimpaired | 100% | 100% | [•] |

---

5    The estimated Unsecured Debt Claims other than 2017 Term Loan Deficiency Claim recovery does not include receipt of the Remaining Tranche B Subscription Rights pursuant to the terms of the Plan and the Rights Offering Procedures.  The value of the Remaining Tranche B Subscription Rights cannot be estimated due to uncertainty regarding the level of subscription.

10

SC1:5210217.8

| Claims | Plan Treatment of Allowed Claims and Interests | Status | Projected Recovery Under the Plan at Set- Up Equity Value[2] | Projected Recovery under the Plan if ICE Brent strip price < $40/Bbl[3] | Estimated Allowed Claims |
|---|---|---|---|---|---|
| | account of and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed General Unsecured Claim (A) Cash in the amount of its Allowed General Unsecured Claim (1) on the Effective Date or as soon thereafter as is reasonably practicable (to the extent not previously paid as authorized by the Bankruptcy Court during the Chapter 11 Cases), (2) on the date that such Allowed General Unsecured Claim becomes due and owing in the ordinary course of the Debtors' business, if after the Effective Date or (3) on the date that such Allowed General Unsecured Claim becomes an Allowed Claim, or as soon thereafter as reasonably practicable, or (B) such other less favorable treatment as may be agreed upon by the Holder thereof and the applicable Debtor(s), (ii) such other treatment as may be required to allow such Allowed General Unsecured Claim to be paid in the ordinary course of business after the Effective Date of the Chapter 11 Cases or (iii) treatment of such Allowed General Unsecured Claim in any other manner that renders the Claim Unimpaired. | | | | |
| Interests in CRC | No Holder of an Interest in CRC shall receive any distributions on account of its Interest. On and after the Effective Date, all Interests in CRC shall be cancelled, released and extinguished, and shall be of no further force and effect, whether surrendered for cancellation or otherwise. | Impaired | 0% | 0% | [•] |

11

F.      Voting Procedures and Voting Deadline

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.  Holders of Claims who are deemed to accept or deemed to reject the Plan will not receive Ballots.  To ensure your vote is counted, you must complete, date, sign and promptly mail the Ballot enclosed with the notice or complete your Ballot using the online portal maintained by the Solicitation and Claims Agent, in each case indicating your decision to accept or reject the Plan in the boxes provided.

The Ballot also contains an election to opt out of the release provisions contained in Section 10.7 of the Plan.  Unless you indicate your decision to opt out of the releases described in Section 10.7 of the Plan on the Ballot, you will be deemed to consent to such releases.

TO BE COUNTED, YOUR BALLOT INDICATING YOUR ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY THE SOLICITATION AND CLAIMS AGENT NO LATER THAN 4:00 P.M. (PREVAILING CENTRAL TIME) ON SEPTEMBER 21, 2020 (THE "VOTING DEADLINE").

In order for the Plan to be accepted by an impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan.  At least one Voting Class, excluding the votes of insiders, must actually vote to accept the Plan.

YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY MAIL THE BALLOT ENCLOSED WITH THE NOTICE OR COMPLETE YOUR BALLOT USING THE ONLINE PORTAL MAINTAINED BY THE SOLICITATION AND CLAIMS AGENT. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY AND TO IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE HOLDER.  IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE DISCLOSURE STATEMENT, THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE SOLICITATION AND CLAIMS AGENT AT (855) 917-3506 OR, FOR INTERNATIONAL CALLERS, AT +1 (503) 520-4480. THE SOLICITATION AND CLAIMS AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.

G.      Confirmation of the Plan

1.      Plan Objection Deadline

Objections to Confirmation of the Plan must be filed with the Bankruptcy Court and served so as to be actually received on or before 4:00 p.m. (prevailing Central Time) on September 21, 2020.  Unless objections to Confirmation are timely served and filed in compliance with the *Order (I) Scheduling an Objection Deadline and Combined Hearing on the Disclosure Statement and Plan Confirmation, (II) Approving the Form and Manner of Notice of*

12

*the Combined Hearing, (III) Establishing Procedures for Objecting to the Disclosure Statement and the Plan, (IV) Approving the Solicitation Procedures, (V) Conditionally Approving the Disclosure Statement, (VI) Approving the Rights Offering Procedures and (VII) Granting Related Relief* [Docket No. •] (the "Solicitation Procedures Order"), they will not be considered by the Bankruptcy Court.

>2.      Confirmation Hearing

The Bankruptcy Court has scheduled the hearing to consider the adequacy of this Disclosure Statement and confirmation of the Plan (the "Confirmation Hearing") for October 5, 2020 at [•] [a.m./p.m.] (prevailing Central Time). The Confirmation Hearing may be adjourned by the Bankruptcy Court or the Debtors without further notice other than by announcement in open court and/or notice(s) of adjournment filed on the docket with the Bankruptcy Court's permission.

THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.

## ARTICLE II

### GENERAL INFORMATION REGARDING THE DEBTORS

A.      The Debtors' Corporate History

Debtor California Resources Corporation ("CRC") was incorporated in Delaware on April 23, 2014 as a wholly owned subsidiary of Occidental Petroleum Corporation ("Occidental"). On December 1, 2014, CRC was spun off from Occidental and became an independent, publicly traded company. CRC is an independent, publicly traded oil and natural gas exploration and production company that, with its wholly owned subsidiaries, operates properties exclusively within California with offices throughout California and in Houston, Texas.

CRC is the direct parent of 15 of the Debtor subsidiaries. Of these direct subsidiaries, Debtors California Heavy Oil, Inc., Socal Holding, LLC, Southern San Joaquin Production, Inc., California Resources Petroleum Corporation, California Resources Elk Hills LLC, California Resources Production Corporation, California Resources Long Beach, Inc., California Resources Mineral Holdings LLC and California Resources Production Mineral Holding LLC are all owners and operators of oil and gas assets. Debtor CRC Marketing, Inc. primarily markets the Debtors' production. Debtor CRC Services, LLC manages the Debtors' centralized cash management system and provides procurement and IT services. Debtor CRC Construction Services, LLC is a party to a project labor agreement. Debtor California Resources Real Estate Ventures, LLC owns and operates commercial real estate. Debtor California Resources Royalty Holdings, LLC owns and holds non-participating royalty interests in the Debtors' oil and gas assets. Debtor Oso Verde Farms, LLC is the Debtors' farming entity.

Of the seven other Debtor subsidiaries, Debtor California Resources Elk Hills, LLC is the direct or indirect parent of two downstream subsidiaries: California Resources Coles

13

Levee, L.P. and California Resources Coles Levee, LLC; Debtor California Resources Long Beach, Inc. is the direct or indirect parent of four subsidiaries: California Resources Tidelands, Inc., California Resources Wilmington, LLC, Tidelands Oil Production Company LLC and Thums Long Beach Company and Debtor California Resources Production Corporation is the direct parent of Monument Production Inc.  Debtors California Resources Coles Levee, L.P. and California Resources Coles Levee, LLC are the owners of the North and South Coles Levee fields.  Debtors California Resources Tidelands, Inc., California Resources Wilmington, LLC, Tidelands Oil Production Company LLC, Thums Long Beach Company and Monument Production Inc. are owners or contract operators of oil and gas assets.

B.      The Debtors' Assets and Operations

The Debtors are the largest oil and natural gas producer in California on a gross operated basis, operating over half of the fields in the state.



1.      Mineral Acreage

While the majority of California production is shallow, CRC accounts for the majority of deeper production.



14

The Debtors' operations are located exclusively in California with a vast majority of the operations in four of the oil and natural gas basins: San Joaquin, Los Angeles, Ventura and Sacramento.



The Elk Hills field, the former U.S. Government strategic petroleum reserve located in the San Joaquin basin, is the Debtors' largest producing asset and one of the largest fields in the continental U.S. based on the field's total recoverable and proved reserves.

The Debtors hold the largest privately held mineral acreage position in California, consisting of approximately 2.2 million net mineral acres spanning California's four major oil and natural gas basins.  Approximately 60% of the Debtors' total net mineral interest position is held in fee, approximately 23% is subject to term leases and approximately 17% is held by production (where the Debtors are parties to contractual arrangements granting the Debtors exploration and production rights as long as the Debtors continue to produce oil and natural gas in paying quantities from the acreage associated with those arrangements).  The total developed and undeveloped mineral acreage across these four basins as of December 31, 2019 is as follows:

| | San Joaquin Basin | Los Angeles Basin | Ventura Basin | Sacramento Basin | Total |
|---|---|---|---|---|---|
| | *(in thousands)* | | | | |
| **Developed[1]** | | | | | |
| Gross[2] | 426 | 21 | 63 | 266 | 776 |
| Net[3] | 349 | 16 | 61 | 247 | 673 |
| **Undeveloped[4]** | | | | | |
| Gross[2] | 1,275 | 17 | 204 | 348 | 1,844 |
| Net[3] | 1,041 | 14 | 171 | 265 | 1,491 |
| **Total** | | | | | |
| Gross[2] | 1,701 | 38 | 267 | 614 | 2,620 |
| Net[3] | 1,390 | 30 | 232 | 512 | 2,164 |

1. Mineral acres spaced or assigned to productive wells.
2. Total number of mineral acres in which interests are owned.

15

3.   Net mineral acreage includes acreage reduced to the Debtors' fractional ownership interest and interests under arrangements similar to production-sharing contracts ("PSCs").

4.   Mineral acres on which wells have not been drilled or completed to a point that would permit the production of commercial quantities of oil and natural gas, regardless of whether the mineral acreage contains proved reserves.

### 2.   Reserves

As of December 31, 2019, the Debtors had total estimated proved reserves of approximately 644 million barrels of oil equivalent ("boe"), of which 493 million boe were proved developed reserves and 151 million boe were proved undeveloped reserves. Of these amounts, 417 million boe were attributable to the San Joaquin basin, 170 million to the Los Angeles basin, 42 million to the Ventura basin and 15 million to the Sacramento basin.

CRC refers to PV-10, a non-GAAP financial measure that represents the year-end present value of estimated future cash inflows from proved oil and natural gas reserves, less future development and production costs, discounted at 10% per annum to reflect the timing of future cash flows and using the unweighted arithmetic average of the first-day-of-the-month price for each month within the calendar year.  As of December 31, 2019, the PV-10 of CRC's proved reserves was approximately $6.8 billion.

### 3.   Drilling Locations

As of December 31, 2019, the Debtors had approximately 2,100 gross (1,809 net)[6] drilling locations attributable to their proved undeveloped reserves.  The Debtors have identified a multi-year inventory of 16,270 gross (15,800 net) unproven drilling locations that are not associated with proved undeveloped reserves but are specifically identified on a field-by-field basis considering the applicable geologic, engineering and production data.  The Debtors also have an exploration portfolio, which contains approximately 13,910 gross (6,660 net) unrisked prospective drilling locations identified in conventional reservoirs and 6,400 gross (5,300 net) unrisked prospective resource drilling locations identified in unconventional reservoirs.

### 4.   Productive Wells

Productive wells are those that produce, or are capable of producing, commercial quantities of hydrocarbons, regardless of whether they produce a reasonable rate of return at any given point in time.  As of December 31, 2019, the Debtors had 10,712 gross (9,695 net) productive oil wells and 1,086 gross (1,003 net) productive natural gas wells.  The Debtors' average working interest in producing wells is approximately 90%.

### 5.   Production Sharing Contracts

Debtors Tidelands Oil Production Company LLC and California Resources Long Beach, Inc. are parties to certain PSCs related to the development of certain portions of the Wilmington oil field in the tidelands located within the city limits of Long Beach, California. These PSCs consist of several complex agreements, many of which were originally entered into over 50 years ago by parties unrelated to the Debtors.

---

6   Gross wells refers to the total number of wells in which interests are owned by the Debtors.  Net wells includes wells reduced to the Debtors' fractional interest.

SC1:5210217.8

6.	Marketing Arrangements

Debtor CRC Marketing, Inc. sells crude oil, natural gas and NGLs to California refineries and other purchasers that have access to transportation and storage facilities. For the year ended December 31, 2019, the Debtors' principal customers were Phillips 66 Company and Valero Marketing & Supply Company. Each accounted for at least 10%, and together accounted for 46%, of the Debtors' oil and natural gas sales before the effects of hedging.

(a)	Crude Oil

The Debtors sell all of their crude oil into the California refining markets, which offer extremely favorable pricing for comparable grades relative to other regions in North America and worldwide. Currently, all of the Debtors' crude oil sales contracts are index-based and have 30- to 90-day termination provisions. Substantially all of the Debtors' crude oil production is connected to third-party pipelines and California refining markets via the Debtors' gathering systems. The Debtors do not refine or process the crude oil they produce and do not have any significant long-term transportation arrangements.

(b)	Natural Gas

The Debtors sell all of their natural gas not used in their operations into the California markets. Natural gas prices and differentials are strongly affected by local market fundamentals, such as storage capacity and the availability of transportation capacity in the market and producing areas. Transportation capacity influences prices because California imports more than 90% of its natural gas from other states and Canada. As a result, the Debtors typically enjoy favorable margins relative to out-of-state producers due to lower transportation costs on the delivery of natural gas.

In addition to selling natural gas, the Debtors also use natural gas for their steamfloods (a form of heavy oil extraction) and power generation. As a result, the positive impact of higher natural gas prices is partially offset by higher operating costs of the Debtors' steamflood projects and power generation, but higher prices still have a net positive effect on the Debtors' operating results due to higher revenue. Conversely, lower natural gas prices lower the operating costs but have a net negative effect on the Debtors' financial results.

The Debtors currently have sufficient firm transportation capacity contracts to transport their natural gas, where some capacity volumes vary by month. The Debtors sell virtually all of their natural gas production under individually negotiated contracts using market-based pricing on a monthly or shorter basis.

(c)	NGLs

NGL price realizations are related to the supply and demand for the products making up these liquids. The Debtors' earnings are also affected by the performance of their natural gas-processing plants, which process the Debtors' wet gas to extract NGLs and other natural gas byproducts. The Debtors then deliver the dry gas to pipelines and separately sell the NGLs. The Debtors currently have pipeline delivery contracts to transport a minimum of 6,500

17

barrels per day of NGLs to market.  Virtually all of the Debtors' NGLs are sold using index-based pricing.  The Debtors' NGLs are generally sold pursuant to one-year contracts that are renewed annually.

      7.      The Debtors' Infrastructure

The Debtors, directly or indirectly, own or control a network of infrastructure that is integral to and complements their operations.  This includes gas processing plants, power plants, steam generators/plants, compressors, water management systems, water softeners, oil and NGL storage and gathering systems.

The significant scale of the Debtors' owned or controlled infrastructure reduces the Debtors' operating costs.  For example, the Debtors' natural gas processing systems connect to third-party transportation pipelines, the Debtors utilize the power generated by their own facilities when possible, and the Debtors' gathering systems connect to multiple transportation lines, which provides the Debtors with access to improved prices.

| Description | Quantity | Unit[1] | Capacity | | |
|---|---|---|---|---|---|
| | | | San Joaquin Basin | Other Basins | Total |
| Gas Processing Plants | 9 | MMcf/d | 610 | 50 | 660 |
| Power Plants | 3 | MW | 600 | 50 | 650 |
| Steam Generators/Plants | >50 | MBbl/d | 220 | — | 220 |
| Compressors | 400 | MHp | 300 | 20 | 320 |
| Water Management Systems | 22 | MBw/d | 2,400 | 2,100 | 4,500 |
| Water Softeners | 30 | MBw/d | 265 | — | 265 |
| Oil and NGL Storage | — | MBbls | 580 | 660 | 1,240 |
| Gathering Systems | — | Miles | — | — | >8,000 |

      8.      The Debtors' Employees

As of the Petition Date, the Debtors had approximately 1,224 employees.

      9.      Surface Assets

CRC has interests in diversified property throughout California representing 80,000 surface acres, including in Los Angeles, Ventura and Kern County.  CRC's Los Angeles surface assets are comprised of lands in Huntington Beach, Pacoima, Harbor City, Fort Apache and West Pico.  CRC's Ventura surface assets include property in Santa Paula and Ojai.  In Kern County, CRC owns commercial property and property in Kern Bluff.  Additionally, CRC owns certain agricultural surface assets.  All of CRC's surface assets are pledged under the DIP Facilities (discussed below).

C.      Financial Performance and Cash Position

For the three months ended March 31, 2020, the Debtors had $228 million of net cash provided by operating activities, $12 million of net cash used in investing activities and $156 million of net cash used in financing activities.  For the year ended December 31, 2019, the

18

Debtors had $676 million of net cash provided by operating activities, $394 million of net cash used in investing activities and $282 million of net cash used in financing activities.

As of March 31, 2020, the Debtors had available liquidity of $395 million, which consisted of $67 million in unrestricted cash and $328 million of available borrowing capacity under the RBL Facility (as defined below).  As of December 31, 2019, the Debtors had available liquidity of $323 million, which consisted of $6 million in unrestricted cash and $317 million of available borrowing capacity under the RBL Facility.  As of the Petition Date, the Debtors have approximately $20 million in unrestricted cash and no remaining borrowing capacity.

D.      The Debtors' Prepetition Indebtedness

As of the Petition Date, the Debtors have approximately $5,235,010,656 in total funded debt, excluding accrued interest.  The following table summarizes the Debtors' prepetition indebtedness:

| Debt | Maturity | Approximate Principal Amount |
|---|---|---|
| RBL Facility | June 30, 2021 | $883,010,655 |
| 2017 Term Loan | December 31, 2022 | $1,300,000,000 |
| 2016 Term Loan | December 31, 2021 | $1,000,000,000 |
| Second Lien Notes | December 15, 2022 | $1,808,000,000 |
| Senior Unsecured Notes | September 15, 2021 | $100,000,000 |
| Senior Unsecured Notes | November 15, 2024 | $144,000,000 |
| Total: | | $5,235,010,656 |

1.      The RBL Facility

CRC is a party to that certain credit agreement, dated as of September 24, 2014 (as may be amended, modified or supplemented from time to time, the "RBL Agreement"), which provides for a first lien revolving credit facility (the "RBL Facility"), among CRC as borrower, several lenders from time to time parties thereto (the "RBL Lenders") and JPMorgan Chase Bank, N.A., as administrative agent (the "RBL Agent").  The RBL Facility allows for cash borrowings as well as the issuance of letters of credit ("LCs") to backstop certain of the Debtors' obligations.  Each of the other Debtors, other than Debtors California Resources Mineral Holdings LLC, California Resources Production Mineral Holdings, LLC, Monument Production, Inc. and Oso Verde Farms, LLC (the "Debtor Non-Guarantors"), guarantees CRC's obligations under the RBL Agreement.  The RBL Facility is secured by a first-priority lien on a substantial majority of the Debtors' assets.  Interest under the RBL Facility accrues at either LIBOR (London Inter-Bank Offered Rate) or an alternate base rate ("ABR"), in each case plus a margin that varies based on the utilization of the RBL Facility.  The unused portion of the RBL Facility is subject to a commitment fee of 0.50% per annum.  The RBL Facility matures on June 30, 2021.

The RBL Facility is structured as a "reserve backed loan," where funding availability is a function of an assessment of the relative value of CRC's oil and gas reserves, which contribute to a borrowing base against which CRC is able to borrow.  As of December 31, 2019, the borrowing base under the RBL Facility was $2.3 billion and was subject to scheduled

SC1:5210217.8

semi-annual redeterminations on May 1 and November 1 of each year and is based upon a number of factors, including commodity prices and the Debtors' reserves, and the RBL Lenders' aggregate commitment under the RBL Facility was $1 billion. In addition, the $1.3 billion outstanding under the 2017 Term Loan is taken into account in limiting the amount of the commitment available under the RBL Facility. Thus, a reduction to the borrowing base as of December 31, 2019 would have had the effect of reducing capacity under the RBL Facility. On April 30, 2020, the Debtors entered into an amendment to the RBL Agreement with the RBL Agent and the RBL Lenders, which amendment deferred the scheduled redetermination of the borrowing base to May 15, 2020 and reduced the revolving loan limit of the RBL Facility from $1 billion to $900 million. On May 15, 2020, the borrowing base was reduced from $2.3 billion to $1.2 billion.

As of the Petition Date, there is $732,871,057 in principal amount outstanding under the RBL Facility plus $150,139,598.62 in face amount of outstanding LCs.

2.      The 2017 Term Loan

On November 17, 2017, CRC as borrower entered into a credit agreement (as may be amended, modified or supplemented from time to time, the "2017 Term Loan") with the lenders from time to time parties thereto (the "2017 Term Loan Lenders") and The Bank of New York Mellon Trust Company, N.A., as administrative agent (the "2017 Term Loan Agent"), which provides for a $1.3 billion term loan facility. Each of the other Debtors, other than the Debtor Non-Guarantors, guarantees CRC's obligations under the 2017 Term Loan. The net proceeds of the 2017 Term Loan were used to pay the remaining balance on a term loan outstanding under the RBL Agreement. Interest under the 2017 Term Loan accrues at either LIBOR plus 4.75% or an ABR plus 3.75%. The 2017 Term Loan is secured by the same first-priority lien that secures the RBL Facility but is entitled to collateral recovery after the RBL Facility in accordance with the Collateral Agency Agreement (defined below). The 2017 Term Loan matures on December 31, 2022. As of the Petition Date, there is $1.3 billion outstanding under the 2017 Term Loan.

To govern the relationship between the 2017 Term Loan and the RBL Facility and the shared collateral relating to both, the RBL Agent, the 2017 Term Loan Agent and the Debtors entered into that certain Collateral Agency Agreement, dated as of November 17, 2017 (the "Collateral Agency Agreement").

3.      The 2016 Term Loan

On August 12, 2016, CRC as borrower entered into a credit agreement (as may be amended, modified or supplemented from time to time, the "2016 Term Loan") with the lenders from time to time parties thereto (the "2016 Term Loan Lenders") and The Bank of New York Mellon Trust Company, N.A., as administrative agent (the "2016 Term Loan Agent"), which provides for a $1.0 billion term loan facility. Each of the other Debtors, other than the Debtor Non-Guarantors, guarantees CRC's obligations under the 2016 Term Loan. The net proceeds of the 2016 Term Loan were used to (a) prepay $250 million of a term loan outstanding under the RBL Agreement and (b) repay then outstanding loans under the RBL Facility. Interest under the 2016 Term Loan accrues at either LIBOR plus 10.375% or an ABR plus 9.375%. The 2016

20

Term Loan is secured by a first-priority lien on a substantial majority of the Debtors' assets but is entitled to collateral recovery after the RBL Facility and the 2017 Term Loan in accordance with the Pari Passu Intercreditor Agreement (defined below).  The 2016 Term Loan matures on December 31, 2021.  As of the Petition Date, there is $1 billion outstanding under the 2016 Term Loan.

To govern the relationship between the 2016 Term Loan on the one hand and the 2017 Term Loan and the RBL Facility on the other hand, the RBL Agent, the 2017 Term Loan Agent, the 2016 Term Loan Agent and the Debtors entered into that certain Pari Passu Intercreditor Agreement, dated as of August 15, 2016 (the "Pari Passu Intercreditor Agreement").

4.      The Second Lien Notes

On December 15 2015, CRC, as the issuer, entered into an indenture (as may be amended, modified or supplemented from time to time, the "Second Lien Notes Indenture") with the guarantors party thereto and The Bank of New York Mellon Trust Company, N.A. ("BNYM"), as trustee and collateral trustee, pursuant to which CRC issued $2.25 billion in aggregate principal amount of 8% senior secured second lien notes due December 15, 2022 (the "Second Lien Notes").  Each of the other Debtors, other than the Debtor Non-Guarantors, guarantees CRC's obligations under the 2017 Term Loan.  Pursuant to the Agreement of Resignation, Appointment and Acceptance, dated as of June 18, 2020, by and among CRC, BNYM and Delaware Trust Company, BNYM resigned as trustee and collateral trustee and Delaware Trust Company was appointed the successor trustee and collateral trustee (in such capacities, the "Second Lien Notes Trustee").  The Second Lien Notes were issued in exchange for $2.8 billion aggregate principal amount of the Debtors' then-outstanding Senior Unsecured Notes (as defined and described below).  Interest on the Second Lien Notes accrues at 8% per annum and is paid semiannually in arrears on June 15 and December 15.  The Second Lien Notes are secured on a junior-priority basis to the first-priority liens that secure the loans under the RBL Facility, 2017 Term Loan and 2016 Term Loan in accordance with the 1L-2L Intercreditor Agreement (as defined below).  The Second Lien Notes require principal repayments of approximately $287 million in June 2021, $57 million in December 2021, $59 million in June 2022 and $1.41 billion in December 2022.  As of the Petition Date, the Debtors had approximately $1.808 billion in aggregate principal amount of the Second Lien Notes outstanding.

To govern the relationship between the 2016 Term Loan, the 2017 Term Loan and the RBL Facility on the one hand and the Second Lien Notes on the other hand, the RBL Agent, the 2017 Term Loan Agent, the 2016 Term Loan Agent, the Second Lien Notes Trustee and the Debtors entered into that certain Intercreditor Agreement, dated as of December 15, 2015 (the "1L-2L Intercreditor Agreement" and together with the Collateral Agency Agreement and the Pari Passu Intercreditor Agreement, the "Intercreditor Agreements").

5.      The Senior Unsecured Notes

On October 1, 2014, CRC entered into an indenture (as may be amended, modified or supplemented from time to time, the "Senior Notes Indenture") with the guarantors

21

party thereto and Wells Fargo Bank, National Association, as Trustee, pursuant to which CRC issued $5 billion in aggregate principal amount of senior unsecured notes, including $1 billion of 5% notes due on January 15, 2020 (the "2020 Notes"), $1.75 billion of 5.5% notes due September 15, 2021 (the "2021 Notes") and $2.25 billion of 6% notes due November 15, 2024 (the "2024 Notes" and, together with the 2020 Notes and the 2021 Notes, the "Senior Unsecured Notes"). Each of the other Debtors, other than the Debtor Non-Guarantors, guarantees CRC's obligations under the Senior Unsecured Notes. The Debtors used the net proceeds from the issuance of the Senior Unsecured Notes to make a $4.95 billion cash distribution to Occidental in October 2014.

As of the Petition Date, there is approximately $100 million aggregate principal amount of 2021 Notes outstanding and approximately $144 million aggregate principal amount of 2024 Notes outstanding.

E.      Elk Hills

1.      The Elk Hills Facilities

The Elk Hills field was discovered in 1911 and has produced over two billion barrels of oil equivalent since that time. It is the largest natural gas and natural gas liquids field in California, generating over half of the state's natural gas production. The Elk Hills field figured prominently in the Teapot Dome scandal in the 1920s and for decades was owned by the United States as part of the national strategic reserve.

The Elk Hills field is one of the Debtors' flagship assets. In 2019, approximately 40% of the Debtors' total production came from the Elk Hills field.

The Debtors extract oil and gas from the Elk Hills fields, which can be gas associated with oil extraction or directly from wells. This gas, referred to as "wet gas," is transported through the Debtors' pipelines to a cryogenic gas plant (the "Cryogenic Plant"), where it is processed to extract NGLs and other natural gas byproducts. The resulting NGLs and residue gas, referred to as "dry gas," are then transported through pipelines to be sold. The Cryogenic Plant processes all of the wet gas that the Debtors extract from their Elk Hills fields, and thus it is critical to ensure continuing the Debtors' operations.

Occidental constructed the Cryogenic Plant and it began operations in July 2012 (prior to the spinoff of CRC). The Cryogenic Plant replaced two older low-temperature separation processing plants (the "LTS Plants") located at Elk Hills. Among other advantages over the LTS Plants, the Cryogenic Plant separates NGLs more efficiently. This increased efficiency is important because, among other reasons, when a processing plant has low separation efficiency, the processed gas can contain too many natural gas byproducts or have too high a heat content, and thus not meet pipeline specifications for transport. The Cryogenic Plant is also more reliable than the LTS Plants, which may shutdown more frequently when ambient temperatures are too high.

Prior to CRC's spinoff, Occidental also constructed a 550-megawatt power plant at Elk Hills (the "Power Plant"). The Power Plant, which came online in July 2003 and later

22

added cogeneration capabilities, generates electricity by burning some of the dry gas produced by the Cryogenic Plant. CRC is the primary consumer of the electricity produced by the Power Plant. The joint venture between Debtor CREH (as defined below) and ECR (as defined below) has a contract with Southern California Edison for power and sells excess electricity to the California grid.

2.     The Elk Hills Transaction

Both the Power Plant and the Cryogenic Plant at Elk Hills are currently owned by Elk Hills Power, LLC ("EHP"), which is structured as a joint venture between Debtor California Resources Elk Hills, LLC ("CREH") and ECR Corporate Holdings L.P. ("ECR"). ECR is a portfolio company of Ares Management L.P. ("Ares"). Neither EHP nor ECR are debtors in this proceeding.

In 2018, the Debtors found themselves in need of financing to pay down debt they incurred as a result of CRC's spinoff from Occidental. After exploring various other financing options, the Debtors contributed the Elk Hills assets through the joint venture agreements with ECR described below, in exchange for $750 million cash.

Specifically, on February 7, 2018, CREH entered into several agreements that are integrated into a single unitary agreement[7] among ECR, EHP, and CRC (solely for the purpose of section 7.14 of the Contribution Agreement) (the "EHP Transactions"). ECR contributed $750 million to EHP in exchange for equity in EHP. Pursuant to the Contribution Agreement, CREH contributed the Cryogenic Plant to EHP, which already owned the Power Plant, in exchange for preferred and common equity in EHP. CREH also received $739 million of the $750 million contributed by ECR to EHP. CREH continues to be responsible for the day-to-day management of the business and affairs of EHP pursuant to the Master Services Agreement.

Under the EHP LLC Agreement, EHP is required to make monthly distributions of 13.5% per annum on ECR's $750 million contribution. EHP also makes distributions of

---

[7]   These agreements (collectively, the "EHP Agreements") are: (a) the Second Amended and Restated Elk Hills Power Limited Liability Company Agreement, dated as of February 7, 2018, by and between CREH and ECR (as may be amended, modified or supplemented from time to time, the "EHP LLC Agreement"); (b) the Contribution and Unit Purchase Agreement, dated as of February 7, 2018, by and between CREH, ECR and, solely for purposes of section 7.14 thereof, CRC (as may be amended, modified or supplemented from time to time, the "Contribution Agreement"); (c) the Master Services Agreement, dated as of February 7, 2018, by and between EHP and CREH (as may be amended, modified or supplemented from time to time, the "Master Services Agreement"); (d) the Commercial Agreement, dated as of February 7, 2018, by and between EHP and CREH (as may be amended, modified or supplemented from time to time, the "Commercial Agreement"); (e) Amendment No. 2 to the Gas Sales Agreement, dated as of February 7, 2018, by and between CRC Marketing, Inc. and EHP (as may be amended, modified or supplemented from time to time, the "Gas Sales Amendment"); (f) Employee Matters Agreement, dated February 7, 2018, by and between CRC and EHP (as may be amended, modified or supplemented from time to time, the "Employee Matters Agreement"); (g) that certain amendment to the Ground Lease, dated as of February 7, 2018, by and between EHP and CREH (as may be amended, modified or supplemented from time to time, the "Ground Lease") and (h) that certain amendment to the Easement Agreement for Oil and Gas Operations, dated as of February 6, 2018, by and between EHP and CREH (as may be amended, modified or supplemented from time to time, the "Oil and Gas Easement").

23

monthly excess cash flow, after the distribution to ECR on its $750 million contribution, to ECR and CREH at 4.75% and 95.25%, respectively.

The EHP LLC Agreement gives CREH the right to redeem most of ECR's equity interests in EHP by paying back ECR's contribution and making certain other payments, including any previously accrued but unpaid distributions on the preferred equity and a make-whole payment for the preferred equity if the redemption happens prior to February 7, 2023. CREH has the option of extending the redemption period for up to an additional two and one-half years, in which case ECR's preferred equity may be redeemed by paying back ECR's contribution and making certain other payments, including any previously accrued but unpaid distributions on the preferred equity and a make-whole payment for the preferred equity if the redemption happens prior to September 7, 2025.

Under the Commercial Agreement, CREH is obligated to purchase electricity, steam and gas processing services exclusively from EHP, subject to certain limitations, including certain geographical limitations, in exchange for monthly capacity payments. EHP uses these monthly capacity payments to cover operating expenses and make distributions to ECR. Under the Master Services Agreement, CREH provides services to EHP in exchange for monthly payments. Under the Employee Matters Agreement and the Contribution Agreement, certain of CRC's employees were hired by EHP and certain other employment matters were addressed. Under the Gas Sales Amendment, the parties amended, among other things, provisions regarding CRC Marketing Inc.'s continuing obligation to supply gas to EHP.

3.    The "Recharacterization Claim" and "Bypass" Option

Given the nature of the arrangement created by the EHP Agreements, the Debtors have evaluated whether to seek relief from the Court to determine if this arrangement should be recharacterized as a secured financing. The Debtors have explored the merits, costs, timing, likelihood of success and available remedies for the Recharacterization Claim.

The Debtors have also evaluated whether to "bypass" the joint venture by rejecting the EHP Agreements and utilizing other facilities available to the Debtors to secure power and gas processing. In this scenario, the Debtors would no longer buy electricity or gas processing capacity from EHP, and would instead find alternatives to support their operations at Elk Hills.

As an alternative to the Cryogenic Plant, the Debtors investigated the feasibility of processing wet gas at the LTS Plants, which the Cryogenic Plant had replaced in 2012. The Debtors and their advisors concluded that this approach, while technically feasible, would likely lead to less reliable processing facilities with lower separation efficiency, which would risk disruptions, perhaps substantial, to the Debtors' Elk Hills operations.

The Debtors also analyzed whether they could purchase electricity from the California grid to power their operations, and, if so, the cost of doing so. The Debtors and EHP both own a meter at Elk Hills, but EHP is the contractual counterparty in the relationship with Pacific Gas and Electric Company ("PG&E"). To purchase electricity from the grid, the Debtors would need to become customers of PG&E, a process which could take months. The market

24

price of electricity from the California grid is at least three times greater than the Power Plant's cost of producing the same amount of electricity.

The Debtors believe that while rejection and bypass may be a possible alternative to assuming the EHP Agreements, it would be very difficult to achieve from an operational perspective and would carry significant operational risks. Rejecting the EHP Agreements would also destroy much of the value of the joint venture—and the Debtors' stake in it. Further, ECR contests any argument that the EHP Agreements should be recharacterized as secured financing and would have vigorously litigated the foregoing. Considering all of these factors, the Debtors ultimately concluded that the Recharacterization Claim and bypass options would not be worth pursuing.

F.      Events Leading to the Commencement of the Debtors' Chapter 11 Cases

CRC was spun-off by Occidental in 2014 with over $6 billion of funded debt and had over $6.7 billion of debt at its peak in the second quarter of 2015. The spin-off coincided with a severe dislocation in commodity markets in late-2014 and a sharp decline in Brent crude oil prices, resulting in a diminished asset base compared to CRC's initial debt burden. CRC adapted to the new commodity price environment by reducing overall capital expenditures and executing on various deleveraging strategies, including liability management transactions and asset monetizations. In December 2015, CRC completed a debt exchange resulting in over $500 million of net debt reduction and, in August 2016, CRC completed a cash tender offer for its outstanding Senior Unsecured Notes resulting in over $600 million of net debt reduction. In addition, CRC further delevered by regularly repurchasing its debt in open market purchases at substantial discounts to par when such opportunities were determined to be attractive uses of capital. As a result of CRC's prudent capital management and the successful execution of various deleveraging strategies since the spin-off, CRC had reduced its debt to approximately $5 billion as of December 31, 2019.

Although commodity prices partially recovered in the latter half of 2017, permitting CRC to increase activity and investment at that time, the period of price declines beginning in late 2018, and in particular the disruptions to commodity markets during the first few months of 2020 and the exacerbation thereof by the COVID-19 global pandemic, have required CRC to further reduce its rig count and overall investment and focus on value preservation. On March 9, 2020, CRC issued a press release announcing that it was reducing its capital investment due to recent changes in the commodity market to a level that maintains the mechanical integrity of its facilities to operate them in a safe and environmentally responsible manner.

Throughout 2019 and early 2020, CRC had been considering and discussing with its advisors various opportunities to achieve its long-term goals of strengthening its balance sheet and reducing its absolute levels of debt, including potentially through liability management transactions, asset sales, monetizations of royalty and other property interests and other similar transactions. On August 28, 2019, CRC entered into an amendment to the RBL Agreement to provide CRC with flexibility in connection with specified royalty interest transactions that would facilitate further delevering. On February 20, 2020, CRC launched offers to exchange (the "Offers") a significant portion of the Second Lien Notes and the Senior Unsecured Notes into

25

interests in an entity that would hold a term royalty interest in certain of the Debtors' oil and gas assets or new term loans and warrants to purchase CRC's common stock. If the Offers were fully subscribed, CRC had expected that the royalty exchange transactions would have reduced CRC's net debt by approximately $1 billion.

On March 16, 2020, CRC announced the termination of the Offers as a result of substantial disruptive developments in the commodity and financial markets at that time that rendered the Offers inadvisable and impractical. CRC determined to pursue other alternatives to delever its balance sheet and protect the value of its business during the market dislocation, rather than to extend or amend the Offers.

G.      The Restructuring Support Agreements

1.      The Original Restructuring Support Agreement

In the months leading up to the Petition Date, the Debtors engaged in good faith and arm's length negotiations with their prepetition creditors in order to commence the Chapter 11 Cases with a consensual restructuring path. As a result of such hard-fought but constructive negotiations, on July 15, 2020, the Debtors entered into the Original Restructuring Support Agreement. The Original Restructuring Support Agreement would substantially deleverage the Debtors' balance sheet and guaranteed a significant new money investment that would enable the Debtors to go into chapter 11 with much-needed liquidity and ultimately emerge from chapter 11 with a substantially deleveraged balance sheet and a partnership with its key creditor constituency—the fulcrum class of 2017 Term Loans—as well as the re-contribution of the Elk Hills Power assets by Ares. It also had significant support from the Debtors' stakeholders: 84.4% of the 2017 Term Loan Lenders, 50.8% of the 2016 Term Loan Lenders, 8.2% of the Second Lien Noteholders and Ares are parties to the Original Restructuring Support Agreement.

2.      The Restructuring Support Agreement

Following the Petition Date, the Debtors continued to engage in good faith and arm's length discussions with their prepetition creditors, resulting in additional prepetition creditors of the Debtors agreeing to support the consensual restructuring transactions and executing the Restructuring Support Agreement on July 24, 2020.

The key financial components of the restructuring are as follows:

- the $1.133 billion DIP Financing;

- a commitment for a second lien exit facility in an aggregate principal amount of $200 million;

- a $450 million equity rights offering, backstopped by certain of the parties to the Restructuring Support Agreement; and

- a global settlement with respect to all issues relating to Ares' interest in EHP.

26

The Restructuring Support Agreement contemplates stakeholder recoveries as follows pursuant to the Plan:

- Holders of Claims on account of the RBL Facility will be paid in full;

- Holders of Claims on account of the 2017 Term Loan will be bifurcated into a stipulated secured Claim and a stipulated deficiency Claim, where Holders of the stipulated secured Claim will receive 83.6% of the total New Common Stock (subject to dilution by the Rights Offering, the Backstop Commitment Premium, the Eligible Stock, the Exit Premium and the MIP) and 100% of the Tranche A Remaining Subscription Rights;

- Holders of stipulated deficiency Claims on account of the 2017 Term Loan will be combined with the Holders of Claims on account of the 2016 Term Loan, the Second Lien Notes and the Unsecured Notes into a single "Unsecured Debt Claims" class which will receive 16.4% of the total New Common Stock (subject to dilution by the Rights Offering, the Backstop Commitment Premium, the Eligible Stock, the Exit Premium and the MIP) and 100% of the Tranche B Remaining Subscription Rights; and

- existing equity Interests in CRC will receive no recoveries and will be cancelled, released and extinguished, and will be of no further force or effect.

The Restructuring Support Agreement provides that the $450 million Rights Offering will be split into two tranches—"Tranche A" and "Tranche B"—with Tranche A being offered to holders of 2017 Term Loans with respect to their 2017 Term Loan Secured Claims ("Tranche A Equity Rights Offering") and Tranche B being offered to holders of Unsecured Debt Claims (the "Tranche B Equity Rights Offering"). The Tranche A Equity Rights Offering will be sized to raise $405 million and the Tranche B Equity Rights Offering will be sized to raise $45 million. The Rights Offering will be conducted on a Pro Rata basis in reliance upon one or more exemptions from registration under the Securities Act, which will include the exemption provided in section 1145 of the Bankruptcy Code to the fullest extent available.

Each Holder of 2017 Term Loan Secured Claims will receive its Pro Rata share of (i) 83.6% of the total New Common Stock in Reorganized CRC (subject to dilution by the Rights Offering, the Backstop Commitment Premium, the Eligible Stock, the Exit Premium and the MIP) and (ii) 100% of the Remaining Tranche A Subscription Rights. Each Holder of Unsecured Debt Claims will receive its Pro Rata share of (i) 16.4% of the total New Common Stock in Reorganized CRC (subject to dilution by the Rights Offering, the Backstop Commitment Premium, the Eligible Stock, the Exit Premium and the MIP) and (ii) 100% of the Remaining Tranche B Subscription Rights.

As of the date hereof, the Supporting Creditors that own or manage with the authority to act on behalf of the beneficial owners of  approximately 85% in principal amount of

27

the 2017 Term Loans and approximately 68% in principal amount of the Unsecured Debt Claims are party to the Restructuring Support Agreement.

3.      The Backstop Commitment Agreement

As part of the transaction contemplated by the Restructuring Support Agreement, CRC entered into a Backstop Commitment Agreement on July 15, 2020 (the "Original Backstop Commitment Agreement") with certain parties to the Restructuring Support Agreement.  On July 24, 2020, the Original Backstop Commitment Agreement was amended and restated in its entirety (the "Backstop Commitment Agreement") to provide for additional of the Debtors' creditors to become party thereto and to modify certain terms of the Original Backstop Commitment Agreement.  Pursuant to the Backstop Commitment Agreement, the Backstop Parties have agreed to backstop the $450 million Rights Offering at a 35% discount to the Plan equity value.  As discussed in more detail below, in consideration for agreeing to backstop the rights offering, (i) the Backstop Parties will receive (x) a 10% premium based on the amount of the Rights Offering or (y) a break premium in the aggregate amount of $22.5 million payable in cash if the Backstop Commitment Agreement is terminated for any reason, except for certain reasons as set forth therein and (ii) 37.5% of the Tranche A Equity Rights Offering and 50% of the Tranche B Equity Rights Offering will be reserved for the Backstop Parties and allocated based on the terms set forth in the Backstop Commitment Agreement.  The transactions contemplated by the Backstop Commitment Agreement are conditioned upon the satisfaction or waiver of customary conditions for transactions of this nature.

4.      The Settlement Agreement

During the period leading up to the Debtors commencing the Chapter 11 Cases, the Debtors engaged in negotiations with Ares and ECR (together, the "Ares Entities") over numerous disputes concerning the Debtors' and the Ares Entities' respective legal rights and obligations under the EHP Agreements, including, among other things, the possible ramifications of the implementation of the bypass scenario described above.  As part of a comprehensive resolution of such disputes, on July 15, 2020, CRC, CREH, EHP, ECR and certain other affiliates of Ares entered into a settlement and assumption agreement (the "Settlement Agreement").

The Settlement Agreement provides that CRC and CREH will act in the ordinary course with respect to EHP until the final approval of the Settlement Agreement by the Bankruptcy Court, including by not commencing any litigation against the Ares Entities and EHP.  In exchange, the Ares Entities have agreed to modify certain of their economic rights under the EHP Agreements.  As a result, the status quo with such modified economic rights will otherwise be maintained until the Settlement Agreement is approved.  Prior to the Bankruptcy Court's final approval of the Settlement Agreement, any party can terminate the Settlement Agreement without any further effect to any party in the event certain bankruptcy timing milestones are not met or upon material breach of the agreement by another party.

Upon the Bankruptcy Court's final approval of the Settlement Agreement, the Debtors, on the one hand, and the Ares Entities, on the other hand, will provide each other with a mutual release of all past and present claims with respect to the EHP Transactions.  In addition,

28

(a) the Ares Entities' economic concessions with respect to the EHP Agreements will be memorialized in an amendment to the EHP LLC Agreement and (b) the Ares Entities will grant the Debtors a conversion right with respect to the equity interests of EHP owned by the Ares Entities (the "Ares Interests"). Upon the Bankruptcy Court's final approval of the Settlement Agreement, the Debtors will have the right until December 31, 2021 to convert all of the Ares Interests into certain eligible debt and equity securities meeting the parameters set forth in the Settlement Agreement in connection with the confirmation of the Plan. As a result of the conversion, the Ares Entities would no longer own any equity securities of EHP and the EHP facilities will be effectively reintegrated into the Debtors' group of companies.

H.       The Debtors' Prepetition DIP Financing Marketing Efforts

Along with their efforts to effect the Offers as a method of deleveraging their balance sheet, the Debtors and their advisors have engaged in months of negotiations with their stakeholders regarding the terms of a transaction that will reduce leverage to a manageable level, provide sufficient liquidity for working capital needs, and position the Debtors for long-term success. Pursuant to these efforts, in April, 2020, the Debtors and their advisors began contacting a number of potential lenders, both within and outside their current capital structure, to provide a potential postpetition debtor-in-possession financing (the "DIP Financing").

As part of these efforts, the Debtors, with the assistance of their advisors, engaged in discussions with the RBL Agent and the RBL Lenders' advisors, certain of the 2016 Term Loan Lenders, certain of the 2017 Term Loan Lenders, and Ares regarding their interest in providing DIP Financing or consent to DIP Financing from a third-party source. After extensive negotiations between certain of the 2016 Term Loan Lenders, certain of the 2017 Term Loan Lenders, Ares, and the RBL Lenders, certain 2016 Term Loan Lenders and certain of the 2017 Term Loan Lenders provided a term sheet that would provide for a Senior DIP Facility (as defined below) funded by the RBL Lenders and a Junior DIP Facility (as defined below) funded by certain of the 2016 Term Loan Lenders and certain of the 2017 Term Loan Lenders. This DIP Financing was the best financing alternative available to the Debtors as it enjoyed the support of the Debtors' 2016 Term Loan Lenders, 2017 Term Loan Lenders, Ares, and RBL Lenders as well as provided the liquidity needed for the Debtors to continue operating in the ordinary course. Crucially, the funding of the Junior DIP Facility to pay down the Prepetition RBL Facility was a necessary component of the DIP Financing to obtain the support of the RBL Lenders.

As a result of the Debtors' postpetition DIP Financing marketing efforts, the Debtors have reached agreement with the RBL Agent and certain of the RBL Lenders, certain of the 2017 Term Loan Lenders and 2016 Term Loan Lenders to provide critically-needed senior secured superpriority postpetition DIP Financing (the "DIP Facilities"). The DIP Facilities represent the only actionable DIP Financing available to the Debtors as of the Petition Date, and was the result of extensive, arms' length negotiations with the RBL Agent and the RBL Lenders' advisors, the 2016 Term Loan Lenders' advisors, the 2016 Term Loan Agent, the 2017 Term Loan Lenders' advisors, and the 2017 term Loan Agent.

The DIP Facilities provide for financing in an aggregate amount of $1,133,010,655.62, consisting of (a) a $483,010,655.62 senior superpriority debtor-in-possession

29

credit facility (the "Senior DIP Facility"), consisting of (i) a $400,139,598.62 new money subfacility (the "Senior New Money Subfacility"), including $250,000,000 in new money loans and $150,139,598.62 to deem letters of credit outstanding under the RBL Facility as being issued under the Senior New Money Subfacility and a sublimit of not more than $35,000,000 for additional letters of credit, and (ii) a "roll-up" of $82,871,057.00 of commitments under the RBL Facility, which will be deemed term loans under the Senior DIP Facility (the "Senior Roll-Up Subfacility"), and (b) a $650,000,000 junior superpriority debtor-in-possession term loan facility (the "Junior DIP Facility").

## ARTICLE III

## THE CHAPTER 11 CASES

The Debtors intend to continue to operate their businesses in the ordinary course during the pendency of the Chapter 11 Cases.  To minimize disruptions to the Debtors' operations on the Petition Date, the Debtors intend to seek to have all of the Chapter 11 Cases assigned to the same bankruptcy judge and administered jointly and to file various motions seeking important and urgent relief from the Bankruptcy Court.  Such relief, if granted, will assist in the administration of the Chapter 11 Cases; however, there can be no assurance that the requested relief will be granted by the Bankruptcy Court.

A.      Commencement of the Chapter 11 Cases

The commencement of a chapter 11 case creates an estate that is composed of all of the legal and equitable interests of the debtor as of that date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."  Following the Petition Date, the Debtors will continue to operate their businesses and manage their properties as debtors and debtors in possession.  The Debtors also intend to seek approval from the Bankruptcy Court to have their cases jointly administered for procedural purposes only.

B.      Automatic Stay

The filing of the Debtors' bankruptcy petitions on the Petition Date will trigger the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoins all collection efforts and actions by creditors, the enforcement of Liens against property of the Debtors and both the commencement and the continuation of prepetition litigation against the Debtors.  With certain limited exceptions and/or modifications as permitted by order of the Bankruptcy Court, the automatic stay will remain in effect from the Petition Date until the Effective Date of the Plan.

C.      "First Day" Motions and Related Applications

On the Petition Date, the Debtors filed a number of "first-day" motions and applications (the "First Day Motions") designed to ease the Debtors' transition into Chapter 11, maximize the value of the Debtors' assets and minimize the effects of the commencement of the Chapter 11 Cases. On July 17, 2020, the Bankruptcy Court entered orders granting the first-day

30

SC1:5210217.8

motions (the "First Day Orders"), allowing the Debtors to continue certain normal business activities not specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior court approval.  In particular, the Bankruptcy Court entered First Day Orders:

1. on an interim basis, authorizing the Debtors to (a) continue their existing cash management system, (b) honor certain related obligations, (c) maintain existing bank accounts and (d) continue to perform intercompany transactions [Docket No. 124];

2. (a) authorizing the Debtors to file (i) a consolidated list of creditors in lieu of submitting a separate matrix for each Debtor and (ii) a consolidated list of the Debtors' top 30 creditors, (b) authorizing the Debtors to redact portions of the creditor matrix and list of top 30 creditors, and (c) approving the form and manner of notifying creditors of the commencement of the Chapter 11 Cases [Docket No. 115];

3. (a) extending the deadline by which the Debtors must file their (i) schedules of assets and liabilities, (ii) schedules of current income and expenditures, (iii) schedules of executory contracts and unexpired leases and (iv) statements of financial affairs, (b) extending the deadline by which the Debtors must file financial information reports under Bankruptcy Rule 2015.3(a) and (c) waiving the requirement to file a list of, and provide notice directly to, Debtor CRC's equity security holders [Docket No. 116];

4. (a) authorizing the Debtors to continue their insurance program, pay prepetition obligations relating thereto and revise, extent, supplement or change insurance coverage as needed, (b) modifying of the automatic stay to permit the Debtors' employees to proceed with Workers' Compensation Claims and (c) authorizing financial institutions to honor related payment requests [Docket No. 121];

5. (a) authorizing the Debtors to continue their surety bond program and pay prepetition obligations related thereto and (b) authorizing financial institutions to honor related payment requests [Docket No. 122];

6. (a) authorizing the Debtors to remit and pay certain prepetition taxes and assessments as they become due and (b) authorizing financial institutions to honor related payment requests [Docket No. 120];

7. (a) authorizing the Debtors to pay or honor royalty obligations and joint-interest billings payments and (b) authorizing financial institutions to honor related payment requests [Docket No. 119];

8. on an interim basis, (a) authorizing the Debtors to (i) pay certain prepetition compensation obligations and (ii) pay postpetition

31

compensation obligations in the ordinary course of business, and (b) authorizing financial institutions to honor related payment requests [Docket No. 117];

9. on an interim basis, authorizing the Debtors to pay certain prepetition claims of vendors [Docket No. 118];

10. (a) approving the form of adequate assurance of payments to utility companies, (b) establishing procedures for resolving objections by utility companies and (c) prohibiting utility companies from altering, refusing or discontinuing service [Docket No. 123];

11. authorizing the Debtors to (a) enter into and perform under postpetition hedging arrangements, (b) assume, and amend, as necessary, International Swap and Derivatives Association, Inc. Master Agreements and the prepetition swap contracts thereunder, (c) continue to perform under prepetition exchange agreements and (d) grant liens and superpriority administrative expense claims [Docket No. 125];

12. on an interim basis, (a) authorizing and approving the settlement by and among the Debtors, Elk Hills Power, LLC, ECR Corporate Holdings L.P. and certain affiliates of Ares Management LLC, and (b) authorizing the Debtors to assume the EHP Agreements as amended [Docket No. 126]

13. authorizing joint administration of the Chapter 11 Cases [Docket No. 48]; and

14. establishing notice and objection procedures for transfers of equity securities and claims of worthless stock deductions [Docket No. 166].

In addition, the Debtors have filed with the Court the *Debtors' Motion for an Order (I) Establishing a Record Date for Notice and Sell-Down Procedures for Trading in Certain Claims and (II) Granting Related Relief* [Docket No. 15].

D. Debtor-In-Possession Financing

In addition to the other First Day Motions, the Debtors also filed a motion seeking authority to obtain postpetition financing on a secured, superpriority basis in the aggregate maximum principal amount of up to $1,133,010,655.62, consisting of the Senior DIP Facility and the Junior DIP Facility (the "DIP Motion") [Docket No. 18].

On July 22, 2020, the Bankruptcy Court approved the DIP Motion on an interim basis and entered an order [Docket No. 185] authorizing, among other things, the Debtors to draw up to $266,139,598.62 under the Senior New Money Subfacility (including $150,139,598.62 to deem letters of credit outstanding under the RBL Facility as being issued under the Senior New Money Subfacility and up to $31,000,000 to issue additional letters of credit to backstop surety bonds), $82,871,057.00 under the Senior Roll-Up Subfacility, and $650,000,000 under the Junior DIP Facility.  In accordance with the order of the Bankruptcy

32

Court granting interim approval of entry into the DIP Facilities, the entire Junior DIP Facility and a portion of the Senior DIP Facility were used on the closing date to refinance and replace the RBL Facility in full.  A final hearing on the DIP Motion was scheduled for August 14, 2020 (the "Second Day Hearing").

E.      Other Procedural Motions and Retention of Professionals

        The Debtors have filed various motions that are common to chapter 11 proceedings of similar size and complexity as the Chapter 11 Cases, including applications to retain various professionals to assist the Debtors in the Chapter 11 Cases.

        On July 21, 2020 the Debtors filed with the Court the *Debtors' Motion for an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals and Notice of Opportunity for Hearing* [Docket No. 171], and the *Debtors' Motion for an Order Implementing Certain Procedures to Retain, Compensate and Reimburse Professionals Utilized in the Ordinary Course of Business* [Docket No. 172] (together, the "Professional Expenses Motions").  The Professional Expenses Motions will be heard at the Second Day Hearing.

F.      The Compensation Motion

        On July 23, 2020, the Debtors filed with the Court the *Debtors' Motion for an Order Authorizing, But Not Directing, the Debtors to Implement (I) the Quarterly Incentive Plan, (II) the Incentive and Retention Plan and (III) the Supplemental Retention* [Docket No. 209] (the "Compensation Motion").  In the Compensation Motion, the Debtors seek authority, but not direction, to implement the Debtors' quarterly incentive plan, which provides for cash incentive payments to the Debtors' insiders upon the achievement of certain financial and operational performance metrics, and the Debtors' incentive and retention plan and supplemental retention payments, which provide incentive and retention compensation to certain non-insider employees. The Compensation Motion will be heard at the Second Day Hearing.

G.      The Official Committee of Unsecured Creditors

        On July 27, 2020, the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code [Docket No. 228].  On July 29, 2020, the U.S. Trustee reconstituted the Committee to include two additional members [Docket No. 237].  The Committee is comprised of Wilmington Trust, National Association, Delaware Trust Company, Richard Soutsos, Kenai Drilling Limited, Chris G. Girand, Liberty Lift Solutions, LLC and Contra Costa Electric, Inc.

H.      Confirmation of the Plan

        In accordance with the Restructuring Support Agreement, the Debtors have agreed to implement the Plan through the Chapter 11 Cases in accordance with certain milestones.  The Restructuring Support Agreement requires, among certain other milestones, that the Bankruptcy Court enter the Confirmation Order within 105 days after the Petition Date.

33

SC1:5210217.8

Achieving the various milestones under the Restructuring Support Agreement is critical to the Debtors' successful reorganization, and the failure to satisfy such milestones could result in termination of the Restructuring Support Agreement and the Backstop Commitment Agreement and the loss of the current consensual path to a timely, value-maximizing emergence from chapter 11.

## ARTICLE IV

### SUMMARY OF THE PLAN

The Debtors believe that the Plan provides the best and most prompt possible recovery to Holders of Claims.  The Debtors believe that (i) through the Plan, Holders of Allowed Claims will obtain a recovery from the Debtors' estates equal to or greater than the recovery that they would receive if the Debtors' assets were liquidated under chapter 7 of the Bankruptcy Code and (ii) consummation of the Plan will maximize the recovery of the Holders of Allowed Claims.

The consummation of a plan is the principal objective of a chapter 11 case.  A plan sets forth the means for satisfying Claims against, and Interests in, a debtor.  Confirmation of a plan makes the plan binding upon the debtor, any issuer of securities under the plan and any creditor of, or equity Holder in, the debtor, whether or not such creditor or equity Holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the Confirmation Order, a Confirmation Order discharges the debtor from any debt that arose prior to the effective date of the plan and substitutes therefor the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual and equitable rights of the Holders of Claims or Interests in certain classes are to remain unaltered by the reorganization effectuated by the plan.  Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan.  Accordingly, a debtor need not solicit votes from the Holders of Claims or Interests in such classes.  A chapter 11 plan may also specify that certain classes will not receive any distribution of property or retain any Claim against a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan.  Any classes that are receiving a distribution of property under the plan but are impaired will be solicited to vote to accept or reject the plan.

Prior to soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan.  To satisfy the requirements of section 1125 of the Bankruptcy Code, the Debtors are submitting this Disclosure Statement to Holders of Claims and Interests against the Debtors who are entitled to vote to accept or reject the Plan.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE

SC1:5210217.8

PLAN.  THIS SECTION IS QUALIFIED IN ITS ENTIRETY BY AND IS SUBJECT TO THE PLAN AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.  REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER THE PLAN.  UPON OCCURRENCE OF THE EFFECTIVE DATE, THE PLAN AND ALL SUCH DOCUMENTS WILL BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND THEIR ESTATES AND ALL OTHER PARTIES IN INTEREST.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

STATEMENTS AS TO THE RATIONALE UNDERLYING THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN ARE NOT INTENDED TO, AND SHALL NOT, WAIVE, COMPROMISE OR LIMIT ANY RIGHTS, CLAIMS OR CAUSES OF ACTION IN THE EVENT THE PLAN IS NOT CONFIRMED.

The classification and treatment of Claims and Interests; treatment of Executory Contracts and Unexpired Leases; and effect of Confirmation, including the release, injunction and related provisions, are summarized below.  For all other provisions relating to the Plan, including acceptance or rejection of the Plan; implementation of the Plan; provisions governing distributions; provisions regarding governance of the Reorganized Debtors; conditions precedent to Confirmation and effectiveness of the Plan; modification, revocation or withdrawal of the Plan and retention of jurisdiction, please refer to the Plan attached hereto as Appendix A.

A.      Considerations Regarding the Plan

The terms of the Plan are the result of an analysis by the Debtors concerning various issues relating to how the distributable value should be allocated among the creditors of the various Debtors.  With respect to substantive consolidation, the Plan shall serve as a motion by the Debtors seeking entry of a court order deeming the substantive consolidation of the Debtors' Estates into a single Estate for certain limited purposes related to the Plan, including voting, Confirmation and distribution.  As a result of the deemed substantive consolidation of the Estates, each Class of Claims and equity Interests will be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors.  The Plan will not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to voting and distribution rights under the Plan.

35

Based upon the Debtors' analyses, the Plan provides that:

- Holders of Allowed Other Priority Claims shall be entitled to payment in full in Cash;

- Holders of Allowed Other Secured Claims shall be entitled to either (i) payment in full in Cash, (ii) delivery of the collateral securing such Allowed Other Secured Claim or (iii) treatment in any other manner that renders the Claim Unimpaired;

- Holders of RBL Claims shall be entitled to payment in full in Cash in an amount equal to such Allowed RBL Claims, to the extent not previously paid from the proceeds of the DIP Facilities;

- Holders of 2017 Term Loan Secured Claims shall be entitled to their Pro Rata share of (i) 83.6% of the total New Common Stock subject to dilution by the Rights Offering, the Backstop Commitment Premium, the Eligible Stock, the Exit Premium and the MIP; and (ii) 100% of the Tranche A Remaining Subscription Rights;

- Holders of Unsecured Debt Claims shall be entitled to their Pro Rata share of (i) 16.4% of the total New Common Stock subject to dilution by the Rights Offering, the Backstop Commitment Premium, the Eligible Stock, the Exit Premium and the MIP; and (ii) 100% of the Tranche B Remaining Subscription Rights; *provided* that the receipt and retention of all New Common Stock and Tranche B Remaining Subscription Rights by Holders of Unsecured Debt Claims shall not be subject to any turnover or similar provisions in any of the Intercreditor Agreements or similar agreement requiring turnover of such New Common Stock or Tranche B Remaining Subscription Rights;

- Holders of General Unsecured Claims shall be entitled to one of the following treatments: (i) on account of and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed General Unsecured Claim (A) Cash in the amount of its Allowed General Unsecured Claim (1) on the Effective Date or as soon thereafter as is reasonably practicable (to the extent not previously paid as authorized by the Bankruptcy Court during the Chapter 11 Cases), (2) on the date that such Allowed General Unsecured Claim becomes due and owing in the ordinary course of the Debtors' business, if after the Effective Date or (3) on the date that such Allowed General Unsecured Claim becomes an Allowed Claim, or as soon thereafter as reasonably practicable, or (B) such other less favorable treatment as may be agreed upon by the Holder thereof and the applicable Debtor(s), (ii) such other treatment as may be required to allow such Allowed General Unsecured Claim to be paid in the ordinary course of business after the Effective Date of the Chapter 11

36

> Cases or (iii) treatment of such Allowed General Unsecured Claim in any other manner that renders the Claim Unimpaired; and

- Holders of Interests in CRC shall not receive any Distributions on account of such Interest, and on and after the Effective Date, all Interests in CRC shall be cancelled, released and extinguished, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

B.      Classification and Treatment of Claims and Interests

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity Interest Holders.  In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Expense Claims and Priority Tax Claims, which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified).  The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtors into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each Claim or Interest of a particular class unless the Claim Holder or Interest Holder agrees to a less favorable treatment of its claim or interest.  The Debtors believe that they have complied with such standard.  If the Bankruptcy Court finds otherwise, however, it could deny Confirmation of the Plan if the Holders of Claims and Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  If such a situation develops, the Debtors intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its Confirmation.  Any such reclassification could materially adversely affect Holders of Claims and Interests by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.  EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM OR INTERESTS AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM OR INTEREST PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF

37

A CLAIM OR INTEREST REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

Any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein and/or the actual distribution received by Creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below.  The Debtors believe that the consideration, if any, provided under the Plan to Holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests.  The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan.  Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

1.      Deemed Substantive Consolidation

The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order deeming the substantive consolidation of the Debtors' Estates into a single Estate for certain limited purposes related to the Plan, including voting, Confirmation and distribution.  As a result of the deemed substantive consolidation of the Estates, each Class of Claims and Interests will be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors.  The Plan will not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to voting and distribution rights under the Plan.

2.      Summary of Classes and Treatment of Claims Against and Interests in the Debtors

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which of those classes are (i) impaired or unimpaired by the Plan and (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code or deemed to accept or reject the Plan.[8]

| Class | Designation | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | RBL Claims | Unimpaired | Deemed to Accept |
| 4 | 2017 Term Loan Secured Claims | Impaired | Entitled to Vote |
| 5 | Unsecured Debt Claims | Impaired | Entitled to Vote |

---

[8]     The information in the table is provided in summary form, and is qualified in its entirety by Section 4.3 of the Plan.

SC1:5210217.8

| Class | Designation | Status | Voting Rights |
|-------|-------------|--------|---------------|
| 6 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 7 | Interests in CRC | Impaired | Deemed to Reject |

3.      Treatment of Claims Against and Interests in the Debtors

(a)      Class 1 – Other Priority Claims

(a)      *Classification*:  Class 1 consists of all Other Priority Claims.

(b)      *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment with the applicable Debtor(s), in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes Allowed and (iii) such other date as may be ordered by the Bankruptcy Court which does not result in an impairment of such Allowed Other Priority Claim.

(c)      *Voting*:  Class 1 is Unimpaired.  Each Holder of an Other Priority Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of Other Priority Claims is entitled to vote to accept or reject the Plan.

(b)      Class 2 – Other Secured Claims

(a)      *Classification*:  Class 2 consists of all Other Secured Claims.

(b)      *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment with the applicable Debtor(s), in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive one of the following treatments, in the sole discretion of the applicable Debtor:  (i) payment in full in Cash, including the payment of any interest payable under section 506(b) of the Bankruptcy Code on the later of (1) the Effective Date and (2) on the date that such Allowed Other Secured Claim becomes Allowed, or as soon thereafter as is reasonably practicable; (ii) delivery of the collateral securing such Allowed Other Secured Claim or (iii) treatment of such Allowed Other Secured Claim in any other manner that renders the Claim Unimpaired.

(c)      *Voting*:  Class 2 is Unimpaired.  Each Holder of an Other Secured Claim is conclusively deemed to have accepted the Plan pursuant

39

to section 1126(f) of the Bankruptcy Code.  No Holder of an Other Secured Claim is entitled to vote to accept or reject the Plan.

(c)     Class 3 – RBL Claims

    (a)     *Classification*:  Class 3 consists of all RBL Claims.

    (b)     *Allowance*:  The RBL Claims shall be Allowed in the full amount due and owing, if any, under the RBL Documents and the DIP Orders as of the Effective Date, including any post-petition interest and fees that have accrued as of the Petition Date but remain unpaid.

    (c)     *Treatment*:  On the Effective Date, each Holder of RBL Claims, on account of and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed RBL Claims shall be paid in full in Cash in an amount equal to such Allowed RBL Claims, to the extent not previously paid from the proceeds of the DIP Facilities.

    (d)     *Voting*:  Class 3 is Unimpaired.  Each Holder of an RBL Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of an RBL Claim is entitled to vote to accept or reject the Plan.

(d)     Class 4 – 2017 Term Loan Secured Claims

    (a)     *Classification*:  Class 4 consists of all 2017 Term Loan Secured Claims.

    (b)     *Allowance*:  The 2017 Term Loan Secured Claims shall be Allowed at an aggregate amount equal to $537,000,000, representing a stipulated secured claim as of the Confirmation Date pursuant to section 506(a) of the Bankruptcy Code.

    (c)     *Treatment*:  On the Effective Date, each Holder of 2017 Term Loan Secured Claims shall receive, on account of and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed 2017 Term Loan Secured Claims, its Pro Rata share of (i) 83.6% of the total New Common Stock subject to dilution by the Rights Offering, the Backstop Commitment Premium, the Eligible Stock, the Exit Premium and the MIP; and (ii) 100% of the Tranche A Remaining Subscription Rights.

    (d)     *Voting*:  Class 4 is Impaired and each Holder of a 2017 Term Loan Secured Claim is entitled to vote to accept or reject the Plan.

40

SC1:5210217.8

(e)    Class 5 – Unsecured Debt Claims

(a)    *Classification*:  Class 5 consists of all Unsecured Debt Claims.

(b)    *Allowance*:  The 2017 Term Loan Deficiency Claims shall be Allowed at an aggregate amount equal to $794,000,000, representing the excess of the principal and accrued and unpaid interest at the contractual rate, including the Default Rate (as defined in the 2017 Term Loan Agreement) to the extent applicable, up to and including the Petition Date plus all other fees, costs, charges and other expenses provided for under the 2017 Term Loan Agreement, above the amount of the stipulated secured claim as of the Confirmation Date.  The 2016 Term Loan Claims shall be Allowed in an aggregate amount equal to $1,045,450,000, representing the principal and accrued and unpaid interest at the contractual rate, including the Default Rate (as defined in the 2016 Term Loan Agreement) to the extent applicable, up to and including the Petition Date plus all other fees, costs, charges and other expenses provided for under the 2016 Term Loan Agreement.  The Second Lien Notes Claims shall be Allowed in an aggregate amount equal to $1,893,360,000, representing the principal and accrued and unpaid interest at the contractual rate, up to and including the Petition Date plus all other fees, costs, charges and other expenses provided for under the Second Lien Notes Indenture.  The Unsecured Notes Claims shall be Allowed in an aggregate amount equal to $247,590,000, representing the principal and accrued and unpaid interest at the contractual rate, up to and including the Petition Date plus all other fees, costs, charges and other expenses provided for under the Unsecured Notes Indenture.

(c)    *Treatment*:  On the Effective Date, each Holder of Unsecured Debt Claims shall receive, on account of and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Unsecured Debt Claims, its Pro Rata share of (i) 16.4% of the total New Common Stock subject to dilution by the Rights Offering, the Backstop Commitment Premium, the Eligible Stock, the Exit Premium and the MIP; and (ii) 100% of the Tranche B Remaining Subscription Rights ; *provided* that the receipt and retention of all New Common Stock and Tranche B Remaining Subscription Rights by Holders of Unsecured Debt Claims shall not be subject to any turnover or similar provisions in any of the Intercreditor Agreements or similar agreement requiring turnover of such New Common Stock or Tranche B Remaining Subscription Rights.

41

(d)  *Voting*:  Class 5 is Impaired and each Holder of an Unsecured Debt Claim is entitled to vote to accept or reject the Plan.

(f)  Class 6 – General Unsecured Claims

(a)  *Classification*:  Class 6 consists of all General Unsecured Claims.

(b)  *Treatment*:  The legal, equitable and contractual rights of the Holders of Allowed General Unsecured Claims are unaltered by the Plan (subject to the Allowed amount of such Claims being "statutorily capped" under section 502 of the Bankruptcy Code, as applicable).  Each Holder of an Allowed General Unsecured Claim shall receive one of the following treatments:  (i) on account of and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed General Unsecured Claim (A) Cash in the amount of its Allowed General Unsecured Claim (1) on the Effective Date or as soon thereafter as is reasonably practicable (to the extent not previously paid as authorized by the Bankruptcy Court during the Chapter 11 Cases), (2) on the date that such Allowed General Unsecured Claim becomes due and owing in the ordinary course of the Debtors' business, if after the Effective Date or (3) on the date that such Allowed General Unsecured Claim becomes an Allowed Claim, or as soon thereafter as reasonably practicable, or (B) such other less favorable treatment as may be agreed upon by the Holder thereof and the applicable Debtor(s), (ii) such other treatment as may be required to allow such Allowed General Unsecured Claim to be paid in the ordinary course of business after the Effective Date of the Chapter 11 Cases or (iii) treatment of such Allowed General Unsecured Claim in any other manner that renders the Claim Unimpaired.

(c)  *Voting*:  Class 6 is Unimpaired.  Each Holder of a General Unsecured Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of General Unsecured Claims is entitled to vote to accept or reject the Plan.

(g)  Class 7 – Interests in CRC

(a)  *Classification*:  Class 7 consists of all Interests in CRC.

(b)  *Treatment*:  No Holder of an Interest in CRC shall receive any distributions on account of its Interest.  On and after the Effective Date, all Interests in CRC shall be cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

42

(c)     *Voting*:  Class 7 is Impaired.  Each Holder of an Interest in CRC is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of an Interest in CRC is entitled to vote to accept or reject the Plan.

4.     Treatment of Intercompany Claims

Notwithstanding anything herein to the contrary, on the Effective Date or as soon thereafter as is reasonably practicable, at the option of the Reorganized Debtors with the consent of the Required Consenting Parties as set forth in the Restructuring Support Agreement, all Intercompany Claims will be:  (i) preserved and reinstated, in full or in part; (ii) canceled and discharged, in full or in part, in which case such discharged and satisfied portion shall be eliminated and the Holders thereof shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such portion under the Plan; (iii) eliminated or waived based on accounting entries in the Debtors' or the Reorganized Debtors' books and records and other corporate activities by the Debtors or the Reorganized Debtors; (iv) contributed to the capital of the obligor entity or (v) otherwise compromised.  In no event shall Intercompany Claims be Allowed as General Unsecured Claims or entitled to any distribution under the Plan.

5.     Treatment of Executory Contracts and Unexpired Leases

Executory Contracts and Unexpired Leases not previously assumed or rejected pursuant to an order of the Bankruptcy Court will be deemed assumed as of the Effective Date except any Executory Contract or Unexpired Lease (i) identified on the Rejected Executory Contract and Unexpired Lease List (which shall be filed with the Bankruptcy Court in the Plan Supplement) as an Executory Contract or Unexpired Lease designated for rejection or (ii) which is the subject of a separate motion or notice to reject filed by the Debtors and pending as of the Confirmation Hearing.

C.     Implementation of the Plan

1.     Operations Between the Confirmation Date and Effective Date

During the period from the Confirmation Date through and until the Effective Date, the Debtors may continue to operate their businesses as debtors-in-possession in the ordinary course in a manner consistent with past practice in all material respects (other than any changes in operations (i) resulting from or relating to the Plan or the filing of the Chapter 11 Cases or (ii) imposed by the Bankruptcy Court), substantially consistent with the transactions contemplated by the Plan and Restructuring Support Agreement, and subject to all applicable orders of the Bankruptcy Court.

2.     Organizational Existence

Except as otherwise provided in the Plan, each Debtor shall, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal Entity, each with all the powers of a limited liability company or a corporation, as applicable, under the laws of its respective

43

SC1:5210217.8

jurisdiction of organization and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under applicable state law.

3.      Cancellation of Existing Interests, Existing Indebtedness and Related Agreements

On the Effective Date, except as otherwise specifically provided for in the Plan, all rights of any Holder of Interests in the Debtors, including options or warrants to purchase Interests, or obligating the Debtors to issue, transfer or sell Interests of the Debtors, shall be cancelled.

Upon receipt of a distribution on account of its 2016 Secured Term Loan Claim or Unsecured Debt Claim, each record holder of such Claim shall be deemed to have surrendered its respective 2016 Term Loan, 2017 Term Loan, Second Lien Note and Unsecured Note, and all such surrendered loans, notes, loan documents and indentures shall be deemed to be canceled as to the Debtors pursuant to Section 3 of the Plan, except to the extent otherwise provided herein. Such Claims shall be canceled solely with respect to the Debtors, and such cancelation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Claims.

Except as otherwise set forth herein, the 2016 Term Loan Documents, 2017 Term Loan Documents, Second Lien Notes Indenture and Unsecured Notes Indenture shall terminate as of the Effective Date, except as necessary to (i) enforce the rights and Claims of the respective agent or trustee vis-à-vis the applicable lenders or holders and any parties other than the Debtors, including, for avoidance of doubt, pursuant to the Intercreditor Agreement, (ii) allow the respective agent or trustee to receive distributions under the Plan and to distribute them to the applicable lenders or holders in accordance with the terms of the applicable documents and (iii) preserve any rights of the respective agent or trustee and any predecessor thereof as against any money or property distributable to Holders of 2016 Secured Term Loan claim or Unsecured Debt Claim.

Upon the full payment or other satisfaction of an Allowed 2016 Secured Term Loan Claim or an Allowed Unsecured Debt Claim, or promptly thereafter, the Holder of such Allowed Claim shall deliver to the Debtors or Reorganized Debtors (as applicable) any termination statements, instruments of satisfaction or releases of all security interests with respect to its Allowed Claim that may reasonably be required in order to terminate any related financing statements, mortgages, mechanic's liens or *lis pendens*, and take any and all other steps reasonably requested by the Debtors or the Reorganized Debtors or any administrative agent under the New Exit Facilities Documents that are necessary to cancel and/or extinguish any Liens or security interests securing such Holder's Claim.

4.      Sources of Cash for Plan Distributions

Any Cash payments or distributions required to be made hereunder shall be obtained from existing Cash of the Debtors, including Cash from business operations, and Cash from the New Exit Facilities and the Rights Offering.

44

SC1:5210217.8

5.      Implementation of Effective Date Agreements

On the Effective Date, the New Exit Facilities Documents and the organizational documents of the Reorganized Debtors shall become effective without further action from any Person or Entity, and shall be binding and enforceable upon each of the parties thereto.

6.      Restructuring Support Agreement

The Restructuring Support Agreement shall be assumed pursuant to the Confirmation Order, in accordance with the Restructuring Support Agreement, and the Debtors shall continue to perform thereunder and comply therewith in all respects during the period through and including the Effective Date.

7.      Backstop Commitment Agreement

To the extent not previously assumed pursuant to an order of the Bankruptcy Court, the Backstop Commitment Agreement shall be assumed pursuant to the Confirmation Order, in accordance with the Backstop Commitment Agreement, and the Debtors shall continue to perform thereunder and comply therewith in all respects during the period through and including the Effective Date.

8.      New Common Stock

On the Effective Date, the Reorganized CRC Certificate of Incorporation shall have provided for [•] million shares of authorized New Common Stock, and Reorganized CRC shall issue or reserve for issuance a sufficient number of shares of New Common Stock equal to the [•].  The shares of New Common Stock issued in connection with the Plan, including in connection with the consummation of the Rights Offering, the Backstop Commitment Agreement, the Eligible Stock, the Exit Premium, and options or other equity awards issued pursuant to the MIP, shall be authorized without the need for further corporate action or without any further action by any Person, and once issued, shall be duly authorized, validly issued, fully paid and non-assessable.

Any share of New Common Stock issued to a creditor of any Debtor that is not CRC shall be treated as (a) a contribution of cash by Reorganized CRC to the applicable Debtor in the amount equal to the fair market value of such New Common Stock, followed by (b) the issuance of New Common Stock by Reorganized CRC to the applicable Debtor in return for such cash, followed by (c) the transfer of the New Common Stock by the applicable Debtor to the applicable creditor.

9.      Ares Settlement

The Debtors shall be deemed to have exercised the Conversion Right on the Effective Date and shall issue the Eligible Stock and the Eligible Notes, in each case in accordance with the Elk Hills Settlement Agreement, the 9019 Orders and the consent rights set forth in the Restructuring Support Agreement.

45

10.     Rights Offering

The Debtors will implement the Rights Offering in accordance with the Backstop Commitment Agreement and the Rights Offering Procedures.  None of the Rights, the Rights Offering Shares or the Backstop Commitment Premium, or the receipt and retention thereof, shall be subject to any turnover or similar provision in any of the Intercreditor Agreements or similar agreement requiring turnover of such Rights, Rights Offering Shares or the Backstop Commitment Premium.

The Rights Offering shall be open to all Holders of Eligible Claims.  The Rights Offering shall consist of a distribution of the Subscription Rights in respect of the Rights Offering Shares in accordance with the Solicitation Procedures Order.

The Backstop Parties have agreed to purchase (on a several and not joint basis) all of the Rights Offering Shares that are not purchased by Eligible Holders (the "Unsubscribed Shares"), subject to and in accordance with the terms of the Backstop Commitment Agreement.

11.     Exemption from Registration

Except with respect to any Person that is an underwriter as defined in section 1145(b) of the Bankruptcy Code or an "affiliate" as defined in the Securities Act, the offer, issuance, sale or distribution under the Plan of the (a) shares of New Common Stock issued to Holders of the Allowed 2017 Term Loan Secured Claims and Holders of the Allowed Unsecured Debt Claims, (b) Subscription Rights and (c) Rights Offering Shares shall all be exempt from registration under Section 5 of the Securities Act (or any State or local law requiring registration for offer or sale of a security) under section 1145 of the Bankruptcy Code.

The (a) shares of New Common Stock issued in connection with the payment of the Backstop Commitment Premium and the Exit Premium, (b) shares of New Common Stock issued pursuant to the Backstop Commitment Agreement, (c) the Eligible Stock and (d) the Eligible Notes shall all be issued without registration in reliance upon the exemption set forth in section 4(a)(2) of the Securities Act and will be "restricted securities."

The Subscription Rights and Rights Offering Shares were offered, distributed and sold pursuant to the Plan.

12.     Registration Rights Agreement

The Registration Rights Agreement shall have been executed and delivered by Reorganized CRC, shall otherwise have become effective with respect to the Registration Rights Parties and the other parties thereto, and shall be in full force and effect.

13.     Exit Facilities

On the Effective Date, the Reorganized Debtors shall, and are hereby authorized to, enter into and perform and execute and deliver the New Exit Facilities Documents to which such Reorganized Debtor is contemplated to be a party on the Effective Date.  The Reorganized Debtors are hereby authorized to borrow under such New Exit Facilities and use the proceeds of

46

such borrowings for any purpose permitted thereunder, including to fund (a) the repayment of all DIP Claims, (b) distributions under and in accordance with the Plan, and (c) ongoing business operations, general corporate purposes and working capital needs.  Without limiting the foregoing, the Reorganized Debtors shall pay, as and when due, all fees, expenses, losses, damages, indemnities and other amounts, including any applicable refinancing premiums and applicable exit fees, provided under the DIP Facilities Documents related to the DIP Facilities and/or the New Exit Facilities Documents relating to such New Exit Facilities.

Confirmation of the Plan shall be deemed (a) approval of the New Exit Facilities and all transactions contemplated hereby and thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, expenses, losses, damages, indemnities and other amounts provided for by the New Exit Facilities Documents, and (b) authorization for the Reorganized Debtors to enter into and perform under the New Exit Facilities Documents.  The New Exit Facilities Documents shall constitute legal, valid, binding and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the New Exit Facilities Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.

On the Effective Date, all of the liens and security interests to be granted in accordance with the New Exit Facilities Documents (a) shall be deemed to be approved; (b) shall be legal, binding and enforceable liens on, and security interests in, the collateral granted under respective New Exit Facilities Documents in accordance with the terms of the New Exit Facilities Documents; (c)(i) shall be deemed perfected on the Effective Date, and (ii) the priorities of such liens and security interests shall be as set forth in the respective New Exit Facilities Documents, in the case of this clause (ii), subject only to such liens and security interests as may be permitted under the New Exit Facilities Documents; and (d) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the secured parties (and their designees and agents) under such New Exit Facilities Documents are hereby authorized to make all filings and recordings, and to obtain all governmental approvals and consents to establish and perfect such liens and security interests under the provisions of the applicable state, provincial, federal or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection of the liens and security interests granted under the New Exit Facilities Documents shall occur automatically by virtue of the entry of the Confirmation Order and funding on or after the Effective Date, and any such filings, recordings, approvals and consents shall not be necessary or required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.  To the extent that any Holder of a Secured Claim that has been satisfied or discharged pursuant to the Plan, or any agent for such Holder, has filed or recorded any liens and/or security interests to secure such Holder's Secured Claim,

47

then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder), at the Reorganized Debtors' expense, shall take any and all steps requested by the Debtors, Reorganized CRC or any administrative agent under the New Exit Facilities Documents that are necessary to cancel and/or extinguish such liens and/or security interests (it being understood that such liens and security interests held by Holders of Secured Claims that are satisfied on the Effective Date pursuant to the Plan shall be automatically canceled/or extinguished automatically on the Effective Date by virtue of the entry of the Confirmation Order).

On the Effective Date, all issued and outstanding letters of credit under the Senior DIP Facility shall be cash collateralized, replaced or reinstated in accordance with their terms and the terms of the Senior DIP Credit Agreement and any applicable New Exit Facilities Documents.

14.    Section 1146 Exemption from Certain Transfer Taxes and Recording Fees

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any transfers from the Debtors to the Reorganized Debtors or to any other Person, pursuant to, in contemplation of, or in connection with the Plan (including any transfer pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (b) the creation, modification, consolidation, assumption, termination, refinancing and/or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment or recording of any lease or sublease; (d) the grant of collateral as security for any or all of the New Exit Facilities; (e) the Backstop Commitment Agreement; or (f) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan) shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, sales and use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local government officials or agents shall, and shall be directed to, forgo the collection of any such tax, recordation fee or government assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or government assessment.  The Bankruptcy Court shall retain specific jurisdiction with respect to these matters.

15.    Preservation of Causes of Action

Except as otherwise provided in Article 10 or the other provisions of the Plan, each Cause of Action of a Debtor shall be preserved and, along with the exclusive right to enforce such Cause of Action, shall vest exclusively in the applicable Reorganized Debtor as of the Effective Date; *provided* that nothing in Section 6.11 shall limit the ability under the Bankruptcy Code of any party-in-interest to object to any Claim prior to the Claim Objection Bar Date unless otherwise ordered by the Bankruptcy Court.  Unless a Cause of Action is expressly waived, relinquished, released or compromised in the Plan or an order of the Bankruptcy Court, the Reorganized Debtors expressly reserve such Cause of Action for later adjudication and,

48

accordingly, no doctrine of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), laches or other preclusion doctrine shall apply to such Cause of Action as a consequence of the Confirmation, the Plan, the vesting of such Cause of Action in the Reorganized Debtors, any order of the Bankruptcy Court or these Chapter 11 Cases. **No Person may rely on the absence of a specific reference in the Plan or the Amended Disclosure Statement to any Cause of Action against them as an indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue such Cause of Action.**

## ARTICLE V

## VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION OF THE PLAN

A.      General

The following is a brief summary of the Plan Confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or consult their own attorneys.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation hearing.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

Section 1129 of the Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtors, including that (i) the Plan has classified Claims in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Plan has been proposed in good faith and not by any means forbidden by law; (iv) the disclosure required by section 1125 of the Bankruptcy Code has been made; (v) the Plan has been accepted by the requisite votes of Holders of Claims (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code); (vi) the Plan is feasible and Confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors unless such liquidation or reorganization is proposed in the Plan; (vii) the Plan is in the "best interests" of all Holders of Claims in an impaired Class by providing to such Holders on account of their Claims property of a value, as of the Effective Date, that is not less than the amount that such Holders would receive or retain in a chapter 7 liquidation, unless each Holder of a Claim in such Class has accepted the Plan and (viii) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date.  The Debtors believe that the Plan satisfies section 1129 of the Bankruptcy Code.

B.      Parties in Interest Entitled to Vote

Pursuant to the Bankruptcy Code, only Classes of Claims that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan.  A Class is impaired if the legal, equitable or contractual rights to which the Claims of that Class entitled the Holders of such Claims are modified, other than by curing

49

defaults and reinstating the Claims.  Classes that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan.  In addition, Classes that receive no distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan.

C.      Classes Impaired and Entitled to Vote Under the Plan

        The following Classes are impaired under the Plan and entitled to vote on the Plan:

| Class | Designation | Status | Voting Rights |
|---|---|---|---|
| 4 | 2017 Term Loan Secured Claims | Impaired | Entitled to Vote |
| 5 | Unsecured Debt Claims | Impaired | Entitled to Vote |

        In general, if a Claim or Interest is unimpaired under a plan, section 1126(f) of the Bankruptcy Code deems the Holder of such Claim or Interest to have accepted the plan, and thus the Holders of Claims in such unimpaired Classes are not entitled to vote on the plan.  Because Classes 1, 2, 3 and 6 are unimpaired under the Plan, the Holders of Claims and Interests in these Classes are not entitled to vote.

        Under section 1126(g) of the Bankruptcy Code, the Holder of an impaired Claim or Interest that will not receive any distribution under the plan in respect of such Claim or Interest is deemed to have rejected the plan and is not entitled to vote on the plan.  Because Class 7 is to receive no distributions under the Plan, the Holders of Claims and Interests in this Class are not entitled to vote.

D.      Voting Procedures and Requirements

        The Bankruptcy Court can confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code.  One of these technical requirements is that the Bankruptcy Court find, among other things, that the Plan has been accepted by the requisite votes of all Classes of impaired Claims and Interests unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more such Classes.

        If you have any questions about (i) the procedures for voting your Claim or with respect to the packet of materials that you have received or (ii) the amount of your Claim, please contact the Debtors' Solicitation and Claims Agent at (855) 917-3506 or, for international callers, +1 (503) 520-4480.  If you wish to obtain (at no charge) an additional copy of the Plan, this Disclosure Statement or other solicitation documents, you can obtain them from the Debtors' case information website (located at http://dm.epiq11.com/CaliforniaResources) or by requesting a copy from the Debtors' Solicitation and Claims Agent, who can be reached (855) 917-3506 or, for international callers, +1 (503) 520-4480.

50

1.      Ballots

The record date for voting on the Plan is August 11, 2020 (the "Voting Record Date").  Accordingly, only Holders of record as of the Voting Record Date that are otherwise entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

In voting for or against the Plan, please use (i) only the Ballot sent to you with this Disclosure Statement or (ii) the online electronic ballot portal.  If you are a Holder of a Claim in Class 4 or 5 and did not receive a Ballot, if your Ballot is damaged or lost or if you have any questions concerning voting procedures, please contact the Solicitation and Claims Agent at (855) 917-3506 or, for international callers, +1 (503) 520-4480, or by email at CRCInquiries@epiqglobal.com.

2.      Submitting Ballots

If you are entitled to vote to accept or reject the Plan, you should read carefully, complete and submit your Ballot in accordance with the instructions below.

To be counted, all Ballots must be properly executed, completed and delivered by: (i) first-class mail (using the reply envelope provided in the solicitation package or otherwise), (ii) overnight mail, (iii) personal delivery or (iv) the online electronic ballot portal (as described on the Ballot), in each case so that they are actually received NO LATER THAN 4:00 P.M. (PREVAILING CENTRAL TIME) ON SEPTEMBER 21, 2020 (THE "VOTING DEADLINE") by the Solicitation and Claims Agent.  If you are submitting a Ballot via first-class mail, it should be sent to:

California Resources Corporation Ballot Processing
c/o Epiq Corporate Restructuring, LLC
P.O. Box 4422
Beaverton, OR 97076-4420

If you are submitting a Ballot via personal delivery or overnight mail, it should be sent to:

California Resources Corporation Ballot Processing
c/o Epiq Corporate Restructuring, LLC
10300 SW Allen Blvd.
Beaverton, OR 97005

Delivery of a Ballot to the Solicitation and Claims Agent by facsimile or any other electronic means (other than as expressly provided therein) shall not be valid.

Ballots received after the Voting Deadline will not be counted by the Debtors in connection with the Debtors' request for Confirmation of the Plan.  The method of delivery of Ballots to be sent to the Solicitation and Claims Agent is at the election and risk of each Holder of a Claim or Interest.  Except as otherwise provided in the Plan, such delivery will be deemed made only when the Ballot is actually received by the Solicitation and Claims Agent.  In all cases, sufficient time should be allowed to assure timely delivery.  For submissions via first-class

51

SC1:5210217.8

mail, overnight courier or personal delivery, original executed Ballots are required.  Delivery of a Ballot to the Solicitation and Claims Agent by facsimile, email or any other electronic means (other than as expressly provided therein) will not be accepted.  No Ballot should be sent to the Debtors, their agents (other than the Solicitation and Claims Agent), any administrative agent (unless specifically instructed to do so) or the Debtors' financial or legal advisors, and if so sent will not be counted.  If no Holders of Claims in a particular Class that is entitled to vote on the Plan vote to accept or reject the Plan, then such Class shall be deemed to accept the Plan.

3.     Voting

A Holder of a Claim entitled to vote on the Plan may vote to accept or reject the Plan only if no party in interest has objected to such Claim or Interest (or the Claim or Interest has been Allowed subsequent to any objection or estimated for voting purposes).

4.     Releases Under the Plan

Each Ballot advises the recipient in bold and capitalized print that Holders of Claims who (i) vote to accept the Plan or (ii) vote to reject the Plan but do not elect to opt out of the release provisions contained in Section 10.7 of the Plan, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged the Released Parties from any and all Causes of Action.  Holders who do not grant the releases contained in Section 10.7 of the Plan will not receive the benefit of the releases set forth in Section 10.7 of the Plan.

E.     Acceptance of Plan

As a condition to Confirmation, the Bankruptcy Code requires that each class of impaired claims vote to accept a plan, except under certain circumstances.  See "Confirmation Without Necessary Acceptances; Cramdown" below.  A class of claims or interests that is unimpaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is impaired unless the plan (i) leaves unaltered the legal, equitable and contractual rights to which the claim or interest entitles the Holder of such claim or interest or (ii) cures any default, reinstates the original terms of the obligation and does not otherwise alter the legal, equitable or contractual rights to which the claim or interest entitles the Holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an impaired class as acceptance by Holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class; only those Holders that are eligible to vote and that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met.  Thus, a class of claims will have voted to accept a plan only if two-thirds in amount and a majority in number that actually vote cast their ballots in favor of acceptance.  Under section 1126(d) of the Bankruptcy Code, a class of interests has accepted a plan if Holders of such interests holding at least two-thirds in amount that actually vote have voted to accept the plan. Holders of claims or interests who fail to vote are not counted as either accepting or rejecting a plan.

52

In addition to these voting requirements, section 1129 of the Bankruptcy Code requires that a plan be accepted by each Holder of a claim or interest in an impaired class or that the plan otherwise be found by a court to be in the best interests of each Holder of a claim or interest in such class.  See "Best Interests Test" below.  Moreover, each impaired class must accept the plan for the plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests set forth in section 1129(b) of the Bankruptcy Code discussed below.  See "Confirmation Without Necessary Acceptances; Cramdown" below.

F.	Confirmation Without Necessary Acceptances; Cramdown

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for Confirmation of the plan.  A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims or interests, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code.  Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (i) "does not discriminate unfairly" and (ii) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests.

A plan "does not discriminate unfairly" if (i) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (ii) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests.  The Debtors believe that, under the Plan, all impaired Classes of Claims and Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Interests that are similarly situated, if any, and no class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class.  Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any impaired Class of Claims or Interests.

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable."  In order to determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity Holders, as follows:

(1)	Secured Creditors. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and such liens on proceeds to receive treatment consistent with clause (i) or (ii) above.

(2)	Unsecured Creditors. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the Holders of claims and interests that are junior to

53

the claims of the dissenting class will not receive any property under the plan.

(3)   Equity Interests. Either (i) each Holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such Holder is entitled, the fixed redemption price to which such Holder is entitled or the value of the interest or (ii) the Holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtors believe that the distributions provided under the Plan satisfy the absolute priority rule, where required.

G.   Classification

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divides the different claims (excluding administrative claims) against, and equity interests in, a debtor into separate classes based upon their legal nature.  Pursuant to section 1122 of the Bankruptcy Code, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  The Debtors believe that the Plan classifies all Claims and Interests in compliance with the provisions of the Bankruptcy Code because valid business, factual and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan.  Accordingly, the classification of Claims and Interests in the Plan complies with section 1122 of the Bankruptcy Code.

## ARTICLE VI

### FEASIBILITY AND BEST INTERESTS OF CREDITORS

A.   Best Interests Test

As noted above, even if a plan is accepted by the Holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all Holders of claims or interests that are impaired by that plan and that have not accepted the plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such Holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code (the "Best Interests Test").

To calculate the probable distribution to Holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its Chapter 11 Cases were converted to chapter 7 cases under the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the distributions from the proceeds of a liquidation of the

54

debtor's assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan.  If the hypothetical liquidation distribution to Holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the Holders of claims or interests in such impaired class.

B.      Liquidation Analysis

        Amounts that a Holder of Claims and Interests in Impaired Classes would receive in a hypothetical chapter 7 liquidation are discussed in the liquidation analysis of the Debtors prepared by the Debtors' management with the assistance of its advisors (the "Liquidation Analysis"), which is attached hereto as Appendix B.

        As described in Appendix B, the Debtors developed the Liquidation Analysis based on the unaudited book values as of [•], unless otherwise noted in the Liquidation Analysis. The recoveries may change based on further refinements of Allowed Claims and as the Debtors' claims reconciliation process begins following the Petition Date.

        As described in the Liquidation Analysis, underlying the analysis is a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management and advisors, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management.  The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change.  Accordingly, the values reflected in the Liquidation Analysis might not be realized if the Debtors were, in fact, to undergo a liquidation.

        This Liquidation Analysis is solely for the purposes of (i) providing "adequate information" under section 1125 of the Bankruptcy Code to enable the Holders of Claims and Interests entitled to vote under the Plan to make an informed judgment about the Plan and (ii) providing the Bankruptcy Court with appropriate support for the satisfaction of the "Best Interests Test" pursuant to section 1129(a)(7) of the Bankruptcy Code, and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtors or any of their Affiliates.

        Events and circumstances occurring subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner.  The Debtors and Reorganized Debtors do not intend to and do not undertake any obligation to update or otherwise revise the Liquidation Analysis to reflect events or circumstances existing or arising after the date the Liquidation Analysis is initially filed or to reflect the occurrence of unanticipated events.  Therefore, the Liquidation Analysis may not be relied upon as a guarantee or other assurance of the actual results that will occur.

SC1:5210217.8

In deciding whether to vote to accept or reject the Plan, Holders of Claims or Interests must make their own determinations as to the reasonableness of any assumptions underlying the Liquidation Analysis and the reliability of the Liquidation Analysis.

C.      Application of the Best Interests Test

The Debtors believe that the continued operation of the Debtors as a going concern satisfies the Best Interests Test for the Impaired Classes.  Notwithstanding the difficulties in quantifying recoveries to Holders of Claims and Interests with precision, the Debtors believe that, based on the Liquidation Analysis, the Plan meets the Best Interests Test. As the Plan and Appendix B indicate, Confirmation of the Plan will provide each Holder of an Allowed Claim in an Impaired Class with a recovery that is equal to or greater than the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code.

D.      Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to Confirmation, that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Debtors or the need for further financial reorganization, unless such liquidation is contemplated by the Plan.  For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors, with the assistance of their advisors, have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their businesses. As part of this analysis, the Debtors have prepared the financial projections, as set forth in Appendix C (the "Financial Projections").

As noted in Appendix C, the Financial Projections present information with respect to all of the Reorganized Debtors.  These Financial Projections do not reflect the full impact of "fresh start reporting" in accordance with American Institute of Certified Public Accountants Statement of Position 90-7 "Financial Reporting by Entities in Reorganization under the Bankruptcy Code."  Fresh start reporting may have a material impact on the analysis.

The Debtors have prepared the Financial Projections solely for the purpose of providing "adequate information" under section 1125 of the Bankruptcy Code to enable the Holders of Claims and Interests entitled to vote under the Plan to make an informed judgment about the Plan and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtors.

In addition to the cautionary notes contained elsewhere in this Disclosure Statement and in the Financial Projections, it is underscored that the Debtors make no representation as to the accuracy of the Financial Projections or their ability to achieve the projected results.  Many of the assumptions on which the Financial Projections are based are subject to significant uncertainties.  Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the financial results.  Therefore, the actual results achieved throughout the Projection Period (as defined in the Financial Projections) may vary from the Financial Projections, and the variations may be material.  Also as noted above, the Financial Projections currently do not reflect the full impact of any "fresh start reporting,"

56

and its impact on the Reorganized Debtors' "Consolidated Balance Sheets" and prospective "Results of Operations" may be material.  All Holders of Claims in the Impaired Classes are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of, and voting on, the Plan.

Based upon the Financial Projections, the Debtors believe that they will be able to make all distributions and payments under the Plan and that Confirmation of the Plan is not likely to be followed by liquidation of the Debtors or the need for further restructuring.

## ARTICLE VII

### EFFECT OF CONFIRMATION

A.      Binding Effect of Confirmation

Confirmation will bind the Debtors and all Holders of Claims and Interests to the provisions of the Plan, whether or not the Claim or Interest of any such Holder is impaired under the Plan and whether or not any such Holder of a Claim or Interest has accepted the Plan.  Confirmation will have the effect of converting all Claims into rights to receive the treatment specified in Article IV hereof and cancelling all Interests in CRC.

B.      Good Faith

Confirmation of the Plan will constitute a finding that:  (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code and (ii) all solicitations of acceptances or rejections of the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

## ARTICLE VIII

### SECURITIES LAW MATTERS

A.      Bankruptcy Code Exemptions from Registration Requirements

1.      Issuance.

The Plan provides for the offer, issuance, sale and distribution of New Common Stock (a) in connection with the Tranche A Remaining Subscription Rights and the Tranche B Remaining Subscription Rights and (b) on account of Allowed 2017 Term Loan Secured Claims and Allowed Unsecured Debt Claims (collectively, the "1145 Securities").  The Debtors believe that the 1145 Securities are "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.  Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state securities laws if three principal requirements are satisfied:  (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the

57

debtor and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property.  The Debtors believe that the issuance and distribution of the 1145 Securities satisfies the requirements of section 1145(a)(1) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws.

The Subscription Rights are not detachable or transferable separately from the Eligible Claims.

2.      Subsequent Transfers.

The 1145 Securities issued pursuant to the Plan that are covered by the section 1145(a)(1) exemption may be freely transferred by most recipients following the initial issuance under the Plan, and all resales and subsequent transfers of 1145 Securities are exempt from registration under the Securities Act and state securities laws unless the Holder is an "underwriter" with respect to such securities.  Section 1145(b) of the Bankruptcy Code defines four types of "underwriters":

(i) Persons who purchase a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such claim or interest;

(ii) Persons who offer to sell securities offered under a plan for the Holders of such securities;

(iii) Persons who offer to buy such securities from the Holders of such securities, if the offer to buy is:

(A) with a view to distributing such securities; and

(B) under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or

(iv) a Person who is an "issuer" with respect to the securities as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

Under section 2(a)(11) of the Securities Act, an "issuer" includes any Person directly or indirectly controlling or controlled by the issuer, or any Person under direct or indirect common control of the issuer.

To the extent that Persons who receive any 1145 Securities pursuant to the Plan are deemed to be "underwriters," resales by such Persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Persons deemed to be underwriters may, however, be permitted to sell such Interests without registration pursuant to the provisions of Rule 144 under the Securities Act.  As described in further detail below, Rule 144 provides an exemption for the public resale of securities, such as 1145 Securities, if certain conditions are met.  These conditions depend on whether the holder of the securities is considered to be an "affiliate" of the issuer.  An affiliate is defined as "a person

58

that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer." An 1145 underwriter who is an affiliate of Reorganized CRC or its predecessor may resell 1145 Securities after the six-month holding period only if, at the time of the sale, certain current public information regarding the issuer is available and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144. An 1145 underwriter who is not, and has not been for at least three months, an affiliate of Reorganized CRC or its predecessor, may resell 1145 Securities after a six-month holding period if at the time of the sale there is available certain current public information regarding the issuer, and may sell the securities after a one-year holding period whether or not there is current public information regarding the issuer. Adequate current public information is available for a reporting issuer if the issuer has filed all periodic reports required under section 13 or 15(d) of the Securities Exchange Act of 1934 during the 12 months preceding the sale of the restricted securities. If the issuer is a non-reporting issuer, adequate current public information is available if certain company information is made publicly available. The Debtors currently expect that Reorganized CRC will continue to be a reporting issuer and file all such required periodic reports and that current public information will be available to allow resales by non-affiliates when the six-month holding period expires (approximately six months after the Effective Date).

Whether or not any particular Person would be deemed to be an "underwriter" with respect to such Interests or any other security to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any particular Person receiving any Interests or other securities under the Plan would be an "underwriter" with respect to such Interests or other securities.

GIVEN THE COMPLEX AND SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, THE DEBTORS MAKE NO REPRESENTATION CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN THE NEW COMMON STOCK. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF SUCH INTERESTS OR OTHER SECURITIES CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH INTERESTS OR OTHER SECURITIES WITHOUT REGISTRATION UNDER, OR EXEMPTION FROM REGISTRATION UNDER, THE SECURITIES ACT, THE SECURITIES EXCHANGE ACT OF 1934 OR SIMILAR STATE AND FEDERAL LAWS.

B.    Private Placement Exemptions

1.    Issuance.

The Plan provides for the offer, issuance, sale and distribution of (i) New Common Stock (a) consisting of Eligible Stock, Rights Offering Unsubscribed Shares, Tranche A Minimum Allocation and the Tranche B Minimum Allocation (each as defined in the Backstop Commitment Agreement) and (b) in connection with the Backstop Commitment Premium and the Exit Premium and (ii) the Eligible Notes (collectively, the "4(a)(2) Securities"). The Debtors believe that the 4(a)(2) Securities are issuable without registration under the Securities Act in reliance upon the exemption from registration provided under section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder.

59

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act.  Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under section 4(a)(2) of the Securities Act.

2.      Subsequent Transfers.

Because the 4(a)(2) Securities will not be issued pursuant to section 1145(a)(1) of the Bankruptcy Code, they will be deemed "restricted securities" that may not be offered, sold, exchanged, assigned or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available.

The Debtors do not plan to register the 4(a)(2) Securities held by persons other than the Backstop Parties and the other holders party to the Registration Rights Agreement. Thus, persons who receive 4(a)(2) Securities (other than the Backstop Parties and the other holders party to the Registration Rights Agreement) will not be permitted to offer, sell or otherwise transfer their 4(a)(2) Securities except pursuant to an available exemption from registration.

All persons (other than the Backstop Parties) who purchase 4(a)(2) Securities will be required to agree that they will not offer, sell or otherwise transfer any 4(a)(2) Securities except in accordance with the exemption from registration provided by Rule 144 under the Securities Act, if and when available.

Rule 144 provides an exemption for the public resale of "restricted securities" if certain conditions are met.  These conditions vary depending on whether the holder of the restricted securities is an affiliate of the issuer.  An affiliate is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer."

A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is available certain current public information regarding the issuer, and may sell the securities after a one-year holding period whether or not there is current public information regarding the issuer.  Adequate current public information is available for a reporting issuer if the issuer has filed all periodic reports required under section 13 or 15(d) of the Securities Exchange Act of 1934 during the twelve months preceding the sale of the restricted securities.  If the issuer is a non-reporting issuer, adequate current public information is available if certain information about the issuer is made publicly available.  The Debtors currently expect that Reorganized CRC will continue to be a reporting issuer and file all such required periodic reports and that current public information will be available to allow resales by non-affiliates when the six-month holding period expires (approximately six months after the emergence date).

An affiliate may resell restricted securities after the six-month holding period if at the time of the sale certain current public information regarding the issuer is available.  As noted above, the Debtors currently expect that this information requirement will be satisfied.  The affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144.

60

First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the greater of 1% of the average weekly reported volume of trading in such restricted securities during the four weeks preceding the filing of a notice of proposed sale on Form 144. Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, which generally means they must be sold through a broker and handled as a routine trading transaction. The broker must receive no more than the usual commission and cannot solicit orders for the sale of the restricted securities except in certain situations. Third, if the sale exceeds 5,000 restricted securities or has an aggregate sale price greater than $50,000, an affiliate must file with the SEC three copies of a notice of proposed sale on Form 144. The sale must occur within three months of filing the notice unless an amended notice is filed.

The Debtors believe that the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least six months after the Effective Date. Accordingly, holders of 4(a)(2) Securities will be required to hold their 4(a)(2) Securities for at least six months and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144.

All 4(a)(2) Securities will be issued in certificated form and will bear a restrictive legend. Each certificate representing, or issued in exchange for or upon the transfer, sale or assignment of, any 4(a)(2) Security shall be stamped or otherwise imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [ISSUANCE DATE], AND HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT PURSUANT TO THE EXEMPTION FROM REGISTRATION UNDER THE ACT PROVIDED BY RULE 144 THEREUNDER, WHEN AVAILABLE."

Reorganized CRC will reserve the right to require certification or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities. Reorganized CRC will also reserve the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144. Any person who purchases 4(a)(2) Securities will be required to acknowledge and agree not to resell such securities except in accordance with Rule 144, when available, and that the securities will be subject to the other restrictions described above.

Any persons receiving "restricted securities" under the Plan should consult with their own counsel concerning the availability of an exemption from registration for resale of these securities under the Securities Act and other applicable law.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF

61

EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS OR THE REORGANIZED DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN.  THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

C.      Registration Rights Agreement

The Plan provides that from and after the Effective Date, each holder of at least 1% of the shares of New Common Stock outstanding on the Effective Date, including New Common Stock issued in connection with the Rights Offering, will be entitled to customary registration rights pursuant to a registration rights agreement to be entered into as of the Effective Date (the "Registration Rights Agreement").


## ARTICLE IX

### CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

A.      Certain Bankruptcy Law Considerations

1.      General.

While the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to their businesses, the Debtors cannot be certain that this will be the case.  Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.  Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have a material adverse effect on the Debtors' business.  A delay in the bankruptcy proceedings will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

SC1:5210217.8

2.  Plan Confirmation.

The Debtors can make no assurances that they will receive the requisite acceptances to confirm that Plan or that the conditions to Confirmation will be satisfied or waived.  Further, if the requisite acceptances are not received, the Debtors may seek to accomplish an alternative restructuring and obtain acceptances to an alternative plan of reorganization for the Debtors, or otherwise, that may not have the support of the Holders of Claims and/or may be required to liquidate these Estates under chapter 7 or 11 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Holders of Claims as those proposed in the Plan.

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan.  If the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could nevertheless decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.  Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes.  If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Interests ultimately would receive in a subsequent plan of reorganization.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Subject to the terms and conditions of the Plan and Restructuring Support Agreement, any such modifications could result in less favorable treatment of any non-accepting Class of Claims, as well as any Class junior to any such non-accepting Class, than the treatment currently provided in the Plan.  Such less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

3.  Objections to Classification of Claims.

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Interests in, the Debtors.  The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class.  The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek (i) to modify the Plan to provide for whatever classification might be required for Confirmation and (ii) to use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could materially adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class

63

and the vote required for approval of the Plan.  There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.

4.       Risks Related to Possible Objections to the Plan

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan.  Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

5.       Risk of Termination of the Restructuring Support Agreement.

The Restructuring Support Agreement contains certain provisions that give the Debtors and the Supporting Creditors the ability to terminate the Restructuring Support Agreement if various conditions are satisfied.  Termination of the Restructuring Support Agreement could result in the loss of support for the Plan by important creditor constituencies and could result in the withdrawal of the Plan and protracted Chapter 11 Cases.

6.       The Debtors Could Modify the Rights Offering.

The Debtors may modify the procedures governing the Rights Offering, with the approval of the Required Backstop Parties (as defined in the Backstop Commitment Agreement) to, among other things, adopt additional detailed procedures if necessary to administer the distribution and exercise of subscription rights or to comply with applicable law.  Such modifications may adversely affect the rights of those participating in the Rights Offering.

7.       Bankruptcy Court May Not Approve the Rights Offering.

The Bankruptcy Court's approval of the Rights Offering is crucial to consummating the restructuring contemplated by the Plan.  Failure to obtain the Bankruptcy Court's approval of the Rights Offering could prevent the Debtors from consummating the Plan and the transactions contemplated thereby.

8.       The Backstop Commitment Agreement Could be Terminated.

The Backstop Commitment Agreement contains certain provisions that give the parties the ability to terminate the Backstop Commitment Agreement, if various conditions are not satisfied.  Termination of the Backstop Commitment Agreement could prevent the Debtors from consummating the Plan.  Under certain circumstances resulting in termination of the

64

Backstop Commitment Agreement, as more fully described therein, the Backstop Parties may be eligible to be paid the Backstop Commitment Premium in Cash.

9.      Risk of Nonoccurrence of the Effective Date.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

10.      Nonconsensual Confirmation.

In the event that any impaired class of claims or interests does not accept a Chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting class.  The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan, financially or otherwise.

11.      Failure to Consummate the Plan.

As of the date of this Disclosure Statement, there can be no assurance that the conditions to consummation of the Plan will be satisfied or waived.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and that the contemplated restructuring will be completed.

12.      Conversion into Chapter 7 Cases.

If the Bankruptcy Court finds that it would be in the best interest of the Holders of claims or interests, the Bankruptcy Court may convert the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities under the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided in a chapter 11 plan because of (a) the likelihood that assets would have to be sold in  a disorderly fashion over a short period of time, when commodity prices are at historically low levels, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee and (c)

SC1:5210217.8

additional expenses and Claims, including Claims resulting from the rejection of certain Unexpired Leases and other Executory Contracts in connection with cessation of operations.

13.     Risk of Litigation.

Certain of the Debtors' creditors may bring litigation against the Debtors during the course of the Chapter 11 Cases, the outcome of which is uncertain.  Although the Debtors and the Supporting Creditors believe that the Plan satisfies all of the requirements necessary for Confirmation by the Court, creditors and other parties in interest may bring objections to challenge Confirmation of the Plan.

14.     Plan Releases, Injunctions and Exculpation Provisions May Not Be Approved.

There can be no assurance that the Plan releases, injunctions and exculpation provisions, as provided in Sections 10.5-10.8 of the Plan, will be granted.  Failure of the Bankruptcy Court to grant such relief may result in a plan of reorganization that differs from the Plan or the Plan not being confirmed.

B.     Risk Factors Relating to Securities to Be Issued Under the Plan

15.     Market for Securities

Effective July 17, 2020, CRC's common stock began to be quoted on the OTC Pink Market under the ticker symbol "CRCQQ", which may have an unfavorable impact on the CRC's stock price and liquidity. The OTC Pink Marketplace is a significantly more limited market than the New York Stock Exchange or the Nasdaq Stock Market. There is no guarantee that active trading in CRC's common stock will develop on the OTC Pink Market. The quotation of CRC's shares on such marketplace may result in a less liquid market available for existing and potential stockholders to trade.

The Debtors shall use their commercially reasonable efforts to have the New Common Stock listed on the NYSE, or another nationally recognized exchange, as soon as practicable, subject to meeting applicable listing requirements, on or following the Effective Date.  However, there can be no assurance as to when or whether any such listing will occur or as to the liquidity of any market for the New Common Stock.

16.     Potential Dilution.

The ownership percentage represented by the New Common Stock distributed on the Effective Date under the Plan to the holders of (a) 2017 Term Loan Claims and (b) Unsecured Debt Claims other than 2017 Term Loan Deficiency Claims will be subject to dilution from the New Common Stock issued pursuant to each of the Rights Offering, the MIP, the Backstop Commitment Premium, the Exit Premium and the Eligible Stock, and any other shares that may be issued post-emergence, and the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.

In the future, similar to all companies, additional equity financings or other share issuances by any of the Reorganized Debtors could adversely affect the value of the New

66

Common Stock issuable upon such conversion.  The amount and dilutive effective of any of the foregoing could be material.

17.     Significant Holders.

The Holders of 2017 Term Loan Secured Claims and Ares are expected to acquire a significant ownership interest in the New Common Stock.  If such Holders were to act as a group, such holders would be in a position to control the outcome of all actions requiring stockholder approval, including the election of directors, without the approval of other stockholders.  This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the New Common Stock.

18.     Equity Interests Subordinated to Reorganized Debtors' Indebtedness.

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Stock would rank below all debt claims against the Reorganized Debtors.  As a result, holders of the New Common Stock will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution or winding up of the Reorganized Debtors until after all the Reorganized Debtors' obligations to their debt holders have been satisfied.

19.     Implied Valuation of New Common Stock May Not Represent Trading Value of New Common Stock.

The valuation of the Reorganized Debtors is not intended to represent the trading value of New Common Stock in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates, (b) conditions in the financial markets, (c) the anticipated initial securities of creditors receiving New Common Stock under the Plan, some of which may prefer to liquidate their investment rather than hold it on a long-term basis, and (d) other factors that generally influence prices of securities.  Factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict could affect the market price of the New Common Stock.  Accordingly, the implied value of the securities to be issued, stated herein and in the Plan, should not be construed as reflecting values that will be attained for the New Common Stock in the public or private markets.

20.     No Dividends.

Reorganized CRC may not pay any dividends on the New Common Stock and may instead retain any future cash flows for debt reduction and to support its operations.  As a result, the success of an investment in the New Common Stock may depend entirely upon any

67

future appreciation in the value of the New Common Stock.  There is no guarantee that the New Common Stock will appreciate in value or even maintain its initial value.

C.      Risks Related to Debtors' Ongoing Operations during the Chapter 11 Case

21.      The Debtors will be subject to risks and uncertainties associated with the Chapter 11 Cases.

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following: (i) ability to develop, confirm, and consummate the Plan; (ii) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (iii) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, royalty interest Holders, working interest Holders, and other third parties; (iv) ability to maintain contracts that are critical to the Debtors' operations; (v) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (vi) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings and (vii) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways.  For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers and other third parties, which in turn could materially adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

22.      Operating in bankruptcy for a long period of time may harm the Debtors' business.

The Debtors' future results are dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operating under Chapter 11 of the Bankruptcy Code and subject to Bankruptcy Court supervision may have a material adverse effect on the Debtors' business, financial condition, results of operations and liquidity. So long as the Chapter 11 Cases continue, the Debtors' senior management may be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on the Debtors' business operations. A prolonged period of operating under Chapter 11 of the Bankruptcy Code also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' business. In addition, the longer the Chapter 11 Cases continue, the more likely it is that the Debtors' customers and suppliers

may lose confidence in the Debtors' ability to reorganize their business successfully and may seek to establish alternative commercial relationships.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even once a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently reorganized under Chapter 11 of the Bankruptcy Code.

23.    The Reorganized Debtors may not be able to achieve their projected financial results.

Actual financial results will be subject to a number of factors including natural gas and oil industry performance, general business and economic conditions, and other matters, many of which will be beyond the control of the Reorganized Debtors and may differ materially from the Financial Projections.  If the Reorganized Debtors do not achieve projected revenue or cash flow levels, the Reorganized Debtors may lack sufficient liquidity to continue operating their businesses consistent with the Financial Projections after the Effective Date.  The Financial Projections represent management's view based on currently known facts, the successful Confirmation and implementation of the Plan and hypothetical assumptions regarding the Reorganized Debtors' future operations and ability to finance such operations; they do not guarantee the Reorganized Debtors' future financial performance.

24.    The Debtors' Financial Projections are subject to inherent uncertainty due to the numerous assumptions upon which they are based.

The Plan relies upon the Financial Projections that are based on numerous assumptions including, without limitation, the timing, Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, natural gas and oil industry performance, general business and economic conditions, competition, adequate financing, absence of material claims, the ability to make necessary capital expenditures, use of unrestricted cash, the ability to control future operating expenses, and other matters, many of which will be beyond the control of the Reorganized Debtors and some or all of which may not materialize.  Particular uncertainties with respect to the Reorganized Debtors' operations and financial results arise from the risks and uncertainties relating to changes in the demand for the Reorganized Debtors' natural gas oil; legislation and regulations relating to the natural gas and oil industry; operational, geological, permit, labor and weather-related factors; fluctuations in the amount of cash the Reorganized Debtors will generate from operations and numerous other matters of national, regional and global scale, including those of a political, economic, business, competitive or regulatory nature.

Because the actual results achieved throughout the periods covered by the Financial Projections may vary from the projected results, perhaps materially, the Financial Projections should not be relied upon as an assurance of the actual results that will occur. Consequently, there can be no assurance that the results or developments contemplated by any plan of reorganization implemented will occur or, even if they do occur, that they will have the anticipated effects on the Reorganized Debtors and their businesses or operations.  The failure of

69

any such results or developments to materialize as anticipated could materially adversely affect the successful execution of any plan of reorganization.

Except with respect to the Financial Projections and except as otherwise specifically and expressly stated herein, this Disclosure Statement and the Plan do not reflect any events that might occur subsequent to the date hereof.  Such events could have a material impact on the information contained in this Disclosure Statement and the Plan.  Neither the Debtors nor the Reorganized Debtors intend to update the Financial Projections.  The Financial Projections therefore may not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Financial Projections.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets.  The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

25.     Undue delay in Confirmation may disrupt operations of the Debtors.

Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.

The continuation of the Chapter 11 Cases, particularly if the Plan is not confirmed in the time frame currently contemplated, could materially adversely affect operations.  If Confirmation and consummation of the Plan do not occur expeditiously, the Chapter 11 Cases could result in, among other things, increased costs for professional fees and other case expenses.  In addition, prolonged Chapter 11 Cases would require senior management to spend a significant amount of time and effort dealing with the Debtors' financial reorganization instead of focusing on the operation of the Debtors' businesses.

D.     Operational Risks for the Reorganized Debtors

26.     Risks Related to the Company's Business and Industry

The Company is subject to various risks and uncertainties in the course of its business.  Discussions of such risks and uncertainties may be found in Part I, Item 1A, Risk Factors in the Company's Annual Report on Form 10-K for the year ended December 31, 2019 and Part II, Item 1A, Risk Factors in the Company's Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2020.

27.     Declines in natural gas, oil and NGL prices and/or production volumes may materially adversely affect the Reorganized Debtors' business, operations,

SC1:5210217.8

financial condition and their ability to meet their capital expenditure obligations or targets and financial commitments.

The Debtors' financial condition, results of operations, cash flow and ability to invest in their assets are highly dependent on oil, natural gas and NGL prices. A sustained period of low prices for oil, natural gas and NGLs would reduce the Debtors' cash flows from operations. Under these conditions, if the Debtors were unable to improve liquidity through additional financing, asset monetizations, equity issuances or otherwise, cash flow from operations and expected available credit capacity could be insufficient to meet the Debtors' commitments. Successfully completing these actions could have significant adverse effects such as higher operating and financing costs, dilution of equity and further covenant restrictions.

Historically, the markets for oil, natural gas and NGLs have been volatile and they are likely to continue to be so.  The Debtors are particularly dependent on Brent crude prices that have been as low as $27.88 per barrel and as high as $115.19 per barrel during the period between 2014 and 2020.  Factors affecting these commodity prices include:

- changes in domestic and global supply and demand;

- domestic and global inventory levels;

- political and economic conditions;

- the actions of OPEC and other significant producers and governments;

- changes or disruptions in actual or anticipated production, refining and processing;

- worldwide drilling and exploration activities;

- government energy policies and regulation, including with respect to climate change;

- the effects of conservation;

- weather conditions and other seasonal impacts;

- speculative trading in derivative contracts;

- currency exchange rates;

- technological advances;

- transportation and storage capacity, bottlenecks and costs in producing areas;

- the price, availability and acceptance of alternative energy sources;

- regional market conditions; and

71

- other matters affecting the supply and demand dynamics for these products.

Lower prices could have adverse effects on the Reorganized Debtors' business, financial condition, results of operations and cash flow, including:

- reducing the Reorganized Debtors' proved oil and natural gas reserves over time, including as a result of impairments of existing reserves;

- limiting the Reorganized Debtors' ability to grow or maintain future production including a delay in the reversion dates of certain of their joint ventures;

- reducing the Reorganized Debtors' ability to make interest payments or maintain compliance with financial covenants in agreements governing their indebtedness;

- forcing monetization events of certain assets under one of the Reorganized Debtors' joint venture arrangements;

- affecting the Reorganized Debtors' ability to attract counterparties and enter into commercial transactions, including hedging, surety or insurance transactions; and

- limiting the Reorganized Debtors' access to funds through the capital markets and the price the Reorganized Debtors could obtain for asset sales or other transactions of their equity and debt securities.

The Debtors' hedging program does not provide downside protection for all of their production in 2020 and beyond. As a result, the Debtors' hedges do not fully protect the Debtors from commodity price declines, and the Debtors may be unable to enter into acceptable hedges in the future.

28. The Reorganized Debtors' business requires substantial capital investments, which may include acquisitions or join ventures. The Reorganized Debtors may be unable to fund these investments which could lead to a decline in their oil and natural gas reserves or production. The Reorganized Debtors' capital investment program is also susceptible to risks that could materially affect its implementation.

The Debtors' exploration, development and acquisition activities require substantial capital investments. Historically, the Debtors have funded their capital investments through a combination of cash flow from operations, borrowings under the Debtors' RBL Facility and joint ventures. The Reorganized Debtors may continue to seek to manage their internally funded capital investments to closely align with projected cash flow from operations. Accordingly, a reduction in projected operating cash flow could cause the Reorganized Debtors to reduce their future capital investments. In general, the ability to execute any capital plan of the Reorganized Debtors' will depend on a number of factors, including:

- the amount of oil, natural gas and NGLs that the Reorganized Debtors are able to produce;

72

- commodity prices;

- regulatory and third-party approvals;

- the Reorganized Debtors' ability to timely drill, complete and stimulate wells;

- the Reorganized Debtors' ability to secure equipment, services and personnel; and

- the availability of external sources of financing.

Access to future capital may be limited by the Reorganized Debtors' lenders, their joint venture partners, capital markets constraints, activist funds or investors, or poor stock price performance. Because of these and other potential variables, the Reorganized Debtors may be unable to deploy capital in the manner planned, which may negatively impact production levels and development activities and limit the Reorganized Debtors' ability to make acquisitions or enter into joint ventures.

Unless the Reorganized Debtors make sufficient capital investments and conduct successful development and exploration activities or acquire properties containing proved reserves, the Reorganized Debtors' proved reserves will decline as those reserves are produced. The Reorganized Debtors' ability to make the necessary long-term capital investments or acquisitions needed to maintain or expand the Reorganized Debtors' reserves may be impaired to the extent they have insufficient cash flow from operations or liquidity to fund these activities. Over the long term, a continuing decline in the Reorganized Debtors' production and reserves would reduce the Reorganized Debtors' liquidity and their ability to satisfy debt obligations by reducing the Reorganized Debtors' cash flow from operations and the value of their assets.

29. Acquisition and disposition activities and the Reorganized Debtors' joint ventures involve substantial risk.

Any acquisition activity of the Reorganized Debtors' will carry risks that the Reorganized Debtors' may:

- not fully realize anticipated benefits due to less-than-expected reserves or production or changed circumstances;

- bear unexpected integration costs or experience other integration difficulties;

- experience share price declines based on the market's evaluation of the activity;

- assume liabilities that are greater than anticipated; and

- be exposed to currency, political, marketing, labor and other risks, particularly associated with investments in foreign assets.

In connection with any acquisition by the Reorganized Debtors, the Reorganized Debtors may only be able to perform limited due diligence. Successful acquisitions of oil and natural gas properties require an assessment of a number of factors, including estimates of

73

SC1:5210217.8

recoverable reserves, the timing for recovering the reserves, exploration potential, future commodity prices, operating costs and potential environmental, regulatory and other liabilities. Such assessments are inexact and incomplete, and the Reorganized Debtors may be unable to make these assessments with a high degree of accuracy.

If the Reorganized Debtors are unable to make acquisitions, the Reorganized Debtors may not be able to grow their reserves or develop their properties in a timely manner or at all.

Part of the Reorganized Debtors' business strategy involves entering into joint ventures and divesting non-core assets. The Reorganized Debtors' joint ventures and disposition activities carry risks that the Reorganized Debtors may:

- not be able to realize reasonable prices or rates of return for assets;

- be required to retain liabilities that are far greater than desired or anticipated;

- experience increased operating costs; and

- reduce the Reorganized Debtors' cash flows if the Reorganized Debtors cannot replace associated revenue.

There can be no assurance that the Reorganized Debtors will be able to successfully enter into new joint ventures or that joint ventures will occur in the time frames or with economic terms that the Reorganized Debtors expect. The Reorganized Debtors may also be unable to divest assets on financially attractive terms or at all.

If the Reorganized Debtors are unable to sell assets as needed or enter into joint ventures, the Reorganized Debtors may not be able to generate proceeds to support their liquidity and capital investments.

30. The Reorganized Debtors' commodity-price risk-management activities may prevent the Reorganized Debtors from fully benefiting from price increases and may expose the Reorganized Debtors to other risks.

The Reorganized Debtors' commodity-price risk-management activities may prevent the Reorganized Debtors from realizing the full benefits of price increases above any levels set in certain derivative instruments we may use to manage price risk. In addition, the Reorganized Debtors' commodity-price risk-management activities may expose the Reorganized Debtors to the risk of financial loss in certain circumstances, including instances in which the counterparties to the Reorganized Debtors' hedging or other price-risk management contracts fail to perform under those arrangements.

The Dodd-Frank Wall Street Reform and Consumer Protection Act (the Dodd-Frank Act), enacted in 2010, established federal oversight and regulation of the over-the-counter (OTC) derivatives market and entities, like the Reorganized Debtors, that participate in that market. Among other things, the Dodd-Frank Act required the U.S. Commodity Futures Trading Commission to promulgate a range of rules and regulations applicable to OTC derivatives

SC1:5210217.8

transactions.  These regulations may affect both the size of positions that the Reorganized Debtors may enter and the ability or willingness of counterparties to trade opposite us, potentially increasing costs for transactions.  Moreover, the effects of these regulations could reduce the Reorganized Debtors' hedging opportunities which could adversely affect the Reorganized Debtors' revenues and cash flow during periods of low commodity prices.

Recently, U.S. regulators have advanced a final rule regarding a new approach for calculating the exposure of derivative contracts under the applicable agencies' regulatory capital rules, referred to as the standardized approach for counterparty credit risk or SA-CCR.  Financial institutions will be required to comply with the SA-CCR rules beginning on January 1, 2022 and the SA-CCR rule could significantly increase the capital requirements for certain participants in the OTC derivatives market in which the Reorganized Debtors participate.  These increased capital requirements could result in significant additional costs being passed through to end users like us or reduce the number of participants or products available to us in the OTC derivatives market.  The effects of these regulations could reduce the Reorganized Debtors' hedging opportunities or substantially increase the cost of hedging, which could adversely affect the Reorganized Debtors' revenues and cash flow.

The European Union and other non-U.S. jurisdictions may implement regulations with respect to the derivatives market.  To the extent the Reorganized Debtors transact with counterparties in foreign jurisdictions or counterparties with other businesses that subject them to regulation in foreign jurisdictions, the Reorganized Debtors may become subject to or otherwise impacted by such regulations, which could also adversely affect the Reorganized Debtors' hedging opportunities.

31.    The Reorganized Debtors' producing properties are located exclusively in California, making the Reorganized Debtors vulnerable to risks associated with having operations concentrated in this geographic area.

The Debtors' operations are concentrated in California. Because of this geographic concentration, the success and profitability of the Reorganized Debtors' operations may be disproportionately exposed to the effect of regional conditions.  These include local price fluctuations, changes in state or regional laws and regulations affecting the Reorganized Debtors' operations and other regional supply and demand factors, including gathering, pipeline, transportation and storage capacity constraints, limited potential customers, infrastructure capacity and availability of rigs, equipment, oil field services, supplies and labor.  The Reorganized Debtors' operations are also exposed to natural disasters and related events common to California, such as wildfires, mudslides, high winds and earthquakes.  Further, the Reorganized Debtors operations may be exposed to power outages, mechanical failures, industrial accidents or labor difficulties.  Any one of these events has the potential to cause producing wells to be shut in, delay operations and growth plans, decrease cash flows, increase operating and capital costs, prevent development of lease inventory before expiration and limit access to markets for the Reorganized Debtors' products.

32.    The Reorganized Debtors may incur substantial losses and be subject to substantial liability claims as a result of catastrophic events.  The Reorganized

75

SC1:5210217.8

Debtors may not be insured for, or the Reorganized Debtors; insurance may be inadequate to protect them against, these risks.

The Debtors are not fully insured against all risks.  The Reorganized Debtors oil and natural gas exploration and production activities and the Reorganized Debtors' assets will be subject to risks such as fires, explosions, releases, discharges, power outages, equipment or information technology failures and industrial accidents, as are the assets and properties of third parties who supply the Reorganized Debtors or who purchase, transport or use the Reorganized Debtors' products.  In addition, events such as earthquakes, floods, mudslides, wildfires, power outages, high winds, droughts, cyber-security, van ease or be curtailed and could adversely affect the Reorganized Debtors' business, workforce, and the communities in which the Reorganized Debtors will operate.  The Reorganized Debtors may be unable to obtain, or may elect not to obtain, insurance for certain risks if the Reorganized Debtors believe that the cost of available insurance is excessive relative to the risks presented.

E.      Financing Risks for the Reorganized Debtors

33.     Increases in the cost of capital could adversely affect the Reorganized Debtors' business.

Recent and continuing disruptions and volatility in the global financial markets may lead to an increase in interest rates or a contraction in credit availability, impacting the Reorganized Debtors' ability to finance their operations.  The Reorganized Debtors' business and operating results can be harmed by factors such as the terms and cost of capital, increases in interest rates, changes to required covenant restrictions or a reduction in credit rating.  Changes in any one or more of these factors could cause the Reorganized Debtors' cost of doing business to increase, limit their access to capital, limit their ability to pursue acquisition opportunities, reduce cash flows available for drilling, render them unable to replace reserves and production and place them at a competitive disadvantage.

34.     The Debtors may not be able to generate sufficient cash to service all of their indebtedness.

The Debtors ability to make scheduled payments on or refinance their debt obligations depends on the Debtors' financial condition and operating performance, which are subject to prevailing economic, industry and competitive conditions and to certain financial, business, legislative, regulatory and other factors beyond the Debtors' control.  The Debtors may be unable to maintain a level of cash flow from operating activities sufficient to pay the principal, premium, if any, and interest on their indebtedness, including potential borrowings under exit financing upon emergence.

F.      Exploration and Production Risks for the Reorganized Debtors

35.     Drilling for and producing oil and natural gas carry significant operational risk and uncertainty.  The Reorganized Debtors may not drill wells at the scheduled times, or at all.  Wells the Reorganized Debtors do drill may not yield production in economic quantities or generate the expected Value Creation Index (VCI)

76

metrics, which are based on certain estimates including future production rates, costs and commodity prices.

The processes of drilling and completing wells are subject to numerous risks beyond the Debtors' control, including risks that could delay the Debtors' current drilling schedule and the risk that drilling will not result in commercially viable production. The Reorganized Debtors will not be obligated to undertake any development activities, so any drilling and completion activities will be subject to the sole discretion of the Reorganized Debtors. The exploration and development of oil and gas properties will depend in part on the Reorganized Debtors' analysis of geophysical, geologic, engineering, production and other technical data and processes, including the interpretation of 3D seismic data. This analysis is often inconclusive or subject to varying interpretations. The Reorganized Debtors will also bears the risks of equipment failures, accidents, environmental hazards, unusual geological formations or unexpected pressure or irregularities within formations, adverse weather conditions, permitting or construction delays, title disputes, regulatory limitations on surface access or use, disappointing drilling results or reservoir performance (including lack of production response to workovers or improved and enhanced recovery efforts) and other associated risks. Further, the Reorganized Debtors' future business, financial condition, results of operations, liquidity or ability to finance its planned development expenditures could be materially and adversely affected by any factor that may curtail, delay or cancel drilling. In the event that drilling of development wells is delayed or cancelled, that permits for drilling, workovers, well stimulation or injections expire before such activities occur or that development wells have lower than anticipated production, due to one or more of the factors above or for any other reason, it could adversely affect revenues generated by the Reorganized Debtors.

The Reorganized Debtors will allocate capital by reference to a VCI metric. The Reorganized Debtors calculate the VCI of a well or project at the time capital is allocated and frequently re-calculate the VCI after a well or project is completed. VCI is calculated based on internal estimates of future cash flows and capital investment, which are inherently uncertain. In addition, future cash flows are dependent on the Reorganized Debtors' production costs. The Debtors' production cost per barrel is higher than that of many of the Debtors' peers due to the extraction methods that the Debtors use, the large number of wells the Debtors operate and the effects of the Debtors' PSC-type contracts.

The Reorganized Debtors' decisions and ultimate profitability will also be affected by commodity prices, the availability of capital, regulatory approvals, available transportation and storage capacity, the political environment and other factors. The Reorganized Debtors' cost of drilling, completing, stimulating, equipping, operating, inspecting, maintaining and abandoning wells will often be uncertain.

Any of the foregoing operational or financial risks could cause actual results to differ materially from the expected VCI or cause a well or project to become uneconomic or less profitable than forecasted.

The Debtors have specifically identified locations for drilling over the next several years, which represent a significant part of the Reorganized Debtors' long-term growth strategy. The Reorganized Debtors' actual drilling activities may materially differ from those

77

presently identified.  If future drilling results in these projects do not establish sufficient reserves to achieve an economic return, the Reorganized Debtors may curtail drilling or development of these projects.  When the Debtors identify these locations, they make assumptions about the consistency and accuracy of data that may prove inaccurate.  It is not guaranteed that the Debtors' identified drilling locations will ever be drilled or if the Reorganized Debtors will be able to produce crude oil or natural gas from these drilling locations.  In addition, some of the Reorganized Debtors' leases could expire if the Reorganized Debtors do not establish production in the leased acreage.  The combined net acreage covered by leases expiring in the next three years represented approximately 15% of the Debtors' total net undeveloped acreage at December 31, 2019.

36.     Part of the Reorganized Debtors' strategy will involve exploratory drilling, including drilling in new or emerging plays.  The Reorganized Debtors' drilling results are uncertain, and the value of the Reorganized Debtors' undeveloped acreage may decline if drilling is unsuccessful.

The risk profile for the Reorganized Debtors' exploration drilling locations will be higher than for other locations because the Reorganized Debtors will have less geologic and production data and drilling history, in particular for those exploration drilling locations in unconventional reservoirs, which are in unproven geologic plays.  The Reorganized Debtors' ability to profitably drill and develop the Reorganized Debtors' identified drilling locations depends on a number of variables, including crude oil and natural gas prices, capital availability, costs, drilling results, regulatory approvals, available transportation capacity and other factors.  The Reorganized Debtors may not find commercial amounts of oil or natural gas or the costs of drilling, completing, stimulating and operating wells in these locations may be higher than initially expected.  If future drilling results in these projects do not establish sufficient reserves to achieve an economic return, the Reorganized Debtors may curtail drilling or development of these projects.  In either case, the value of the Reorganized Debtors' undeveloped acreage may decline and could be impaired.

One of the important assets of the Debtors is their acreage in the Monterey shale play in the San Joaquin, Los Angeles and Ventura basins.  The geology of the Monterey shale is highly complex and not uniform due to localized and varied faulting and changes in structure and rock characteristics.  As a result, it differs from other shale plays that can be developed in part on the basis of their uniformity.  Instead, individual Monterey shale drilling sites may need to be more fully understood and may require a more precise development approach, which could affect the timing, cost and the Reorganized Debtors' ability to develop this asset.

37.     Estimates of proved reserves and related future net cash flows are not precise.  The actual quantities of the Reorganized Debtors' proved reserves and future net cash flows may prove to be lower than estimated.

Many uncertainties exist in estimating quantities of proved reserves and related future net cash flows.  The Debtors' estimates are based on various assumptions that require significant judgment in the evaluation of available information.  These assumptions may ultimately prove to be inaccurate.  Additionally, reservoir data may change over time as more information becomes available from development and appraisal activities.

78

The Reorganized Debtors' ability to add reserves, other than through acquisitions, depends on the success of improved recovery, extension and discovery projects, each of which depends on reservoir characteristics, technology improvements and oil and natural gas prices, as well as capital and operating costs.  Many of these factors are outside the Reorganized Debtors' control and will affect whether the historical sources of proved reserves additions continue to provide reserves at similar levels.

Generally, lower prices adversely affect the quantity of the Debtors' reserves as those reserves expected to be produced in later years, which tend to be costlier on a per unit basis, become uneconomic.  In addition, a portion of the Reorganized Debtors' proved undeveloped reserves may no longer meet the economic producibility criteria under the applicable rules or may be removed due to a lower amount of capital available to develop these projects within the SEC-mandated five-year limit.

In addition, the Debtors' reserves information represents estimates prepared by internal engineers.  Although 80% of the Debtors' 2019 proved reserve estimates were audited by the Debtors' independent petroleum engineers, Ryder Scott Company, L.P. and Netherland, Sewell & Associates, Inc., it is not guaranteed that the estimates are accurate.  Reserves estimation is a partially subjective process of estimating accumulations of oil and natural gas. Estimates of economically recoverable oil and natural gas reserves and of future net cash flows from those reserves depend upon a number of variables and assumptions, including:

- historical production from the area compared with production from similar areas;

- the quality, quantity and interpretation of available relevant data;

- commodity prices;

- production and operating costs;

- ad valorem, excise and income taxes;

- development costs;

- the effects of government regulations; and

- future workover and facilities costs.

Changes in these variables and assumptions could require the Reorganized Debtors to make significant negative reserves revisions.  In addition, factors such as the availability of capital, geology, government regulations and permits, the effectiveness of development plans and other factors could affect the source or quantity of future reserves additions.

G.    Environmental and Other Regulatory Risks for the Reorganized Debtors

38.    Concerns about climate change and other air quality issues may materially affect the Reorganized Debtors' operations or results.

79

Governmental, scientific and public concern over the threat of climate change arising from greenhouse gas ("GHG") emissions, and regulation of GHGs and other air quality issues, may materially affect the Reorganized Debtors' business in many ways, including increasing the costs to provide the Reorganized Debtors' products and services and reducing demand for, and consumption of, the Reorganized Debtors' products and services, and we may be unable to recover or pass through a significant portion of the Reorganized Debtors' costs.  In addition, legislative and regulatory responses to such issues at the federal, state and local level may increase the Reorganized Debtors' capital and operating costs and render certain wells or projects uneconomic, and potentially lower the value of the Reorganized Debtors' reserves and other assets.  Both the EPA and California have implemented laws, regulations and policies that seek to reduce GHG emissions.  California's cap-and-trade program operates under a market system and the costs of such allowances per metric ton of GHG emissions are expected to increase in the future as CARB tightens program requirements and annually increases the minimum state auction price of allowances and reduces the state's GHG emissions cap.  As the foregoing requirements become more stringent, the Reorganized Debtors may be unable to implement them in a cost-effective manner, or at all.

Concern over climate change and GHG and other emissions has also resulted in increasing political risks in California and the United States, including climate change related pledges made by various candidates for federal, state and local offices in California and certain candidates seeking the office of the President of the United States in 2020.  These include threats to ban hydraulic fracturing and other stimulation of oil and natural gas wells and permitting of various operations, pipeline infrastructure and other oil and gas facilities on government or private lands, which could negatively impact the Reorganized Debtors' operations and properties.  Other actions that could be pursued by presidential candidates may include the reversal of the United States' withdrawal from the Paris Agreement in November 2020, as well as reversing various regulatory changes made or proposed by the Trump Administration to promote energy production and other development.  Additionally, various claimants, including certain municipalities, have filed litigation alleging that energy producers are liable for damages attributed to climate change.

In addition, other current and proposed international agreements and federal, state and local laws, regulations and policies seek to restrict or reduce the use of petroleum products in transportation fuels, electricity generation, plastics and other applications, prohibit future sale or use of vehicles, appliances or equipment that require petroleum fuels, impose additional taxes and costs on producers and consumers of petroleum products and require or subsidize the use of renewable energy.  The state has set an ambitious goal by executive order to be "carbon-neutral" by 2045 and initiated and funded studies to identify strategies to implement this goal.  The legislature, state agencies and various municipalities have adopted or proposed laws, regulations and policies that seek to significantly reduce emissions from vehicles, increase the use of "zero emission" vehicles, reduce the use of plastics, increase renewable energy mandates for utilities and in residential and commercial construction, and replace natural gas appliances and infrastructure in residential and commercial buildings with electric appliances.

Government authorities can impose administrative, civil and/or criminal penalties for non-compliance with air permits or other requirements of the federal Clean Air Act and associated state laws and regulations, and various state and local agencies are conducting

80

increased regional, community and field air monitoring specifically with respect to oil and natural gas operations.  In addition, California air quality laws and regulations, particularly in Southern and Central California where most of the Reorganized Debtors' operations are located, are in most instances more stringent than analogous federal laws and regulations.  For example, the San Joaquin Valley will be required to adopt more rigorous attainment plans under the Clean Air Act to comply with federal ozone and particulate matter standards, and these efforts could affect the Reorganized Debtors' activities in the region and the Reorganized Debtors' ability and cost to obtain permits for new or modified operations.

To the extent financial markets view climate change and GHG or other emissions as an increasing financial risk, this could adversely impact the Reorganized Debtors' cost of, and access to, capital and the value of the Reorganized Debtors' stock and the Reorganized Debtors' assets.  Shareholders currently invested in oil and gas companies may elect in the future to shift some or all of their investments into other sectors, and institutional lenders may elect not to provide funding for oil and gas companies.  Additionally, environmental activists, proponents of the Paris Agreement, and other governmental and non-governmental organizations concerned about climate change have sought to pressure public and private investment funds not to invest in oil and gas companies and institutional lenders to restrict oil and gas companies' access to capital.  Limitation of investments in and financings for oil and gas companies like the Reorganized Debtors could result in restriction, delay or cancellation of drilling programs or development or production activities.

It cannot be guaranteed that the Reorganized Debtors' local production of oil, NGLs and natural gas will remain essential to meeting California's energy and feedstock needs for the foreseeable future.  The Reorganized Debtors have also established 2030 Sustainability Goals for water recycling, renewables integration, methane emission reduction and carbon capture and sequestration in the Reorganized Debtors' life-of-field planning that align with the state's long-term goals and support the Reorganized Debtors' ability to continue to efficiently implement federal, state and local laws, regulations and policies, including those relating to air quality and climate, in the future.  However, there can be no assurances that the Reorganized Debtors will be able to design, permit, fund and implement such projects in a timely and cost-effective manner or at all, or that the Reorganized Debtors, their customers or end users of the Reorganized Debtors' products will be able to satisfy long-term environmental, air quality or climate goals if those are applied as enforceable mandates.

The adoption and implementation of new or more stringent international, federal, state or local legislation, regulations or policies that impose more stringent standards for GHG or other emissions from our operations or otherwise restrict the areas in which the Reorganized Debtors may produce oil, natural gas, NGLs or electricity or generate GHG or other emissions could result in increased costs of compliance or costs of consuming, and thereby reduce demand for or value of the Reorganized Debtors' products and services.  Additionally, political, litigation and financial risks may result in restricting or canceling oil and natural gas production activities, incurring liability for infrastructure damages or other losses as a result of climate change, or impairing the Reorganized Debtors' ability to continue to operate in an economic manner.  Moreover, climate change may pose increasing risks of physical impacts to the Reorganized Debtors' operations and those of their suppliers, transporters and customers through damage to infrastructure and resources resulting from drought, wildfires, sea level changes, flooding and

81

other natural disasters and other physical disruptions.  One or more of these developments could have a material adverse effect on the Reorganized Debtors' business, financial condition and results of operations.

39.     The Debtors' business is highly regulated and government authorities can delay or deny permits and approvals or change requirements governing the Reorganized Debtors' operations, including hydraulic fracturing and other well stimulation methods, enhanced production techniques and fluid injection or disposal, that could increase costs, restrict operations and change or delay the implementation of the Reorganized Debtors' business plans.

The Reorganized Debtors' operations are subject to complex and stringent federal, state, local and other laws and regulations relating to the exploration and development of the Reorganized Debtors' properties, as well as the production, transportation, marketing and sale of the Reorganized Debtors' products.  Federal, state and local agencies may assert overlapping authority to regulate these areas. For example, the jurisdiction, duties and enforcement authority of various state agencies have significantly increased with respect to oil and natural gas activities in recent years, and these state agencies as well as certain cities and counties have significantly revised their regulations, regulatory interpretations and data collection and reporting requirements and plan to issue additional regulations of certain oil and natural gas activities in 2020.  In addition, certain of these federal, state and local laws and regulations may apply retroactively and may impose strict or joint and several liability on the Reorganized Debtors for events or conditions over which the Reorganized Debtors and their predecessors had no control, without regard to fault, legality of the original activities, or ownership or control by third parties.

The Reorganized Debtors must obtain and maintain permits, approvals and certificates from federal, state and local government authorities for a variety of activities including siting, drilling, completion, stimulation, operation, inspection, maintenance, transportation, storage, marketing, site remediation, decommissioning, abandonment, fluid injection and disposal and water recycling and reuse.  Failure to comply may result in the assessment of administrative, civil and/or criminal fines and penalties and liability for noncompliance, costs of corrective action, cleanup or restoration, compensation for personal injury, property damage or other losses, and the imposition of injunctive or declaratory relief restricting or prohibiting certain operations.  Under certain environmental laws and regulations, the Reorganized Debtors could be subject to strict or joint and several liability for the removal or remediation of contamination, including on properties over which the Reorganized Debtors and their predecessors had no control, without regard to fault, legality of the original activities, or ownership or control by third parties.  See Items 1 & 2. Business and Properties – Regulation of the Oil and Natural Gas Industry in the Company's Annual Report on Form 10-K for the year ended December 31, 2019 for a description of laws and regulations that affect the Debtors' business.

The Reorganized Debtors' customers, including refineries and utilities, and the businesses that transport the Reorganized Debtors' products to customers, are also highly regulated.  For example, various government authorities have sought to restrict the use of oil, natural gas or certain petroleum-based products such as fuels and plastics.  Federal and state

82

pipeline safety agencies have adopted or proposed regulations to expand their jurisdiction to include more gas and liquid gathering lines and pipelines and to impose additional mechanical integrity, leak detection and reporting requirements. The state has adopted additional regulations on the storage of natural gas that could affect the demand for or availability of such storage, increase seasonal volatility or otherwise affect the prices that the Reorganized Debtors receive from their customers. The California Public Utilities Commission has commenced a rulemaking to develop a long-term natural gas planning strategy to ensure safe and reliable gas systems at just and reasonable rates during what it describes as a 25-year transition from natural gas-fueled technologies to meet the state's GHG goals. Certain municipalities have enacted restrictions on the installation of natural gas appliances and infrastructure in new residential or commercial construction, which could affect the retail natural gas market for the Reorganized Debtors' utility customers and the demand and prices the Reorganized Debtors' receive for the natural gas they produce.

Costs of compliance may increase and operational delays or restrictions may occur as existing laws and regulations are revised or reinterpreted, or as new laws and regulations become applicable to the Reorganized Debtors' operations, each of which has occurred in the past. Government authorities and other organizations continue to study health, safety and environmental aspects of oil and natural gas operations, including those related to air, soil and water quality, ground movement or seismicity and natural resources. For example, the Legislature expanded CalGEM's duties in 2019 to include public health and safety and CalGEM and commenced public health and safety workshops in the first quarter of 2020 to be followed by an associated rulemaking process. Government authorities have also adopted or proposed new or more stringent requirements for permitting, inspection and maintenance of wells, pipelines and other facilities, and public disclosure or environmental review of, or restrictions on, oil and natural gas operations, including proposed setback distances from o her land uses. Such requirements or associated litigation could result in potentially significant added costs to comply, delay or curtail the Reorganized Debtors' operation, development, fluid injection and disposal or production activities, precluding the Reorganized Debtors from drilling, completing or stimulating wells, or otherwise restrict the Reorganized Debtors' ability to access and develop mineral rights, any of which could have an adverse effect on the Reorganized Debtors' expected production, other operations and financial condition.

Changes to elected or appointed officials or their priorities and policies could result in different approaches to the regulation of the oil and natural gas industry. The Reorganized Debtors cannot predict the actions the Governor or Legislature may take with respect to the regulation of the Reorganized Debtors' business, the oil and natural gas industry or the state's economic, fiscal or environmental policies.

H.     Additional Risks for the Reorganized Debtors

40.     Adverse tax law changes may affect the Reorganized Debtors' operations.

The Debtors are subject to taxation by various tax authorities at the federal, state and local levels where they do business. New legislation could be enacted by any of these government authorities that could adversely affect the Reorganized Debtors' business. In California, there have been numerous state and local proposals for additional income, sales,

83

excise and property taxes, including additional taxes on oil and natural gas production.  Although such proposals targeting the Reorganized Debtors' industry have not become law, campaigns by various interest groups could lead to additional future taxes.

41.    Information technology failures and cyber-security attacks could adversely affect the Reorganized Debtors.

The Debtors rely on electronic systems and networks to communicate, control and manage the Debtors' exploration, development and production activities. The Debtors also use these systems and networks to prepare the Debtors' financial management and reporting information, to analyze and store data and to communicate internally and with third parties, including the Debtors' service providers and customers. If the Reorganized Debtors record inaccurate data or experience infrastructure outages, the Reorganized Debtors' ability to communicate and control and manage the Reorganized Debtors' business could be adversely affected.

Cyber-security attacks on businesses have escalated and become more sophisticated in recent years and include attempts to gain unauthorized access to data, malicious software, ransomware and other electronic security breaches that could lead to disruptions in critical systems, unauthorized release of confidential information or the corruption of data.  In addition, the Reorganized Debtors' vendors, customers and other business partners may separately suffer disruptions or breaches from cyber-security attacks that, in turn, could adversely impact the Reorganized Debtors' operations and compromise the Reorganized Debtors' information.  If the Reorganized Debtors or the third parties with whom the Reorganized Debtors interact were to experience a successful attack, the potential consequences to the Reorganized Debtors' business, workforce and the communities in which the Reorganized Debtors operate could be significant, including financial losses, loss of business, litigation risks and damage to reputation.  As the sophistication of cyber-security attacks continues to evolve, the Reorganized Debtors may be required to expend additional resources to further enhance the Reorganized Debtors' security.

42.    The COVID-19 pandemic has caused crude oil prices to decline significantly in 2020, which has materially and adversely affected the Debtors' business, results of operation, financial condition and liquidity.

The COVID-19 pandemic has adversely affected the global economy, and has resulted in, among other things, travel restrictions, business closures and the institution of quarantining and other mandated and self-imposed restrictions on movement. As a result, there has been an unprecedented reduction in demand for crude oil. In March 2020, crude oil prices declined significantly as a result of market concerns about the economic impact from the coronavirus pandemic, restrictions and other measures implemented in response to the pandemic as well as certain actions of OPEC, Russia and other foreign oil producers. In April 2020, oil prices continued to decline precipitously reaching negative prices for spot WTI crude. The severity, magnitude and duration of current or future COVID-19 outbreaks, the extent of actions that have been or may be taken to contain or treat their impact, and the impacts on the economy generally and oil prices in particular, are uncertain, rapidly changing and hard to predict. The current futures forward curve for Brent crude indicates that prices may continue at relatively

84

lower prices for an extended period of time. As a result, the Debtors reduced operating expenses and planned capital expenditures to those necessary to maintain mechanical integrity of its facilities to operate them in a safe and environmentally responsible manner. In addition, the Debtors have shut in approximately 6,000 barrels of oil equivalent per day in net production in May 2020. These operational decisions starting in March 2020 will negatively impact the Debtors production levels beginning in the second quarter and, combined with expected lower commodity prices, will materially adversely affect the Debtors' operating cash flows and may materially and adversely affect the quantity of estimated proved reserves that may be attributed to the Debtors' properties. The Debtors' operations also may be adversely affected if significant portions of the Debtors' workforce are unable to work effectively, including because of illness, quarantines, government actions or other restrictions in connection with the pandemic. In addition, the Debtors are exposed to changes in commodity prices which have been and will likely remain volatile and depressed for the foreseeable future. The foregoing has placed significant pressure on the Debtors' liquidity and financial condition and required the Debtors to record a material impairment charge.

43.     The ability or willingness of OPEC and other oil exporting nations to set and maintain production levels has a significant impact on oil and natural gas commodity prices.

OPEC is an intergovernmental organization that seeks to manage the price and supply of oil on the global energy market. Actions taken by OPEC members, including those taken alongside other oil exporting nations, have a significant impact on global oil supply and pricing. For example, OPEC and certain other oil exporting nations have previously agreed to take measures, including production cuts, to support crude oil prices. In March 2020, members of OPEC and Russia considered extending and potentially increasing these oil production cuts. However, those negotiations were unsuccessful. As a result, Saudi Arabia announced an immediate reduction in export prices and Russia announced that all previously agreed upon oil production cuts would expire on April 1, 2020. These actions led to an immediate and steep decrease in oil prices, which reached a closing NYMEX price low of under negative $37.00 per barrel of crude oil in April 2020. There can be no assurances that OPEC members and other oil exporting nations will agree to future production cuts or other actions to support and stabilize oil prices, nor can there be any assurances that they will not further reduce oil prices or increase production. Uncertainty regarding future actions to be taken by OPEC members or other oil exporting countries could lead to increased volatility in the price of oil, which could adversely affect the Debtors' business, financial condition, results of operations and cash flows.

**ARTICLE X**

CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the holders of 2017 Term Loan Secured Claims and Unsecured Debt Claims (the "holders") who would acquire shares of New Common Stock and Subscription Rights pursuant to the Plan.  The following summary does not address the U.S. federal income tax consequences to holders who are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or who are deemed to reject the Plan.  The discussion of

85

U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), U.S. Treasury regulations, judicial authorities, published positions of the Internal Revenue Service ("IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect).  The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions.  This summary does not address non-U.S., state, or local tax consequences of the contemplated transactions, nor does it address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (e.g., non-U.S. taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that elect to use the mark-to-market method of tax accounting for their securities, and persons whose Claims are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, this discussion does not address the Foreign Account Tax Compliance Act, the alternative minimum tax, the "Medicare" tax on net investment income, or U.S. federal taxes other than income taxes, nor does it apply to any person that acquires New Common Stock in the secondary market.  Unless otherwise indicated, this discussion assumes that all Claims, New Common Stock and Subscription Rights are held as "capital assets" (generally, property held for investment) within the meaning of Section 1221 of the Tax Code and that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their respective forms. This summary does not discuss differences in tax consequences to holders of Claims that act as Backstop Parties or otherwise act or receive consideration in a capacity other than any other holder of a Claim of the same Class or Classes, and the tax consequences for such holders may differ materially from that described below.

*The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances. All holders of Claims are urged to consult their tax advisors for the U.S. federal, state, local and other tax consequences applicable under the Plan.*

A.    Consequences to the Debtors

For U.S. federal income tax purposes, each of the Debtors is a member of an affiliated group of corporations of which CRC is the common parent and which files a single consolidated U.S. federal income tax return (the "Tax Group"). The Debtors estimate that the Tax Group had incurred approximately $1.28 billion of consolidated net operating losses ("NOLs") as of December 31, 2019, and projects $395 million of operating loss for 2020. The Debtors project no material tax for 2020. Subject to on-going review, the Debtors believe that as of December 31, 2019, the aggregate tax basis in their assets (other than stock of members of the Tax Group) is greater than fair market value. In addition, the Debtors expect that a portion of their interest expense for the 2018, 2019 and 2020 taxable years will be subject to disallowance and carry forward under Section 163(j) of the Tax Code. The amount of any such NOLs and

86

SC1:5210217.8

other tax attributes remains subject to further analysis of the Debtors and to audit and adjustment by the IRS.  As discussed below, in connection with and upon implementation of the Plan, the Debtors anticipate that certain tax attributes will be reduced, and that the subsequent utilization of certain tax attributes may be further limited on account of the application of section 382 of the Tax Code.

1.      Cancellation of Debt

In general, the Tax Code provides that a corporate debtor in a bankruptcy case must reduce certain of its tax attributes—such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets—by the amount of any cancellation of debt ("COD") incurred pursuant to a confirmed chapter 11 plan. The amount of COD incurred is generally the amount by which the indebtedness discharged exceeds the value of any consideration given in exchange therefor. Certain statutory or judicial exceptions may apply to limit the amount of COD incurred for U.S. federal income tax purposes. A corporate debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes. If such an election is not made, any reduction in a Debtor's tax basis in its assets is limited to the extent to which its aggregate tax basis in its assets exceeds the amount of its liabilities, as determined for these purposes, immediately after the Effective Date. Under applicable Treasury Regulations, if a corporate debtor is a member of an affiliated group of corporations that files a single consolidated U.S. federal income tax return (as is the case of the Debtors, who are members of the Tax Group) the reduction in certain tax attributes occurs under consolidated return principles. Any reduction in tax attributes in respect of COD generally does not occur until after the determination of the debtor's net income or loss for the taxable year in which the COD is incurred.  In connection with the implementation of the Plan, the Debtors are expected to incur a significant amount of COD for U.S. federal income tax purposes, with an attendant reduction in NOLs and/or tax attributes.

2.      Limitation of NOL Carryforwards and Other Tax Attributes

Following the Effective Date, any remaining NOL carryforwards and certain other tax attributes (including any disallowed interest expense) allocable to periods prior to the Effective Date ("Pre-Change Losses") may be subject to certain limitations resulting from an "ownership change" within the meaning of Section 382 of the Tax Code. Any such limitation applies in addition to, and not in lieu of, any attribute reduction that results from COD incurred in connection with the Plan. Under section 382 of the Tax Code, if a corporation (or consolidated group) undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. The Debtors expect that the issuance of New Common Stock pursuant to the Plan will constitute an ownership change of the Tax Group for this purpose and that the Reorganized Debtors' use of their Pre-Change Losses (and capital loss carryforwards and tax credits) will be subject to limitation unless an exception to the general rules of Sections 382 and 383 of the Tax Code applies.

SC1:5210217.8

       (a)       General Annual Limitation

In general, the amount of the annual limitation to which a corporation (or consolidated group) that undergoes an ownership change will be subject is equal to the product of (A) the fair market value of the stock of the corporation (or common parent of the consolidated group) *immediately before* the ownership change (with certain adjustments) multiplied by (B) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (*e.g.*, 0.89% for ownership changes occurring in August 2020). For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, subject to a special exception described below, the fair market value of the stock of the corporation is generally determined immediately *after* (rather than before) the ownership change after giving effect to the discharge of creditors' claims, subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets. Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year. Under certain circumstances the annual limitation may apply to unrealized built-in losses. If a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change, then built-in losses (including, but not limited to, amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses, the deductibility of which will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10 million or (b) 15 percent of the fair market value of its assets (with certain adjustments) immediately before the ownership change. Under certain circumstances the annual limitation may be increased. If a corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized (or, under an IRS notice, treated as recognized) during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the corporation (or consolidated group) would be permitted to use its Pre-Change Losses against such built-in gain income in addition to its regular annual allowance. If the corporation (or consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses (absent any increases due to recognized built-in gains). Currently, the Debtors are confirming whether the Tax Group underwent a section 382 ownership change prior to the Petition Date. If such an ownership change has already occurred or will occur prior to the Effective Date, then the ownership change that will occur in connection with the Restructuring as of the Effective Date is not expected to result in any material additional limitation on the use of the Debtors' NOLs and other tax attributes, except as such additional limitation relates to NOLs and other tax attributes generated after such earlier ownership change. If, however, the Debtors determine that no such earlier ownership change has occurred, then the application of section 382 of the Tax Code as of the Effective Date would result in significant impairment in the value of the Tax Group's NOLs and other tax attributes unless an exception to the general rule in section 382 of the Tax Code applies.

(b)     Special Bankruptcy Exception

An exception to the foregoing annual limitation rules generally applies when shareholders and "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their equity interests or claims (as applicable), stock of the reorganized debtor (or a controlling corporation if also in chapter 11) representing at least fifty percent (50%) of the vote and value of the stock of the reorganized debtor (or controlling corporation) pursuant to a confirmed chapter 11 plan. Under this exception, a debtor's Pre-Change Losses are not subject to the annual limitation. However, if this exception applies, the debtor's Pre-Change Losses generally will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization pursuant to the chapter 11 plan. Also, if the reorganized debtor thereafter undergoes another "ownership change" within two years, the annual limitation with respect to such later ownership change would be zero, effectively precluding any future use of their Pre-Change Losses. A debtor that qualifies for this exception may, if it so desires, elect not to have the exception apply and instead remain subject to the annual limitation described above.  The Debtors have not determined whether or not this exception will apply in connection with the Plan. Accordingly, it is possible that the Debtors will not qualify for this exception or that the Debtors will elect not to apply this exception. If the Debtors conclude that they can qualify for and wish to elect to utilize this special bankruptcy exception, the Debtors, with the consent of the Required Consenting Creditors as set forth in the Restructuring Support Agreement, may obtain an interim order from the Bankruptcy Court authorizing certain procedures and potential restrictions on the post-petition period accumulation of Claims by persons who are or will be substantial claimholders to preserve the ability to qualify for this exception.

B.     Consequences to U.S. Holders

This summary discusses the U.S. federal income tax consequences of the Plan to a holder that is:

- an individual who is a citizen or resident of the United States;
- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;
- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or
- a trust, if a court within the United States is able to exercise primary supervision over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

If a holder is a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in such a partnership, you are urged to consult your own tax advisor.

89

SC1:5210217.8

Pursuant to the Plan, holders will receive New Common Stock and Subscription Rights in complete and final satisfaction of their Claims. The U.S. federal income tax consequences of the Plan to a holder depends, in part, on whether a holder's Claims constitute "securities" of the Company for U.S. federal income tax purposes. The term "security" is not defined in the Tax Code or in the Treasury regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not. One of the most significant factors considered in determining whether a particular debt obligation is a security is its original term. In general, debt obligations issued with a weighted-average maturity at issuance of less than five (5) years do not constitute securities, whereas debt obligations with a weighted-average maturity at issuance of ten (10) years or more constitute securities. The initial terms to maturity of the 2017 Term Loans, 2016 Term Loans, Second Lien Notes and 2021 Notes were between five and ten years. The initial term to maturity of the 2024 Notes was just over ten years. Holders are urged to consult their own tax advisors regarding the appropriate status of their Claims for U.S. federal income tax purposes.

1.      Recapitalization Treatment

In the event that a Claim constitutes a "security" for U.S. federal income tax purposes, the holder's receipt of New Common Stock and Subscription Rights should be treated as a "recapitalization" for U.S. federal income tax purposes. If so treated, each holder of a Claim generally will not recognize any gain or loss upon the exchange of its Claim for New Common Stock and Subscription Rights. A holder will also have interest income to the extent of any consideration allocable to accrued but unpaid interest not previously included in income (*see* "Consideration Received in Satisfaction of Accrued Interest or OID," below).

In a recapitalization exchange, a holder's tax basis in the New Common Stock and Subscription Rights should equal such holder's adjusted tax basis in its Claim, increased by any interest income recognized in the exchange and decreased by any deductions claimed in respect of any accrued interest that was previously included in gross income and is not paid in full. The holder's tax basis should then be allocated between the New Common Stock and the Rights in accordance with the respective fair market values thereof. In general, the holder's holding period for the New Common Stock would include the holder's holding period for its Claim, except to the extent that the New Common Stock was issued in respect of accrued but unpaid interest, in which case, the holding period for the New Common Stock should begin the day following the Effective Date.

2.      Taxable Exchange Treatment

In the event that a Claim does not constitute a "security" of CRC for U.S. federal income tax purposes, the holder will recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the aggregate fair market value of New Common Stock and Subscription Rights received in satisfaction of its Claim (other than a Claim received in respect of accrued but unpaid interest), and (ii) the holder's adjusted tax basis in its Claim (other than

90

any tax basis attributable to accrued but unpaid interest). A holder will have ordinary interest income to the extent of any consideration allocable to accrued but unpaid interest not previously included in income. *See* "Consideration Received in Satisfaction of Accrued Interest or OID," below.  A holder will have a tax basis in New Common Stock and Subscription Rights received in satisfaction of its Claims equal to the fair market value of such New Common Stock and Subscription Rights. A holder's holding period for the New Common Stock received pursuant to a taxable exchange should begin the day following the Effective Date.

       3.       Treatment of Subscription Rights

       The characterization of the Subscription Rights and their subsequent exercise for U.S. federal income tax purposes as the exercise of options to acquire New Common Stock is uncertain.  Given that the Subscription Rights must be exercised prior to the Effective Date, the receipt and exercise of the Subscription Rights pursuant to the Plan could be viewed as an integrated transaction pursuant to which part of the underlying New Common Stock is treated as acquired directly in satisfaction of a holder's Claims and part is treated as acquired for cash. The characterization of the Subscription Rights as the exercise of an option to acquire New Common Stock (and not as an integrated element within a larger purchase of New Common Stock) may impact, among other things, the amount of loss (if any) that a holder of Claims may recognize if the satisfaction of its Claim as part of the Plan is treated as a taxable exchange and a holder's tax basis in the New Common Stock received. Unless otherwise indicated, the discussion herein assumes that the Subscription Rights will be respected as options to acquire New Common Stock (including the discussion above regarding the calculation of gain or loss).

       Regardless of the characterization of the Subscription Rights, a holder generally would not recognize any gain or loss upon the exercise of the Subscription Rights. A holder's aggregate tax basis in the New Common Stock received upon an exercise of Subscription Rights should be equal to the sum of (i) the amount paid upon exercise of the Subscription Rights and (ii) the holder's tax basis in the Subscription Rights.  A holder's holding period in the New Common Stock received upon exercise of the Subscription Rights generally should commence on the date of exercise of the Subscription Rights. In addition, if the Subscription Rights are treated as received as part of a "recapitalization," any gain recognized upon a subsequent disposition of the New Common Stock may be treated as ordinary income to the extent of any carryover of accrued market discount in respect of the Claims exchanged therefor not previously included in income.

       It is uncertain whether a holder that receives but does not exercise a Right should be treated as receiving anything of additional value in respect of its Claim. If the Subscription Rights are respected for U.S. federal income tax purposes as options to acquire New Common Stock, and a holder is treated as having received a Right of value (despite its subsequent lapse), such that it obtains a tax basis in the Right, upon such lapse of the Right the holder generally would recognize a loss to the extent of the holder's tax basis in the Right. In general, such loss would be a capital loss, long-term or short-term, depending upon whether the requisite holding period was satisfied (which in the case of a "recapitalization" exchange, even if the Right lapses unexercised, should include the holding period of the Claims exchanged therefor).

91

4.      Character of Gain or Loss

Where gain or loss is recognized by a holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder, how long the Claim has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction.  A holder that purchased its Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code. A holder that purchased its Claim from a prior holder will be considered to have purchased such Claim with "market discount" if the holder's adjusted tax basis in its Claim is less than the revised issue price of such Claim by at least a *de minimis* amount. Under these rules, gain recognized on the exchange of Claims (other than in respect of a Claim exchanged for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant yield basis) during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued. If a holder of Claims did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would become deductible at the time of the exchange.

In the case of an exchange of any Claims that qualifies as a recapitalization, any accrued market discount that is not included in income should be applied to any "securities" received in the exchange (such as the New Common Stock or Subscription Rights), such that any gain recognized by a holder upon a subsequent disposition of such securities would be treated as ordinary income to the extent of any accrued market discount not previously included in income. If a holder of such Claims did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts should be carried over to the "securities" received in the exchange to the extent that any accrued market discount is applied to such securities and should become deductible upon a subsequent disposition of such securities.  To date, specific Treasury regulations implementing these rules have not been issued.

5.      Consideration Received in Satisfaction of Accrued Interest or OID

In general, to the extent that any consideration received pursuant to the Plan by a holder of a Claim is received in satisfaction of interest accrued during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). For purposes of this paragraph and related discussions above, "interest accrued" during a holding period includes original issue discount "OID" accrued over the course of such holding period.  Conversely, a holder may be entitled to recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full.  The Plan provides that consideration received in respect of a Claim is generally allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to any Claim for accrued but unpaid interest. There is no assurance that

92

the IRS will respect such allocation for U.S. federal income tax purposes. holders are urged to consult their tax advisors regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID, if applicable) and the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income for U.S. federal income tax purposes.

6.      Distributions on and Dispositions of New Common Stock

Cash distributions with respect to the New Common Stock generally will be treated as taxable dividends to the extent allocable to the Reorganized Debtor's current and/or accumulated earnings and profits as determined under U.S. federal income tax principles ("Earnings and Profits"), and will be includible in income by the holder when received. To the extent the amount of any distribution exceeds available Earnings and Profits with respect to such distribution, the excess will be applied against and will reduce the holder's adjusted tax basis (on a dollar-for-dollar basis) in respect of the stock as to which the distribution was made, but not below zero. Any remaining excess will be treated as gain from the sale or exchange of such stock.

Dividends are generally taxed as ordinary income; however, dividends received by non-corporate holders may qualify for taxation at lower rates applicable to long-term capital gains, provided certain holding period and other requirements are satisfied. The length of time that a shareholder has held stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or similar transactions. Non-corporate holders are urged to consult their own tax advisors regarding the applicability of such lower rates under their particular factual situation.  Subject to applicable limitations, a distribution to a corporate shareholder that is treated as a dividend for U.S. federal income tax purposes may qualify for the dividends received deduction.  No assurance can be given that the Debtors will have sufficient Earnings and Profits (as determined for U.S. federal income tax purposes) to cause distributions to be treated as dividends and thus eligible for a dividends received deduction.  The dividends received deduction is only available if certain holding period and taxable income requirements are satisfied. The length of time that a shareholder has held stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed. Finally, the tax consequences of the receipt of a dividend by a corporate shareholder may be different if the dividend is treated as an "extraordinary dividend" under applicable rules.

A holder that sells or otherwise disposes of the New Common Stock will recognize capital gain or loss for U.S. federal income tax purposes in an amount equal to the difference between the amount realized and the holder's adjusted tax basis in its New Common Stock.  Capital gain of a noncorporate holder is generally taxed at preferential rates where the property is held for more than one year. The deductibility of capital losses is subject to limitations.

93

7.       Information Reporting and Backup Withholding

Payments of interest or dividends and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of the exchange consideration, may be subject to "backup withholding" (currently at a rate of 24%) if a recipient of those payments fails to furnish to the payor certain identifying information and, in some cases, a certification that the recipient is not subject to backup withholding. Backup withholding is not an additional tax. Any amounts deducted and withheld generally should be allowed as a refund or credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS.  Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions. Information may also be required to be provided to the IRS concerning payments, unless an exemption applies.  Holders of Claims should consult their tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.  U.S. Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. Holders of Claims should consult their tax advisors regarding these regulations and whether the contemplated transactions under the Plan would be subject to these regulations and require disclosure on their tax returns.

*The foregoing summary has been provided for informational purposes only and does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular holder's circumstances and income tax situation. All holders of Claims are urged to consult their tax advisors concerning the federal, state, local, and other tax consequences applicable under the Plan.*

## ARTICLE XI

### RECOMMENDATION

The Debtors believe that Confirmation and consummation of the Plan are in the best interests of the Debtors, their Estates and their creditors. The Plan provides for an equitable distribution to Holders of Claims.  The Debtors believe that any alternative to Confirmation of the Plan, such as liquidation under chapter 7 of the Bankruptcy Code, could result in significant delay, litigation and additional costs, as well as a reduction in the distributions to Holders of Claims in certain Classes.

Consequently, the Debtors urge all eligible Holders of impaired Claims to vote to ACCEPT the Plan and to complete and submit their Ballots so that they will be RECEIVED by the Solicitation and Claims Agent on or before the Voting Deadline.

94

Dated: [•]
      [•]

Respectfully submitted,

California Resources Corporation

By: _____

      Name:
      Title:

SC1:5210217.8

<u>Appendix A</u>

Debtors' Joint Plan of Reorganization
Under Chapter 11 of the Bankruptcy Code

2

SC1:5210217.8

Appendix B

Liquidation Analysis

SC1:5210217.8

<u>Appendix C</u>

Financial Projections

Appendix D

Valuation Analysis

SC1:5210217.8

## Exhibit 1

Restructuring Support Agreement

SC1:5210217.8