**IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | * | Case No. 20-33568 (DRJ) |
| | * | |
| CALIFORNIA RESOURCES | * | Chapter 11 |
| CORPORATION, et al., | * | |
| | * | (Jointly Administered) |
| Debtors. | * | |

**WESTERNGECO LLC'S OBJECTION TO CONFIRMATION OF
THE DEBTORS' JOINT PLAN OF REORGANIZATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE
AND TO ASSUMPTION OR ASSUMPTION AND ASSIGNMENT
OF WESTERNGECO'S SEISMIC LICENSE AGREEMENTS**
[Related to ECF Nos. 282, 411, 543 & 544]

**TO THE HONORABLE DAVID R. JONES, UNITED STATES BANKRUPTCY JUDGE:**

WesternGeco LLC ("WesternGeco") submits this objection to confirmation of the Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [ECF No. 282] (the "Plan") filed herein by the debtors, California Resources Corporation, California Heavy Oil, Inc., California Resources Coles Levee, L.P., California Resources Coles Levee, LLC, California Resources Elk Hills, LLC, California Resources Long Beach, Inc., California Resources Mineral Holdings LLC, California Resources Petroleum Corporation, California Resources Production Corporation, California Resources Production Mineral Holdings, LLC, California Resources Real Estate Ventures, LLC, California Resources Royalty Holdings, LLC, California Resources Tidelands, Inc., California Resources Wilmington, LLC, CRC Construction Services, LLC, CRC Marketing, Inc., CRC Services, LLC, Monument Production, Inc., Oso Verde Farms, LLC, Socal Holding, LLC, Southern San Joaquin Production, Inc., Thums Long Beach Company, and Tidelands Oil Production Company LLC (each, a "Debtor" and collectively, the "Debtors"), as well as the assumption or assumption and assignment of any of the License Agreements between

WesternGeco and one or more of the Debtors, and in support thereof, respectfully submits as follows:

## I.     INTRODUCTION

1.     The Court should deny confirmation of the Debtors' Plan because it contains material provisions that are contrary to the United States Bankruptcy Code (the "Bankruptcy Code") and applicable bankruptcy law, thus rendering the Plan non-confirmable under Bankruptcy Code § 1129(a)(1).

2.     Specifically, the provisions of the Plan that purport to nullify change of ownership or control provisions, such as are contained in WesternGeco's License Agreements with one or more of the Debtors, are contrary to law.

3.     The Plan further violates settled bankruptcy law to the extent it provides for a change of control of the Debtors in violation of the change of ownership or control provisions in WesternGeco's License Agreements, but purports to enable the Debtors to assume the License Agreements without requiring that the Debtors cure all defaults thereunder, including those under the change of ownership or control provisions, and without providing adequate assurance of future performance thereof.

4.     Moreover, the release and exculpatory provisions of the Debtors' Plan are overbroad and non-specific. Thus, they fail to meet the standards and requirements for such clauses that have been adopted in the United States Fifth Circuit Court of Appeals.

5.     In addition or, alternatively, WesternGeco objects to assumption or assumption and assignment of any its License Agreements with the Debtors.

6.      WesternGeco's License Agreements contain valid change of ownership and control provisions which will be breached by the Debtors as a result of confirmation of the Debtors' Plan, and the Debtors cannot assume or assume and assign those License Agreements because they cannot cure all defaults thereunder, including the default under the change of ownership or control provision, and cannot provide WesternGeco with adequate assurance of future performance thereof, as required by law.

7.      In addition or, alternatively, WesternGeco's License Agreements are non-assumable and non-assignable under Bankruptcy Code § 365 (c)(1)(A) without the consent of WesternGeco, and WesternGeco does not consent, absent payment of a mutually agreed upon change of ownership or control fee or cure amount.

## II.      BACKGROUND

8.      WesternGeco is a geophysical services company in the business, *inter alia*, of licensing comprehensive worldwide reservoir imaging, monitoring, and development services, including but not limited to 2D, 3D and other types of seismic surveys and images, which are generally offered to clients for the purpose of providing accurate measurements of subsurface geology for potential oil and gas exploration and/or production and other uses.

9.      The Debtors are affiliated independent oil and natural gas exploration and production companies that operate properties within California.[1]

10.     California Resources Corporation ("CRC") is the direct parent company of fifteen (15) of its Debtor-subsidiaries, including California Resources Production Corporation ("CRPC"),

---

[1] Disclosure Statement for Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [ECF No. 253] (the "Disclosure Statement") at p. 24 of 111.

and the indirect parent of the seven (7) other Debtor-subsidiaries.[2]  It is a publicly traded entity that was formerly traded on the New York Stock Exchange but is now traded over the counter.[3]

11.     As of March 9, 2020, the beneficial owners of greater than five (5) percent of CRC's stock were State Street Corporation (8.81%), The Vanguard Group (8.45%), BlackRock, Inc. (6.93%) and the executive officers and directors of CRC (4.09%).[4]

12.     CRC is managed by a Board of Directors that is currently comprised of eight (8) individuals.[5]  CRC's Proxy Statement for its 2020 Annual Meeting filed with the SEC reflects that each holder of common stock is entitled to one (1) vote per share and that directors are elected by the majority vote of shareholders.[6]

## III.   THE BANKRUPTCY CASE AND PLAN

13.     On July 15, 2020 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of Title 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors-in-possession pursuant to Bankruptcy Code §§1107 and 1108(a).

14.     On July 24, 2020, the Debtors filed their initial Plan [ECF No. 215] and, on July 31, 2020, their Disclosure Statement [ECF No. 253]. Thereafter, on August 10, 2020, the Debtors filed their current Plan [ECF No. 282].  By Order (I) Scheduling an Objection Deadline and Combined Hearing on the Disclosure Statement and Plan Confirmation, (II) Approving the Form and Manner of Notice of the Combined Hearing, (III) Establishing Procedures for Objecting to the

---

[2] *Id.*
[3] *Id*.
[4] Proxy Statement for CRC's 2020 Annual Meeting, at p. 68.
[5] Annual Report (10-K) of CRC for the Fiscal Year Ended December 31, 2019, at pp. 147-8.
[6] Proxy Statement for CRC's 2020 Annual Meeting, at p. 75.

Disclosure Statement and the Plan, (IV) Approving the Solicitation Procedures, (V) Conditionally Approving the Disclosure Statement, (VI) Approving the Rights Offering Procedures and (VII) Granting Related Relief [ECF No. 403] (the "Scheduling Order"), the Court, among other things, conditionally approved the Disclosure Statement, approved the Debtors' proposed solicitation materials, scheduled a combined hearing on final approval of the Disclosure Statement and on confirmation of the Debtors' Plan, and established various deadlines relating to same.

15.     The Debtors' Plan is premised upon a de-leveraging of the Debtors' balance sheet and conversion of a substantial portion of its debt into equity.

16.     Holders of Priority, "Other Secured Claims", and "RBL Claims" are to be paid in full.  However, holders of the "2017 Term Loan Secured Claims", which aggregate about $537 million, are to receive a pro rata share of about 83.6% of the New Common Stock of CRC (subject to possible dilution) plus 100% of the "Tranche A Remaining Subscription Rights". Holders of "Unsecured Debt Claims", which are made up of deficiency claims of the 2017 Term Loan Secured Claim holders, and holders of the 2016 Term Loans, Second Lien Notes, and Unsecured Notes (which aggregate about $3.19 billion), are to receive a pro rata share of about 16.4% of CRC's New Common Stock (subject to dilution) plus 100% of the "Tranche B Remaining Subscription Rights".  Moreover, General Unsecured Creditors are to essentially be paid in the ordinary course of business, receive cash in the amount of their allowed claims, or receive such other treatment as is agreed to by them.[7]  Finally, all equity interests in CRC, however, are to be cancelled under the Plan.[8]

17.     According to the Plan, each of the Debtors are to continue to exist after the Effective

---

[7] Plan [ECF No. 282], at pp. 34-37 of 156.
[8] *Id*. at pp. 30-1 of 156.

Date, unless otherwise provided in the Plan.[9]  Nevertheless, the Plan provides that on the Effective Date, the terms of each of CRC's directors shall expire and the directors are to be replaced by the "New Board", which the Plan indicates is to consist initially of nine (9) Directors appointed in accordance with a Restructuring Support Agreement.[10]

18.     The Restructuring Support Agreement reflects that the New Board is to be designated as set forth in a Governance Term Sheet.[11]  The Governance Term Sheet, in turn, provides that the nine (9) directors on the New Board, after the Effective Date, are to include: a) CRC's CEO; b) one (1) director selected by Ares; c) one (1) director selected by Fidelity; d) one (1) director selected by GTAM; and e) five (5) directors selected by the "Required Consenting Creditors."[12]  The term "Required Consenting Creditors" is defined as meaning the Required Consenting Term Loan Lenders and the Required Backstop Parties.[13]  The term "Required Consenting Term Loan Lenders" is, in turn, defined as the Consenting Creditors holding greater than 50% of the aggregate principal amount of the 2017 Term Loan Claims held by Consenting Creditors.[14]  The term "Required Backstop Parties" is defined as Backstop Parties holding greater or equal to 50% of the Backstop Commitments of all Backstop Parties.[15]  Finally, "Backstop Parties" is defined as meaning certain of the Consenting Creditors (or their funds) holding 2017 Term Loan Claims or Deficiency Unsecured Debt Claims that are signatories to the Restructuring Support Agreement.[16]  Unfortunately, the signatories to the Restructuring Support Agreement are

---

[9] *Id*. at p. 40 of 156.
[10] *Id*. at p. 56 of 156.
[11] Revised Restructuring Support Agreement dated July 24, 2020 [ECF No. 214], at p. 76 of 498.
[12] *Id*. at p. 142 of 498.
[13] *Id*. at p. 17 of 498.
[14] *Id*.
[15] *Id*. at p. 129 of 498.
[16] *Id*. at pp. 123-4 of 498.

6

not able to be identified by WesternGeco as the signatory pages to the Restructuring Support Agreement have been deleted.

19.     As to executory contracts, the Plan provides that all executory contracts not previously assumed or rejected will be deemed to be assumed as of the Effective Date, unless they are identified on the Rejected Executory Contract List to be attached to the Plan Supplement or are the subject of a separate motion to reject pending as of the Confirmation hearing.[17]

20.     Counterparties to executory contracts that are to be assumed are supposed to receive a Cure Notice from the Debtors at least fourteen (14) days prior to the Confirmation Hearing, and if the counterparty objects to the Cure Notice or assumption generally, it is required to file an objection not less than ten (10) days after service of the service of the "notice of assumption".[18] There appears to be no provision in the Plan specifying a date by which counterparties to executory contracts that do not receive Cure Notices are to file their objections to assumption or assumption and assignment. Nevertheless, the Debtors reserve the right to alter, amend, modify or supplement the executory contracts listed on their Rejected Executory Contract List prior to the Effective Date of the Plan.[19]

21.     Significantly, the Plan provides that "to the maximum extent permitted by law, to the extent any provision in any Executory Contract . . . assumed . . . restricts or prevents. . . or is breached . . . by the assumption of such Executory Contract . . . (**including any "change of control" provision**) then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory

---

[17] Plan [ECF No. 282], at p. 51 of 156.
[18] *Id.* at p. 51-2 of 156.
[19] *Id.* at p. 51 of 156.

Contract . . ." (emphasis added).[20]

22.     Similarly, another provision of the Plan provides that that assumption of an Executory Contract is to "result in the full release and satisfaction of any Claims against, or defaults, whether monetary or nonmonetary, **including defaults of provisions restricting the change in control or ownership interest composition** or other bankruptcy-related defaults, by the applicable Debtors. . . at any time prior to the effective date of the assumption" (emphasis added).[21]

23.     On August 27, 2020, the Debtors filed a Plan Supplement containing their Schedule of Rejected Contracts.   The Schedule listed no executory contracts as being proposed to be rejected by the Debtors.[22]   Thereafter, on September 23, 2020, the Debtors filed a Second Plan Supplement containing a Schedule of Assumed Executory Contracts and Unexpired Leases. None of WesternGeco's License Agreements with the Debtors is listed as being proposed to be assumed on that schedule.[23]   Finally, on September 23, 2020, the Debtors filed into the record a document entitled "Cure Notice To Counterparties To Executory Contracts And Unexpired Leases The Debtors May Assume".   Once again, none of WesternGeco's License Agreements with the Debtors was listed on the Assumed Executory Contract and Unexpired Lease List attached to the Debtors' Cure Notice.[24]   Nevertheless, according to the terms of the Debtors' Plan, WesternGeco's License Agreements with the Debtors, by default, are still proposed to be assumed or assumed and assigned by the Debtors for a cure amount of $0.

---

[20] *Id.* at p. 51 of 156.
[21] *Id.* at p. 52 of 156.
[22] Plan Supplement [ECF No. 411], at p. 134 of 135.
[23] Second Plan Supplement [ECF No. 543].
[24] Cure Notice To Counterparties To Executory Contracts And Unexpired Leases The Debtors May Assume [ECF No. 544].

## IV.  THE LICENSE AGREEMENTS BETWEEN WESTERNGECO
## AND THE DEBTORS

24.      Prior to the Petition Date, WesternGeco licensed seismic data and derivatives thereof to one or more of the Debtors herein pursuant to written license agreements as well as various supplements and/or related agreements (collectively, the "License Agreements").

25.      Specifically, by Master License Agreement For Multiclient Seismic Data effective November 24, 2014 (the "Master License"), WesternGeco agreed to license to CRPC, on a non-exclusive basis and subject to certain confidentiality provisions and transfer restrictions, certain seismic data and derivatives thereof (the "Seismic Materials") as from time to time were ordered by CRPC and its Related Entities (as defined in the Master License) pursuant to Supplemental Agreements issued in accordance with the terms and conditions of the Master License. CRPC, thereafter, entered into various Supplemental Agreements and/or related agreements in accordance with the Master License for licensing of specific Seismic Materials from WesternGeco.

26.      The Master License between WesternGeco and CRPC provides, among other things, that:

> a)      The license is for a limited period of time and grants use of the Seismic Materials on a non-exclusive basis for CRPC's internal use only;
>
> b)      The Seismic Materials licensed to CRPC shall at all times remain owned by WesternGeco and contain proprietary information and trade secrets of WesternGeco that are protected by international and United States trade secret and copyright laws;
>
> c)      CRPC may not assign, sublet or "Transfer" its rights or obligations under the License Agreements without the prior written consent of WesternGeco; and
>
> d)      CRPC may not Disclose or Transfer the Seismic Materials except as provided in the Master License.

9

27.     Moreover, the Master License provides that the License Agreements, and the

licenses granted thereunder, shall terminate as follows:

a)     In the event CRPC commits a material breach of any condition or provision of the Master License relating to confidentiality or restrictions on the use, Disclosure or Transfer of the Seismic Materials, the License Agreements shall automatically terminate;

b)     In the event a "Related Party", "Licensee's Consultants", or "Allowed Viewing Parties" breach any condition or provision of the Master License relating to confidentiality or restrictions on the use, Disclosure or Transfer of the Seismic Materials, the License Agreements shall automatically terminate; and

c)     Any event **"causing the Ownership**[25] **or Control**[26] **of Licensee to change,** whether by virtue of acquisition, statutory merger, consolidation, buyout, or other transaction, **shall be deemed an assignment hereunder, and this Master License Agreement and the rights thereunder shall automatically terminate** in such event unless WesternGeco has given prior written consent to assign or novate this Master License Agreement and the Data any Supplements to the successor in Ownership or Control pursuant to Section Two, Article 4 above" (emphasis added).

## V.  WESTERNGECO'S SPECIFIC OBJECTIONS TO THE DEBTORS' PLAN AND ASSUMPTION OR ASSUMPTION AND ASSIGNMENT OF ITS LICENSE AGREEMENTS WITH THE DEBTORS

A.     WesternGeco's License Agreements are Executory Contracts

28.     WesternGeco's License Agreements are executory contracts within the meaning of

Bankruptcy Code § 365 as, among other things, the Debtor CRPC has continuing confidentiality

obligations to WesternGeco under those agreements and restrictions upon use of the licensed

---

[25] The term "Ownership" is defined in the Master License as meaning "in the case of a corporation or other entity which issues voting securities, at least 50% (or such lesser percentage which results in *defacto* Control) of the outstanding common stock or other voting securities and, in the case of a partnership, trust or other entity, at least 50% (or such lesser percentage which results in *defacto* Control) of the interests in the profits thereof."

[26] The term "Control" is defined in the Master License as meaning "the ability to direct, manage, and/or dictate the actions of and/or determine the management of the entity in question whether by election of the members of the Board of Directors or other governing body of such entity, or by having a majority number of members of such governing body, or by other means."

Seismic Materials while, at the same time, WesternGeco has continuing obligations to allow CRPC to use the materials and/or to defend legal proceedings arising out of the licensing thereof.  *See, e.g., In re Aerobox Composite Structures*, LLC, 373 B.R. 135 (Bankr. D.N.M. 7/27/07) (patent and technology license agreement found executory based primarily on continuing obligations of both parties to maintain confidentiality); *In re Chapin Revenue Cycle Management, LLC*, 343 B.R. 728 (Bankr. M.D.Fla. 3/1/06) (computer software licensing agreement held to be executory contract where the licensor had obligation to allow continued use by debtor and debtor had obligation to maintain confidentiality of software).  *See also In re Sunterra Corporation*, 361 F. 3d 257 (4th Cir. 3/18/04) (computer software licensing agreement held executory due to confidentiality obligations); *In re Superior Toy & Mfg. Co.*, 78 F. 3d 1169 (7th Cir. 3/7/96) (trademark license found to be executory contract).

B.      The Change of Ownership or Control Provision in WesternGeco's Master License is Valid and Enforceable, and the Plan Provisions Purporting to Invalidate it is Contrary to Bankruptcy and Non-Bankruptcy Law. In addition or, alternatively, the Debtors Cannot Assume WesternGeco's License Agreements Without Curing All Defaults Thereunder, Including Under the Change of Ownership or Control Provision.

29.      In order to assume an executory contract, a debtor is generally required to (a) cure any existing default under the contract or provide "adequate assurance" of a prompt cure; (b) compensate or provide adequate assurance that the debtor will compensate the other party to the contract for any actual pecuniary loss arising from the debtor's default thereunder; and (c) provide "adequate assurance of future performance" under the contract to the other party.   Bankruptcy Code § 365(b)(1).  These requirements apply to defaults that occur under executory contracts either before or after commencement of the case. *In re Luce Industries, Inc*., 8 B.R. 100, 104 (Bankr. S.D.N.Y. 1980), *rev'd on other grds*., 14 B.R. 529 (S.D.N.Y. 1981).

30.     Moreover, it is well-settled that an executory contract must generally be assumed in its entirety or not at all.   One cannot reject the burdens of an executory contract and accept only the benefits.   *In re E-Z Serve Convenience Stores, Inc.*, 289 B.R. 45, 49 (Bankr. M.D.N.C. 2003); *In re Rovine Corp.*, 6 B.R. 661, 666 (Bankr. W.D.Tenn. 1980).

31.     As noted above, WesternGeco's Master License with CRPC contains a change of ownership or control provision that terminates the License Agreements in the event of a change of ownership or control of CRPC without the prior written consent of WesternGeco.

32.     Change of ownership or control provisions of the type contained in the Master License have been held to be valid and enforceable against a debtor.   *See, e.g.*, *In re Washington Capital Aviation & Leasing*, 156 B.R. 167, 174 (Bankr. E.D.Va. 1993).

33.     Although 11 U.S.C. § 365(e) and (f) generally provide that *ipso facto* and anti-assignment clauses in executory contracts can be stricken as contrary to the Bankruptcy Code, it has been held that 11 U.S.C. § 365(e) and (f) do not operate to invalidate clauses that permit termination of a contract upon a change of control of the debtor party.   *In re Washington Capital Aviation & Leasing*, 156 B.R. at 174 (noting that the change of control provision at issue was neither an *ipso facto* clause nor a non-assignment clause).

34.     In any event, courts recognize that executory contracts should be evaluated on a case by case basis to determine the effect of enforcement of these types of provisions on both the debtor party and the non-debtor party, specifically including the extent of the economic detriment suffered by the non-debtor party. *See In re E-Z Serve*, 289 B.R. at 50 (noting that a bankruptcy court's "authority to excise a bargained for element of a contract is questionable" and that "modification of a nondebtor contracting party's rights is not to be taken lightly").

12

35.     Here, the change of ownership or control restrictions in the Master License are critical to WesternGeco's business model, as WesternGeco makes a substantial investment in creating its own seismic data and earns revenue by granting non-exclusive access to this data to multiple customers under restrictive license agreements.   If the change of ownership or control restrictions are not enforced, the value of those licenses will be severely diminished.   For this reason, the change of ownership or control provision in WesternGeco's Master License is an essential, bargained-for element of WesternGeco's agreements with CRPC that should be enforced.

36.     Accordingly, the provision in the Debtors' Plan that purports to nullify change of ownership or control provisions such as are contained in WesternGeco's License Agreements is contrary to Bankruptcy law and non-Bankruptcy law.   Moreover, to the extent the Plan provides for a change of ownership or control of the Debtors in violation of the change of ownership or control provisions of WesternGeco's Master License and/or the Plan otherwise authorizes or enables the Debtors to assume (or assume and assign to third parties) WesternGeco's License Agreements without properly curing all defaults thereunder, including the Debtors' default under the change of ownership or control provisions contained therein, the Plan further violates settled Bankruptcy law.

37.     WesternGeco further objects to assumption or assumption and assignment of WesternGeco's License Agreements by the Debtors because, as is shown above, the Debtors' Plan is premised upon a substantial change of control of CRPC as that term is defined in the Master License, and under settled bankruptcy law, the Debtors are prohibited from assuming or assuming and assigning the License Agreements without curing all defaults thereunder, including non-

monetary defaults such as under the change of ownership and control provision thereof.

38.     Specifically, prior to the Petition Date, CRPC was a direct subsidiary of CRC, which was a publicly traded corporation.[27]  CRC was managed by a Board of Directors comprised of eight (8) individuals.[28]  In addition to managing CRC and determining the officers thereof, those directors further determined the management of and controlled the actions of CRC's subsidiaries, including CRPC.[29]  Each of CRC's directors was elected by the existing stockholders of CRC by majority vote, none of whom owned greater than 8.81% of CRC's stock.[30]  As WesternGeco has found no evidence of any stockholder agreement between the majority shareholders of CRC governing voting for directors, no stockholder or group of stockholders of CRC controlled who would be elected to CRC's Board of Directors, and thus the directors or managers of and management of CRC's subsidiaries, including CRPC.

39.     Upon the Effective Date of the Plan, however, all of that will change. While, prior to the Effective Date, no stockholder or group of stockholders of CRC owned more than 8.81% of CRC's stock, after the Effective Date the holders of the 2017 Term Loan Secured Claims will own approximately 83.6% of the New Common Stock of CRC and another 16.4% of the New Common Stock will be owned by the holders of the 2016 Term Loans, Second Lien Notes, and Unsecured Notes.[31]  Moreover, the holders of the 2017 Term Loan Secured Claims and others (the Required

---

[27] Disclosure Statement, at p. 24 of 111.
[28] Annual Report (10-K) of CRC for the Fiscal Year Ended December 31, 2019, at pp. 147-8.
[29] CRC's Bylaws provide that the members of its Board of Directors have the power to elect various officers of CRC, including a Chief Executive Officer ("CEO"), and the CEO, unless otherwise directed by the Board of Directors, has the power to vote or otherwise act on behalf of CRC at any meeting of security holders of any other entity in which CRC holds securities, and to otherwise exercise any and all rights and powers which CRC may possess by reason of its ownership of securities in such other entity. *See* Amended and Restated Bylaws of California Resources Corporation dated November 4, 2015, §§ 3.1, 5.1, 5.2 & 5.10, at pp. 9, 11-13.
[30] Proxy Statement for CRC's 2020 Annual Meeting, at pp. 68, 75.
[31] Plan [ECF No. 282], at pp. 34-37 of 156.

Back Stop Parties) have banded together, by executing the Revised Restructuring Support Agreement and approving the Governance Term Sheet, to determine the post-Effective Date Board of Directors of CRC, and thus, management and control of CRC and of each of its subsidiaries. As is shown above, assuming the Plan is confirmed, management and control of CRC and its subsidiaries, including CRPC, will pass to the holders of the 2017 Term Loan Secured Claims as they will chose five (5) of the nine (9) members of CRC's New Board.[32]

C.      In addition or, Alternatively, the License Agreements are Non-Assumable and Non-Assignable under Bankruptcy Code § 365 (c)(1)(A).

40.      Although Bankruptcy Code § 365(a) gives a debtor or trustee, with court approval, the right to assume (or reject) executory contracts, and Bankruptcy Code § 365(f) generally gives the debtor or trustee the power to assign executory contracts, Bankruptcy Code § 365(c)(1)(A) contains an exception to both of those grants of authority.   Bankruptcy Code § 365(c)(1)(A) provides that a trustee may <u>not</u> assume or assign an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if:

> (a) "applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession . . .," and (b) "such party does not consent to such assumption or assignment . . .".

i.      *Trade Secret Law is "Applicable Law" Preventing Assumption or Assumption and Assignment as Proposed by the Debtors in their Plan under § 365(c)(1)(A)*

41.      It has been held that the phrase "applicable law" as used in Bankruptcy Code § 365(c)(1)(A) means "any law applicable to a contract, other than bankruptcy law".   *See In re XMH Corp.*, 647 F.3d 690, 695 (7th Cir. 2011).   WesternGeco asserts that Texas and U.S. trade secrets

---

[32] Revised Restructuring Support Agreement dated July 24, 2020 [ECF No. 214], at p. 142 of 498.

laws constitute "applicable law" under Bankruptcy Code § 365(c)(1)(A) and excuse WesternGeco from accepting performance from or rendering performance to an entity other than CRPC, thus precluding assumption or assumption and assignment of WesternGeco's License Agreements without WesternGeco's consent.[33]

42.     The Texas Supreme Court has defined a trade secret as "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003). It is axiomatic that the secrecy of a trade secret is of paramount importance for the information to maintain its value: trade secrets must necessarily remain secret to be useful to the owner. *See generally Rugen v. Interactive Bus. Sys., Inc*., 864 S.W.2d 548, 552 (Tex.App.-Dallas 1993, no writ) ("[A] trade secret can exist in a combination of characteristics and components[,] each of which, by itself, is in the public domain, but the unified process, [the] design and operation of which in unique combination[ ] affords a competitive advantage, is a protected trade secret.")

43.     It has been uniformly held that seismic data is a protected trade secret under Texas law.   *See, e.g., In re Bass*, 113 S.W.3d 735, 742 (Tex. 2003).   *See also Musser David Land Co. v. Union Pac. Res*., 201 F.3d 561, 569 (5th Cir. 2000).   In determining that seismic data is considered a trade secret, the Texas Supreme Court has recognized that seismic data and other methods for obtaining subsurface geological information are widely considered trade secrets both within the oil and gas industry and at law. *See In re Bass*, 113 S.W.3d at 742. Further, the United States Bankruptcy Court for the Western District of Texas has also found subsurface data,

---

[33] The Master License stipulates that Texas law is to be the law governing the agreement.

including both seismic and microseismic data and well logs, to be entitled to trade secret protection under Texas law. *In re TXCO Res., Inc.*, 475 B.R. 781 (Bankr. W.D. Tex. 2012). This Court should follow the Texas Supreme Court, the Fifth Circuit and the Western District of Texas by finding that the Seismic Materials licensed to CRPC by WesternGeco are likewise trade secrets.

44.    Under the Texas version of the Uniform Trade Secrets Act, an actionable misappropriation is considered to exist and may be enjoined when a disclosure or use of a trade secret occurs without the express or implied consent of the owner.[34]   Tex. Civ. Prac. & Rem. Code § 134A.002(3). Further, a person who, without the owner's consent, knowingly communicates or transmits a trade secret, is guilty of committing a felony. *See* Tex. Penal Code § 31.05.

45.    Similarly, the Defend Trade Secrets Act of 2016 creates a federal cause of action for trade secret misappropriation that in large part mirrors the Uniform Trade Secrets Act. The definition of the term "trade secret" in the Defend Trade Secrets Act ("DTSA") is similar to the definition found in the Uniform Trade Secrets Act, and the remedies set forth in the DTSA are in large part, similar to the state version.[35] *See* 18 U.S.C. § 1836 *et seq*. Further, while the DTSA creates federal jurisdiction over trade secret theft, it does not preempt state trade secret law and allows trade secret owners to pursue federal civil remedies as an alternative to or in addition to existing state remedies. 18 U.S.C. § 1838.

46.    Although there is no case law specifically discussing whether trade secret law is

---

[34] A trade secret is defined as information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Uniform Trade Secrets Act, § 1(4).

[35] On the other hand, the DTSA provides an ex parte seizure procedure for use where the party against whom the seizure is ordered "would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person…." 18 U.S.C. § 1836(b)(2).

"applicable law" under § 365(c)(1)(A), the trade secrets laws serve similar purposes to other laws considered "applicable law" under § 365(c)(1)(A), such as federal trademark, patent and copyright law, which prohibit nonconsensual assignments in order to provide protection to owners of information or materials that derive their value from being difficult to develop, unique and/or not publicly available by limiting who can use the information or materials without the owner's consent.[36]  Moreover, under both the Texas Uniform Trade Secrets Act and the Defend Trade Secrets Act of 2016, any transfer or use of a trade secret requires the express or implied consent of the owner thereof.   Thus, the Texas Uniform Trade Secrets Act and the Defend Trade Secrets Act of 2016 should be found to constitute "applicable law" under Bankruptcy Code § 365(c)(1)(A) that excuses WesternGeco from accepting performance from or rendering performance under its License Agreements to entities other than CRPC.

     ii.       *Copyright Law is also "Applicable Law" Preventing Assumption or Assumption and Assignment under § 365(c)(1)(A)*

47.     The U.S. Copyright Act further constitutes "applicable law" under Bankruptcy Code § 365(c)(1)(A) and excuses WesternGeco from accepting performance from or rendering performance to an entity other than CRPC, thus precluding assumption or assumption and

---

[36] *See e.g. In re Trump Entm't Resorts, Inc*., 526 B.R. 116, 124 (Bankr. D. Del. 2015)("federal trademark law generally bans assignment of trademark licenses absent the licensor's consent because, in order to ensure that all products bearing its trademark are of uniform quality, the identity of the licensee is crucially important to the licensor"); *In re CFLC, Inc.*, 89 F.3d 673, 679 (9th Cir. 1996)(The fundamental policy of the patent system is to "encourag[e] the creation and disclosure of new, useful, and non-obvious advances in technology and design" by granting the inventor the reward of "the exclusive right to practice the invention for a period of years"… free assignability—of nonexclusive patent licenses would undermine the reward that encourages invention because a party seeking to use the patented invention could either seek a license from the patent holder or seek an assignment of an existing patent license from a licensee. In essence, every licensee would become a potential competitor with the licensor-patent holder in the market for licenses under the patents."); *In re Patient Educ. Media, Inc*., 210 B.R. 237, 242 (Bankr. S.D.N.Y. 1997)("The federal policy designed to protect the limited monopoly of copyright owners and restrict unauthorized use constitutes applicable nonbankruptcy law. It prevents the trustee from assigning the nonexclusive license absent the owner's consent.")

assignment of the License Agreements under Bankruptcy Code § 365(c)(1)(A), notwithstanding the terms of the Debtors' Plan.

48.     The Copyright Act, 17 U.S.C. §102, *et. seq.*, provides protection to the authors of "original works of authorship" fixed in "any tangible medium of expression . . . from which they can be perceived, reproduced, or otherwise communicated," including but not limited to both published and non-published literary, pictorial, graphic, artistic, audiovisual, sound recording, architectural, and certain other intellectual works. It also applies to and protects compilations and derivative works.

49.     Although materials may be registered in the Copyright Office, registration is not required in order to obtain the protections of the Copyright Act, which arise when the work is "created." *See* 17 U.S.C. §§ 302, 408.

50.     For a work to be sufficiently original for copyrightability, it needs only have been independently created (as opposed to copied from other works) and possess "at least some minimal degree of creativity." *Mason v. Montgomery Data, Inc.,* 967 F.2d 135, 141 (5th Cir. 1992). In other words, the work must have a "creative spark." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 345, 111 S.Ct. 1282, 1290 (1991). But not much more than a spark. The Supreme Court has held that the level of creativity required under the Copyright Act "is extremely low; even a slight amount will suffice." *Feist*, 111 S.Ct. at 1287. Indeed, copyright protects works that possess just something "more than a de minimis quantum of creativity." *Id*. at 1297. In fact, "a work may be protected by copyright even though it is based on . . . something already in the public domain if the author, through his skill and effort, has contributed a distinguishable variation from the older

works." *Donald v. Zack Meyer's T.V. Sales & Serv.*, 426 F.2d 1027, 1029 (5th Cir.1970), *cert. denied*, 400 U.S. 992, 91 S.Ct. 459 (1971).

51.     For example, photographs have long been held to be copyrightable, notwithstanding the objections of 19th century artists who argued that photographs were merely mechanical reproductions of the physical features or outlines of an object. *See SHL Imaging, Inc. v. Artisan House, Inc.,* 117 F. Supp. 2d 301, 308-311 (S.D.N.Y. 2000). Courts now widely recognize that, in taking a photograph, the photographer makes a series of creative choices intended to evoke the desired expression before any image is captured, such as the posing of the subject, the lighting, the angle and perspective of the shot, and the selection of the type of film and camera. *See Biggs v. Cabela's, Inc.,* No. 4:03-CV-0205-A, 2004 WL 530167, * 4 (N.D. Tex. Feb. 23, 2004); *SHL Imaging, Inc.,* 117 F. Supp. 2d at 308-311.

52.     Similarly, maps have been held to be copyrightable, even though a map at its core is designed to accurately reflect the location, size and other relevant information of land parcels. The author of a map utilizes his originality and creativity in designing the map, including choices regarding the placement, size and dimensions of individual tracts of land, geographic conditions and other features and in coordinating, arranging or even drawing the geographic information differently than as might be seen in other maps. *See Mason,* 967 F.2d at 139-141; *City of New York v. Geodata Plus, LLC*, 537 F. Supp. 2d 443, 450-52 (E.D.N.Y. 2007); *Newton v. Voris*, 364 F. Supp. 562, 563-64 (D. Or. 1973) ("The fact that the source of the material for the map is in the public domain does not void the copyright, but [the material] is subject to the requirement of originality and creativity.") (internal citations omitted).

20

53.     The Seismic Materials licensed to CRPC under WesternGeco's License Agreements, much like photographs and maps, are "original works of authorship" of WesternGeco fixed in a tangible medium of expression from which they can be perceived, reproduced or otherwise communicated.   The Seismic Materials are the pictorial and graphic result of sound recordings obtained by geophones or hydrophones that are manipulated, using sophisticated state of the art and proprietary software, to obtain a one of a kind interpretation and analysis of the recording.   Further, the Seismic Materials are in large part formed by collecting and assembling data using WesternGeco's judgment in such a way that the resulting work as a whole constitutes an original work. Indeed, in the Master License, CRPC stipulated that the Seismic Materials licensed thereunder were subject to and protected by copyright law.[37]

54.     It has been held that under U.S. copyright law, nonexclusive licenses such as was granted to CRPC by WesternGeco under the Master License are personal to the licensee, and the licensee cannot assign them to a third party without the consent of the copyright owner.   *See, e.g., In re Patient Education Media, Inc*., 210 B.R. 237, 241 (Bankr. S.D.N.Y. 1997); *In re Buildnet, Inc*., 01-82293, 2002 WL 31103235, at *5 (Bankr. M.D.N.C. Sept. 20, 2002).   This is primarily because, under 17 U.S.C. §204(a), a transfer of copyright ownership, other than by operation of law (such as succession law), is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed.   For that reason, it has been held that U.S. copyright law constitutes "applicable law" under Bankruptcy Code § 365 (c)(1)(A) that "excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the

---

[37] *See* Master License, Section Two, at ¶ 2.

debtor in possession . . .".  *See, e.g., In re Sunterra Corporation*, 361 F.3d 257, 262 (4th Cir. 2004); *In re Golden Books Family Entertainment, Inc.*, 269 B.R. 300, 309-310 (Bankr. D.Del. 2001); *In re Patient Education Media, Inc.*, 210 B.R. 237, 243 (Bankr. S.D.N.Y. 1997).

55.     Because WesternGeco's License Agreements are protected under trade secret and copyright laws, Bankruptcy Code § 365 (c)(1)(A) prohibits their assumption or assumption and assignment by the Debtors without WesternGeco's consent.   As such, the provision of the Plan purporting to authorize the Debtors to assume WesternGeco's License Agreements if not identified on the Debtors' Schedule of Rejected Executory Contracts, and purporting to authorize the Debtors to assume or assume and assign those licenses to third parties, violates Bankruptcy law.

D.     The Release and Exculpation Provisions in the Debtors' Plan are Overbroad and Contrary to Law.

56.     The Debtors' Plan contains broad release and exculpation provisions that release the Debtors, the Reorganized Debtors and numerous third parties from a broad array of both pre and post-Petition claims, obligations, actions, and omissions.[38]

57.     Among other things, the release provision in the Plan releases the Debtor, its estate, and the Reorganized Debtors, from:

> ". . . all past or present Claims, Interests, indebtedness and obligations, . . . and liabilities whatsoever, . . . that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date (collectively "Third-Party Released Claims") based on or relating to, or in any manner arising from or in connection with, in whole or in part, the Debtors . . ., the Debtors' restructuring efforts, the Chapter 11 Cases, the Restructuring, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or any other Released Party, on the one hand, and any Releasing Party, on the other hand, . . . or upon any other act or omission,

---

[38] *See* Plan [ECF No. 282] at pp. 58-61 of 156.

transaction, agreement, event, or other occurrence taking place on or before the Effective Date arising from or relating to any of the foregoing . . .".[39]

58.     The exculpation provision of the Plan, among other things, exculpates the Debtor and Reorganized Debtor from ". . . any Claims and causes of action . . . relating to, or arising out of, the Chapter 11 Cases, . . . the Disclosure Statement, the Plan, . . . the Plan Supplement, . . . or any Restructuring Transaction, contract, instrument release or other agreement or document . . . created or entered into before or during the Chapter 11 Cases, . . . the filing of the Chapter 11 Cases, the pursuit of confirmation, the administration and implementation of the Plan, . . . or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. . .".[40]

59.     The Fifth Circuit takes a "very restrictive" approach to releases in bankruptcy cases. To that end, it has recognized that § 524(e) of the Bankruptcy Code generally prohibits non-consensual, non-debtor releases, and the Court has indicated that a plan containing such a release is non-confirmable. *See In re Vitro S.A. B. de CV*, 701 F.3d 1031, 1069 (5th Cir. 2012), *cert. dismissed*, 569 U.S. 944 (2013), *citing In re Pac. Lumber Co.*, 584 F3d 229, 252 (5th Cir. 2009). Moreover, it has been held that a release provision will be found to be prohibited, thus rendering the plan non-confirmable, if the language of the release is vague, over broad or does not specifically set out who is affected by the release and the specific claims that are being released. *See, e.g., Hernandez v. Larry Miller Roofing, Incorporated*, 628 Fed. Appx. 281, 286-288 (5th Cir. 1/6/16); *In re Patriot Place, Ltd*., 486 B.R. 773, 821-821 (Bankr. W.D.Tex. 2013).

---

[39] *Id*. at pp. 60-1 of 156.
[40] *Id*. at p. 58 of 156.

60.     The releases and exculpation provision contained in the Plan are vague, non-specific, and over broad in violation of Fifth Circuit requirements.   Nowhere does the release identify any specific claims intended to be released, or the identity of the specific parties who are to be releasing those claims.   Yet, to be effective, the Fifth Circuit has made it clear that a release must be specific in what it releases and may not contain generic boilerplate language as does the release proposed in the Debtors' Plan.   *Hernandez*, 628 Fed. Appx. at 287-288.

61.     Moreover, the release and exculpation provisions are so over broad that they could be construed as barring WesternGeco and other similarly situated licensors of Seismic Materials, intellectual property, trade secrets, and copyrighted or patented materials, whose licenses are non-assumable and non-assignable under Bankruptcy Code § 365 (c)(1)(A) from being able to assert rights, benefits and remedies contained in their licenses or under applicable law against the Reorganized Debtors.   That would run contrary to the very purpose and intent of Bankruptcy Code § 365 (c)(1)(A).

## VI.     <u>RESERVATION OF RIGHTS</u>

62.     WesternGeco reserves the right to raise other objections it may have to confirmation of the Debtors' proposed Plan and/or assumption or assumption and assignment of its License Agreements, as well as all other rights including, without limitation, the right to file any such further and additional objections to any filings in this proceeding that it deems appropriate.

## VII.     <u>CONCLUSION</u>

For the foregoing reasons, WesternGeco prays that the Court deny confirmation of the Debtors' Plan, as written, reject the Debtors' proposed assumption or assumption and assignment

of WesternGeco's License Agreements without WesternGeco's consent, and provide any other and further relief as is just and equitable.

Respectfully submitted,

*/s/ Andrew A. Braun*
ANDREW A. BRAUN
Texas State Bar No. 24061558
GIEGER, LABORDE & LAPEROUSE, L.L.C.
Suite 4800, 701 Poydras Street
New Orleans, Louisiana   70139-4800
Telephone:   (504) 561-0400
Facsimile: (504) 561-0100
Email: abraun@glllaw.com

*Counsel for WesternGeco LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing pleading was served via electronic mail on the 2nd day of October, 2020, upon all parties in interest listed on the ECF service list.

*/s/ Andrew A. Braun*
ANDREW A. BRAUN